1    Charles R. Ekberg                          The Honorable Karen A. Overstreet
     Tereza Simonyan                            Chapter 11
2    Lane Powell PC
     1420 Fifth Avenue, Suite 4100
3    Seattle, WA 98101-2338
     (206) 223-7000
4    (206) 223-7107 Facsimile
     Attorneys for Bitvestment Partners
5    LLC f/k/a Dalsa Barbour LLC

6

7

8                    UNITED STATES BANKRUPTCY COURT
9            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

10   In Re                                 )
                                           )
11   CLI HOLDINGS, INC. dba ALYDIAN,       )    CASE NO. 13-19746-KAO
                                           )
12                             Debtor.     )    DECLARATION OF DANIEL H.
                                           )    GALLANCY
13                                         )
                                           )
14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF DANIEL H. GALLANCY - 1

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
SEATTLE, WASHINGTON  98101-2338
128054.0001/5887234.1                          206.223.7000 FAX: 206.223.7107

Case 13-19746-KAO    Doc 46    Filed 11/29/13    Ent. 11/29/13 14:32:42    Pg. 1 of 69

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
                              :

BITVESTMENT PARTNERS LLC,        :
                              :
              Plaintiff,      :
                              :
        -against-         :    13 Civ. _____
                              :
COINLAB, INC., CLI HOLDINGS, INC., ALYDIAN :
INC., PETER VESSENES and JOHN DOE,    :
                              :
             Defendants.    :
                              :
------------------------------------ X

## AFFFIDAVIT OF DANIEL H. GALLANCY IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE

DANIEL H. GALLANCY, being duly sworn, deposes and says:

1.      I am a private investor and investment analyst with an expertise in Bitcoin (which product is explained in detail below).

2.      I make this declaration in support of Plaintiff Bitvestment Partners LLC's ("Bitvestment") Order to Show Cause for a temporary restraining order ("TRO") and preliminary injunction enjoining Defendants CoinLab Inc. ("CoinLab"), CLI Holdings Inc. ("CLI Holdings"), Alydian Inc. ("Alydian") and Peter Vessenes ("Vessenes") (collectively, "CoinLab") and John Doe (a yet unknown investor entity or individual) (CoinLab and John Doe are collectively referred to herein as "Defendants"), and their owners, officers, employees, agents, and those in privity or acting in concert with them, from: (1) transferring Bitcoins between and among themselves and to any third-parties; (2) transferring any other CoinLab assets to any third party, including cash on hand; (3) using Bitcoin mining output for operating expenses and capital expenditures; and further requiring Defendants within 24 hours of being served the Temporary

Restraining Order to: (a) utilize best efforts and begin to mine and deliver Bitcoins to Bitvestment; (b) provide Plaintiff with a comprehensive list of all Bitcoin addresses used by CoinLab, including those of any and all affiliates and employees that mine or have mined Bitcoins since December 13, 2012, regardless of purpose of usage (*i.e.*, whether the Bitcoin addresses are in usage for mining or otherwise), as well as the unencrypted private keys associated with those Bitcoin addresses, and (c) also require that CoinLab be ordered to immediately identify John Doe by its/his/her name and relevant contact information, including business address, mailing address, email address and telephone number.

3.　　As for my educational and professional background, I graduated the University of Pennsylvania with a BA in Physics and a BSE in electrical engineering. I thereafter received my MBA from the Columbia Business School where I focused my studies in the areas of finance, economics and value investing. I also am a Chartered Financial Analyst® ("CFA® charterholder"). To earn the CFA® charterholder designation, one must have four years of qualifying investment work experience, become a member of the CFA Institute, pledge to adhere to the CFA Institute Code of Ethics and Standards of Professional Conduct, apply for membership to a local CFA member society, and complete the CFA® Program.

4.　　Off and on since approximately 2001, I have held various positions with securities firms and hedge funds including proprietary trading, equity research and more recently, investment analyst positions. I have approximately seven years of experience as an investment analyst during which my focus was technology investments; specifically, semiconductors and computer hardware and software. My diverse professional and educational experience with technology and finance has enabled me to obtain a significant and unique expertise in the Bitcoin

industry and, more specifically, the usage of specialized hardware for the production of Bitcoins, commonly referred to as Bitcoin mining (which also is explained in detail below).

5.    Bitcoins are a virtual currency maintained through an Internet peer-to-peer network. Bitcoins are created through a process called mining. Bitcoin mining is the process by which new Bitcoins are created. Bitcoins are mined through a combination of computer hardware and software.

6.    There is a finite amount of Bitcoins to be mined, and there can be no more than a total of 21 million created. There are approximately 11.91 million Bitcoins currently in existence. Between now and the year 2016, blocks of 25 Bitcoins are and will be generated approximately every 10 minutes, for a total of approximately 3,600 per day. Bitcoins will continue to be mined after 2016, but each block created approximately every 10 minutes will only contain 12.5 Bitcoins, for a total of approximately 1,800 per day. Such reductions in the rate of Bitcoin generation (*i.e.*, halving of the size of blocks produced) will happen approximately once every four years until a total of 21 million Bitcoins are created.

7.    Mined Bitcoins are generally allocated to miners approximately in proportion to the amount of computing power they devote to the task. Computing power, in the context of Bitcoin mining, is generally measured in hashes per second. As of October 28, 2013, the aggregate computing power devoted by all miners to the task is approximately 3459 trillion hashes per second (one trillion hashes per second is known as a terrahash or 1 TH). The aforementioned description is a very simplistic description and approximation of what transpires. Annexed hereto as Exhibit A are more-detailed summaries (one that is simplified and one that is more complex) that I prepared for the Court's ease of reference that describes the Bitcoin mining process.

3

8.    On or about December 13, 2012, I entered into a contract with CLI Holdings (the "First Services Agreement"). A true and correct copy of the First Services Agreement is annexed hereto as Exhibit B.

9.    Under the terms of the First Services Agreement, I agreed to pay, and did in fact pay $50,000 to CoinLab in consideration for CoinLab agreeing to mine 6734.00673499673 Bitcoins on my behalf and promptly delivering to me such Bitcoins. A true and correct copy of the $50,000 domestic wire transfer is annexed hereto as Exhibit C.

10.    On March 8, 2013, I entered into a second services agreement with CoinLab (the "Second Services Agreement"). A true and correct copy of the Second Services Agreements is annexed hereto as Exhibit D.

11.    Under the terms of the Second Services Agreement, I agreed to pay, and did in fact pay an additional $25,000 to CoinLab in consideration for CoinLab agreeing to mine 1,250.00000000 Bitcoins on my behalf and promptly delivering to me such Bitcoins. A true and correct copy of the $25,000 domestic wire transfer is annexed hereto as Exhibit E.

12.    On or about August 14, 2013, by virtue of two Assignment and Assumption Agreements, I assigned both the First and Second Services Agreement to Dalsa Barbour LLC n/k/a Bitvestment Partners LLC. Bitvestment assumed, among other things, all of my rights related to the First and Second Services Agreement. Peter Vessenes, as CEO of CoinLab and Chairman of CLI Holdings, acknowledged and expressly agreed to such assignments. True and correct copies of the Assignment and Assumption Agreements are annexed hereto as Exhibits F-G.

13.    Concurrent with the Assignment and Assumption Agreements executed on or about August 14, 2013, Bitvestment entered into an Amended and Restated Bitcoin Services

4

Agreement with CoinLab, CLI Holdings, Alydian, Vessenes and each of their respective affiliates (the "Amended Agreement"). A true and correct copy of the Amended and Restated Bitcoin Services Agreement is annexed hereto as Exhibit H.

14.     The Amended Agreement expressly states that CoinLab would provide the following services to Bitvestment:

> CoinLab will use best efforts to mine 7,984.006735 Bitcoins on [Bitvestment's] behalf, which, for the avoidance of doubt, will mean that <u>CoinLab shall dedicate 100% of its mining output</u> (other than the mining output that is required to meet CoinLab's appropriate mining operating expenses and capital expenditures subject [sic] as approved by all parties) <u>from the date of this Agreement to producing Bitcoin for Bitvestment until such time as Bitvestment receives 7.984.006735 Bitcoins from CoinLab pursuant to this Agreement</u>. On a weekly basis, CoinLab will promptly deliver to [Bitvestment] the Bitcoins ordered as they are mined by CoinLab. CoinLab will deliver to [Bitvestment] a weekly account of Mined Bitcoins compared with Bitcoins delivered to [Bitvestment]. CoinLab will deliver to [Bitvestment] Mined Bitcoins via the CoinLab Storage or other methods of delivery requested by [Bitvesment]. [Bitvestment] may retain Mined Bitcoins in this CoinLab Storage through the Wind Down Period. [Bitvestment] may perform one or more audits, at CoinLab's expense, of CoinLab's Bitcoin output to confirm that [Bitvestment] is receiving the mining output as agreed in section 2.

*See* Amended Agreement at 2-3, ¶ 2 [Emphasis added].

15.     Requiring CoinLab to use its "best efforts" and dedicate 100% of its mining output to producing Bitcoins for Bitvestment was a marked distinction from the First and Second Services Agreements in which CoinLab only committed to providing commercially reasonable efforts and did not place Bitvestment first in line for mined Bitcoins. *Compare* First and Second Services Agreements (Exhibit B at p. 1 and D at p. 1) with Amended Agreement (Exhibit H at p. 2).

16.     The reason for this express change was that in connection with the Amended Agreement, and with CoinLab's express authorization, (*see* Exhibit H) I undertook due diligence of CoinLab's Bitcoin mining operations on behalf of a potential third-party capital partner

5

related to an expansion of CoinLab's Bitcoin mining project. CoinLab was eager for this relationship with the third-party capital partner.

17.     I conducted my diligence over a period of approximately two weeks in August 2013. My diligence included an in-person inspection of CoinLab's facilities in Portland, Oregon, detailed discussions with staff members and executives, and significant analysis of CoinLab's technology capabilities and cost structure. In addition, I developed a detailed financial model for the third-party capital partner and provided the third-party capital partner with all relevant analysis and conclusions.

18.     In connection with that due diligence, during which I was provided access to CoinLab's operations (via both in-person inspection of mining equipment and extensive conversations with CoinLab's executives and employees), mining project cost structure, financial status (corporate structure, balance sheets, cash flows and capital) and operational plans, I determined that: (a) CoinLab had fully and adequately functional Bitcoin mining equipment; (b) CoinLab would be able to execute on the contemplated Bitcoin mining project with the third party investor; (c) CoinLab's mining equipment could be deployed at reasonable cost; and (d) CoinLab had the financial wherewithal to devote additional internal capital to the project.

19.     I advised the third-party capital partner of my due diligence findings. That third-party capital partner was prepared to proceed with an investment into CoinLab in or about late-August 2013.

20.     On or about August 29, 2013, I received an email from Vessenes wherein he informed me that CoinLab located a different capital partner and that CoinLab was not moving forward with the third-party capital partner on whose behalf I performed due diligence. A true

6

and correct copy of the August 29, 2013 email by and between Vessenes and myself is annexed hereto as Exhibit I.

21.     In that same August 29, 2013 email, Vessenes requested that Bitvestment renegotiate the terms of the Amended Agreement with CoinLab, so that his newfound capital partner could jump to the front of the line regarding CoinLab's Bitcoin mining output despite the clear and unambiguous terms of the Amended Agreement.

22.     On or about that same day, I spoke by telephone with Vessenes and he explained that he had already finalized the deal with CoinLab's new capital partner. Vessenes represented that the new capital partner would be provided with the initial 10,000 Bitcoins of CoinLab's mining output prior to any other parties, and in direct contravention of the Amended Agreement. Vessenes again requested that Bitvestment renegotiate the terms of the Amended Agreement. I declined that request on behalf of Bitvestment.

23.     On or about September 6, 2013, I sent an email to Vessenes in which, among other things, I again declined Vessenes request to renegotiate the terms of the Amended Agreement. A true and correct copy of the September 6, 2013 email by and between myself and Vessenes is annexed hereto as Exhibit J.

24.     On or about September 9, 2013, I had another telephone conversation with Vessenes during which Vessenes again asked that Bitvestment renegotiate the Amended Agreement. By email approximately two days later, I again declined his request on behalf of Bitvestment. A true and correct copy of the September 11, 2013 email by and between myself and Vessenes is annexed hereto as Exhibit K.

25.     On or about September 12, 2013, I informed Vessenes by email that Bitvestment was awaiting its first batch of Bitcoins, which were already contractually due, and that

7

Bitvestment requested to receive them on Friday, September 13, 2013. A true and correct copy of the September 12, 2013 email by and between myself and Vessenes is annexed hereto as Exhibit L. Vessenes did not respond to that email and Bitvesment never received such Bitcoins.

26.     By email dated September 27, 2013, Vessenes advised me in sum or substance that, among other things, he was utilizing mined Bitcoin output for capital expenses and operating expenditures, which was in direct contravention of the Amended Agreement since CoinLab did not obtain Bitvestment's express authorization. A true and correct copy of the September 27, 2013 email correspondence by and between myself and Vessenes is annexed hereto as Exhibit M; *see also* Amended Agreement at Exhibit H, p. 2, ¶ 2.

27.     I replied to Vessenes's September 27, 2013 email and advised him that Bitvesment did not approve of CoinLab using mined Bitcoin output for the purported expenses of capital and operating expenditures because CoinLab had ample cash on hand and resources to address any expenses and operating expenditures. I was aware that CoinLab had ample resources because I observed in the scope of my due diligence that the project to mine Bitvestment's Bitcoins was already fully capitalized. Thus, I demanded that Bitvestment receive 100% of mined Bitcoin output until such time as Bitvestment receives 7984.006735 Bitcoins, as required by the express terms of the Amended Agreement. *See* Exhibit M.

28.     Pursuant to the Amended Agreement, by which Bitvesment was entitled to full audit rights and capabilities regarding CoinLab's mining output, Vessenes subsequently provided to me two addresses at which CoinLab is storing mined Bitcoins. It is impossible to know whether these two addresses were the only addresses at which CoinLab is storing mined Bitcoins, but CoinLab asserted that these addresses were the addresses in use. These addresses are 18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC and 1G3Csro9jsrGssJmdgpezj6cbKyu64sfua.

8

The current balance and transaction history of Bitcoins held at these addresses are viewable at

https://blockchain.info/address/18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC and

https://blockchain.info/address/1G3Csro9jsrGssJmdgpezj6cbKyu64sfua.

29.    On or about October 2, 2013, I learned that CoinLab violated the Amended

Agreement by impairing Bitvestment's audit rights and changing the addresses at which it was

mining Bitcoins, in an effort to hide Bitcoins or mask its mining output. One such address,

18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC (its current balance and transaction history

viewable at https://blockchain.info/address/18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC),

showed a last-use date of October 2, 2013, with a cumulative final balance of 803.56015414

Bitcoins, and the last received 3.26 Bitcoins having a timestamp at 6:17:19 pm. Annexed hereto

as Exhibit N is a true and correct copy of a screen shot of the address transaction sheet, that

illustrates the referenced activity.

30.    The cessation of Bitcoins being received at this address after October 2, 2013

demonstrates that CoinLab has indeed has changed the address at which it is mining Bitcoins in

an apparent attempt to hide Bitcoins, as there would be no other reason for this address to no

longer receive Bitcoins on a regular basis (*i.e.*, every few hours).

31.    Bitvestment neither received the 3.26 Bitcoins mined on October 2, 2013 time-

stamped at 6:17:19 pm, nor any of the other 803.56015414 Bitcoins at that address, nor any of

the 119.32687842 Bitcoins at the other address provided by CoinLab,

1G3Csro9jsrGssJmdgpezj6cbKyu64sfua, (its current balance and transaction history viewable at

https://blockchain.info/address/1G3Csro9jsrGssJmdgpezj6cbKyu64sfua), nor any other Bitcoins

from CoinLab, in violation of the Amended Agreement.

9

32.     Vessenes even had the temerity to publicly boast that he has recently mined Bitcoins, none of which were delivered to Bitvestment. On the Bitcoin Internet discussion forum bitcointalk.org, Vessenes (utilizing the moniker Vess) admitted on October 2, 2013 that he has been mining Bitcoins. While he discusses mining Bitcoins through BTC Guild (which is a Bitcoin mining pool), he also discusses Coinlab's (Alydian's) solo mining and his decision to "come out of the closet" by specifically embedding Alydian's name in the actual Bitcoin blockchain. At the bottom of page is text that shows

*03e9fc0318416c796469616e35333333530363335323131303034392e2f2f0429c70100086ed13da0b9 377875 (decoded) Alydian53350635211049)*, to demonstrate to the Bitcoin community (and likely in an effort to attract customers, since a miner is not required to embed one's name in the blockchain and many miners would prefer anonymity) that he is in fact mining Bitcoins. Annexed hereto as Exhibit O is a true and correct copy of a printout from bitcointalk.org in which Vessenes admits to mining Bitcoins and a screenshot of: http://blockchain.info/tx/84fe3982faec6be934c97df3292a401ab81d1368f4ad93a334b8db8812b5 8e10.

33.     On or about October 14, 2013, Vessenes sent me an email advising that he was considering distributing Alydian's mining equipment to third parties and/or contracting with other parties to fulfill any other mining obligations. A true and correct copy of the October 14, 2013 from Vessenes is annexed hereto as Exhibit P.

34.     In Vessenes's email on or about October 14, 2013, he claimed that "it does not appear that there is any chance for the profits that we had hoped for when we began the project or even a few months ago." Although it is true that CoinLab's overall profits could be below

what Vessenes had hoped for, this does not whatsoever prevent CoinLab from fulfilling its obligations under the Amended Agreement.

35.     The reason the profits to CoinLab are not as great as Vessenes had hoped for is because the execution of CoinLab's project took longer than Vessenes had planned. This is in no small part a direct consequence of Vessenes's gross mismanagement about which I am aware from my diligence work during which I had numerous conversations with CoinLab employees. In any event, Bitcoin mining is now more competitive than when the project began, and Vessenes did not expect CoinLab to encounter the current level of competition with which it is faced. Although CoinLab's mining project might generate fewer Bitcoins than Vessenes had projected, the project can and will generate (and has already generated) a significant quantity of Bitcoins.

36.     Based on my diligence work and CoinLab's recent mining activity, it is clear that CoinLab does indeed have the ability to fulfill its obligations under the Amended Agreement, but Vessenes simply does not want to direct CoinLab's resources to fulfill CoinLab's obligations under the Amended Agreement because CoinLab's profits might not be what he once expected.

37.     Based upon conversations and emails with Vessenes, CoinLab's decision not to comply with the Amended Agreement also seems based upon Vessenes's desire to curry favor with John Doe, by reducing that investor's risk of not receiving the desired quantity of Bitcoins (without Vessenes having to direct more of CoinLab's resources to its mining project). CoinLab has refused to identify John Doe, and it is possible that John Doe is either a related party to Vessenes or CoinLab. Vessenes knows that providing John Doe with CoinLab's mining output before Bitvestment receives 7984.006735 is in direct conflict with the Amended Agreement with Bitvestment, and Vessenes knew this before making CoinLab's agreement with John Doe.

38.     As demonstrated by the Bitcoins CoinLab already mined, it already has significant Bitcoin mining capacity and, per its represented plans with its new capital partner, should be bringing online (if it has not already) at least 400 TH of Bitcoin mining capacity, which, as explained below, demonstrates that CoinLab has and will have plenty of output to perform its obligations under the Amended Agreement.

39.     As discussed above, computer power dedicated to Bitcoin mining is measured in hashes per second. As of October 28, 2013, the aggregate computing power devoted by all miners to the task is approximately 3459 trillion hashes per second (one trillion hashes per second is known as a terrahash or 1 TH). CoinLab's 400 TH constitutes (or will constitute) 400/3459 of computing power devoted to mining, which is 12% of the worldwide total. By utilizing its 400 TH of computer power, CoinLab can generate 12% of the 3600 Bitcoins generated daily, or 416 Bitcoins per day. Thus, just one day of mining output provides CoinLab with sufficient Bitcoins to fulfill 416/7984 of the Bitcoins required by the agreement, or 5% of the total agreement. In just the next few weeks, however, based on recent history, mining capacity (*i.e.* computing power) in competition with CoinLab will undoubtedly grow.

40.     If the aggregate computing power of competing miners (*i.e.* "network hash rate" – *see* Exhibit A, A Summary of the Bitcoin Mining Process) continues to grow at 3% per day as, according to statistical estimates, it has during the second half of October, overall Bitcoin mining capacity could rise to 20,000 TH by the end of the year, with overall capacity continuing to rise in future periods. *See* http://mining.thegenesisblock.com/ and http://bitcoin.sipa.be/. If that occurs, and CoinLab does not increase its Bitcoin mining power by an additional 800 TH – which it has sufficient resources to accomplish – CoinLab's mining capacity will be 2% by the end of 2013. Under such circumstances, CoinLab would generate approximately 72 Bitcoins per

day, and CoinLab's output will continue to decline each day, rendering it more difficult for CoinLab to meet the terms of the Amended Agreement.

41.     Eventually (possibly as soon as the next three to six months), the amount of computer power that CoinLab needs to mine Bitcoins will be cost-prohibitive and its resources may not be enough to honor the Amended Agreement. For example, the *difficulty* of mining Bitcoins just increased from 267,731,249, the level established on October 16, 2013, to 390,928,788 on October 26, 2013, an increase of 46%. The next increase in *difficulty* is expected to be on (or likely before) November 8, 2013 and, based on recent events, the next increase in *difficulty* is likely to be significant in magnitude (*see* Exhibit A, A Summary of the Bitcoin Mining Process, for an explanation of *difficulty*).

42.     As of now, however, CoinLab has more than sufficient resources to mine these Bitcoins. CoinLab has, over the past two years, secured significant capital from well-known venture capitalist and angel investors.

43.     During the due diligence process set forth above, CoinLab represented that it possessed approximately $5 million cash.

44.     As I learned from the diligence process, CoinLab's cost per TH is less than $6,000. With such cash resources, among others, CoinLab can easily add at least 800 TH of incremental mining capacity, an amount far in excess of the amount required for CoinLab to produce the necessary mining output to meet its obligations pursuant to the Amended Agreement.

45.     CoinLab also has the ability to raise more capital for additional mining capacity if necessary. For example, CoinLab represented that its minority partner in Alydian, X Ray Holdings LLC, would be prepared to provide additional capital. In addition, the third party

13

capital partner for whom I performed due diligence would have considered certain types of deal structures that would have provided additional capital alongside the capital partner chosen by CoinLab.

46.     CoinLab is refusing to abide by the Amended Agreement that it use its best efforts – or apparently any efforts for that matter – and dedicate 100% of its mining output to producing Bitcoins for Bitvestment until Bitvestment receives 7,984.006735 Bitcoins. CoinLab's refusal is entirely by its own choice, as it no longer views the profitability of its mining project as desirable and, likely, because it wishes to provide Bitcoins to John Doe.

47.     If CoinLab is allowed to continue to hide its mined Bitcoins, not devote necessary resources – which resources it readily possesses – to mine Bitcoins in a timely manner, and not use its best efforts to obtain the contracted-for Bitcoins pursuant to the Amended Agreement, Bitvestment will be irreparably harmed as there will come a time at some point in the very near future, where the resources CoinLab currently possesses will not be sufficient to meet its obligations under the Amended Agreement.

48.     The Amended Agreement expressly provides that in the event of a breach, or anticipated breach, Bitvestment is entitled to injunctive relief without the posting of a bond:

> [A]ny breach, or threatened breach, of this Agreement by CoinLab could cause irreparable damage to [Plaintiffs] and that in the event of such breach [Plaintiff] shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations under this Agreement, without the necessity of proving irreparable damage or posting a bond.

*See* Amended Agreement at 5, ¶ 11. C [Emphasis added].

49.     This clause in the Amended Agreement was intended to provide Bitvestment protection from the harm that both parties knew and acknowledged would occur if CoinLab declined to honor our Amended Agreement.

14

50.     To date, Bitvestment has not received any of the Bitcoins owed under the

Amended Agreement, and is now seeking injunctive relief.

Dated: October 28, 2013
       New York, New York

_____
                        Daniel H. Gallancy

Sworn to before me this
28 day of October, 2013

DIMITRI NEMIROVSKY
Notary Public, State of New York
Registration #02NE6261632
Qualified in New York County
Commission Expires May 14, 2016

15

# EXHIBIT A

## A Summary of the Bitcoin Mining Process

Contained below are two descriptions (a simplified and more complex explanation) from Daniel H. Gallancy of how the Bitcoin mining process works.

### A. Simplified Version of How Bitcoin Mining Works

Bitcoins are a virtual currency maintained through an Internet peer-to-peer network. Bitcoins can be used to purchase goods and services via the Internet or via in-person transactions. There are approximately 11.91 million Bitcoins in existence. There can be no more than a total of 21 million Bitcoins created.

Bitcoin "mining" is the process by which new Bitcoins are created. Bitcoin mining involves using a combination of computer hardware and software. A "block" of 25 new Bitcoins is generated approximately every 10 minutes, for a total of approximately 3,600 per day. The amount of Bitcoins generated in each block is cut in half approximately every four years. In 2016 the amount will be reduced to 12.5 per block, then 6.25 four years thereafter, and so on.

The Bitcoins generated each day are allocated across all Bitcoin miners approximately in proportion to the amount of computing power each miner dedicates to the task. In the context of Bitcoin mining, computing power is measured in hashes per second. A readily available statistical estimate, known as "network hash rate," quantifies the aggregate amount of computing power dedicated by all Bitcoin miners to the task of mining. As of October 28, 2013, network hash rate amounted to approximately 3459 trillion hashes per second (3459 TH).

By design, the supply of Bitcoins is intended to be finite, and the total amount of Bitcoins generated will not increase based upon an increase in the aggregate computing power of Bitcoin miners. Instead, as a miner adds computing power to his mining efforts, *his proportion* of the total amount of generated Bitcoins will go up (and the proportion

allocated to other miners will decrease, unless and until those other miners add more computing power to the task, re-equalizing the situation).

To determine a rough approximation of the quantity of Bitcoins that a miner will generate, a miner simply takes the amount of computing power he is devoting to the task (a known quantity) and divides that by network hash rate. For example, a miner operating 100 TH of mining capacity would expect to receive approximately 100 TH / 3459 TH (2.9%) of the 3600 Bitcoins generated per day, amounting to 104 Bitcoins.

## B. More Complex Version of How Bitcoin Mining Works

Bitcoins are a virtual currency maintained through an Internet peer-to-peer network. Bitcoins can be used to purchase goods and services via the Internet or via in-person transactions. There are approximately 11.91 million Bitcoins in existence. There can be no more than a total of 21 million Bitcoins issued.

By design, the Bitcoin network functions to limit new Bitcoin creation to blocks of 25 approximately every 10 minutes, or 3,600 per day. The amount of Bitcoins generated in each block gets cut in half approximately every four years. In 2016 the amount will be reduced to 12.5 per block, then 6.25 four years thereafter, and so on.

### Mining and the SHA256 function

Bitcoin "mining" is the process by which new Bitcoins are created. Bitcoin mining involves using hardware and software to find specific pairs of inputs and outputs to a mathematical function known as a "hashing function." For Bitcoin mining, the specific hashing function involved is known as "SHA256." For every possible input to the SHA256 function, there is always an output. But only certain specific sets of inputs and outputs are accepted as valid blocks of Bitcoins. Bitcoin miners apply as much computing power as possible in the hopes of finding a valid input/output pair to the SHA256 function. In any given attempt to find the solution to the SHA256 function, it is

impossible to know *a priori* if an attempted input will result in a valid Bitcoin-generating output.

A readily available statistical estimate, known as "network hash rate," quantifies the aggregate amount of computing power dedicated by all Bitcoin miners to the task of executing the SHA256 function for the purpose of Bitcoin mining. As of October 25, 2013, network hash rate amounted to approximately 3459 trillion hashes per second (3459 TH).

By design, the supply of Bitcoins is intended to be finite, and the total amount of Bitcoins generated will not increase based upon an increase in the aggregate computing power of Bitcoin miners. Instead, as a miner adds computing power to his mining efforts, *his proportion* of the total amount of generated Bitcoins will go up (and the proportion allocated to other miners will decrease, unless and until those other miners add more computing power to the task, re-equalizing the situation).

As more miners attempt to find a valid input/output pairs to the SHA256 function, thus increasing the aggregate computing power devoted to Bitcoin mining, the difficulty of finding a valid input/output pair to the SHA256 function is increased by the peer-to-peer network that manages the Bitcoin currency. Were it not for this automatic increase in difficulty, the added computing power would increase the rate at which Bitcoins are generated beyond the designed target of 25 every 10 minutes. Such accelerated Bitcoin production does sometimes happen for periods of time – *i.e.*, blocks of 25 Bitcoins are generated in less than 10 minutes. However, if periods of accelerated Bitcoin production persist for many blocks, the difficulty of the SHA256 function is increased sometime within the subsequent two week period, serving to reduce the frequency with which blocks of Bitcoins are generated.

Conversely, if the amount of computing power devoted to Bitcoin mining decreases, the difficulty of finding a valid input/output pair to the SHA256 function would be decreased by the Bitcoin peer-to-peer network. Were it not for this automatic decrease in difficulty,

the reduction in computing power would decrease the rate at which Bitcoins are generated below the designed target of 25 every 10 minutes. Thus, the automatic difficulty adjustments serve as a mechanism to regulate the pace at which Bitcoins are generated.

## Mining Pools

As the difficulty of mining increases, an individual miner's computing power is less and less likely to find a valid input/output pair to the SHA256 function (*i.e.*, as difficulty increases, a Bitcoin miner is less likely to find a block of Bitcoins). To eliminate the risk of successive fruitless attempts at finding a valid input/output pair, miners often combine their computing power into "mining pools,"[1] which aggregate all of the computing power of the pool participants. As of October 25, 2013, the largest such mining pool is known as "BTC Guild," and the miners participating in that pool constitute approximately 28% of network hash rate.

It is a statistical eventuality that, over time, a mining pool will find some of the valid input/output pairs and thus generate blocks of 25 newly created Bitcoins. The mining pool operator allocates among its constituent miners the Bitcoins generated by the pool, according to the amount of computing power the individual participants add to the pool.

## Determining the Bitcoin Output Based on Computer Power

It is generally in a Bitcoin miner's best interest to attempt to determine how many Bitcoins will be generated with the computing power brought to task by the miner. There are several ways to accomplish this:

(a) To determine a rough approximation of the quantity of Bitcoins that a miner will generate while operating in a mining pool, a miner simply takes the amount of computing power he is devoting to the task (a known quantity) and divides that by network hash rate (the total amount of computing power devoted by all miners to the task, a readily

---

[1] Mining on one's own (i.e. outside of a mining pool) is referred to as "solo mining." This is in contrast to mining inside of a pool, which is referred to as "pooled mining."

4

available statistical estimate). For example, as of October 25 2013, the aggregate estimated computing power devoted by all miners to the task is approximately 3000 trillion hashes per second (one trillion hashes per second is known as a terrahash or 1 TH). A miner operating 100 TH of mining capacity would expect to receive approximately 100 TH / 3459 TH (2.9%) of the 3600 Bitcoins generated per day, amounting to 104 Bitcoins.

(b) For a more precise estimate of how many Bitcoins a miner can expect to mine, a miner can look at the current *Difficulty* level of mining in the Bitcoin network. *Difficulty* is a specific number that is determined by the Bitcoin peer-to-peer network and it is adjusted every 2016 blocks (*i.e.*, after the creation of 50,400 Bitcoins, or approximately every two weeks, if blocks are created every 10 minutes) based on the pace at which blocks are generated (*i.e.*, if blocks are generated more frequently than every 10 minutes, difficulty will increase). *Difficulty* is a known quantity within the Bitcoin peer-to-peer network, and it is readily available. *See* http://Bitcoindifficulty.com/.

The average amount of time, in hours, required to mine a block of 25 Bitcoins is provided from the following formula:

$$(Difficulty * 2^{32}) / (3600 * \text{hashes per second})$$

As of October 28, 2013, *Difficulty* = 390,928,788. So, *e.g.*, for a miner with 100 TH (100,000,000,000,000 hashes per second), the average time required to find a block is 3.2 hours. Thus, with 100 TH of mining capacity, on average, a miner will generate 129 Bitcoins per day.

The next increase in *difficulty* is expected to be on or before November 8, 2013 (i.e. 2016 blocks after the most recent increase in *difficulty*). The most recent increase in *difficulty* was on October 26, when *difficulty* went from 267,731,249 to 390,928,788, an increase of 46%.

5

Neither method (a) nor method (b) above can provide a miner with certainty as to how many Bitcoins will be generated from a mining operation in a given day. If a miner has 100 TH of capacity currently online, however, that miner is likely to be generating well in excess of 100 Bitcoins per day.

So the Court is aware, even this more complex explanation as to the Bitcoin mining process only addresses the points most relevant to the issues in this matter. Other technical information and complexities of the Bitcoin mining process have not been addressed, but such information is available in the public domain via the Internet.

For more information on this topic, please *see*:
http://codinginmysleep.com/Bitcoin-mining-in-plain-english/
https://en.Bitcoin.it/wiki/Mining
http://www.reddit.com/r/Bitcoin/comments/18q2jx/eli5_Bitcoin_mining_xpost_in_eli5/
http://www.Bitcoinmining.com/
http://startBitcoin.com/
https://www.weusecoins.com/en/mining-guide
https://en.Bitcoin.it/wiki/Difficulty
https://Bitcointalk.org/index.php?topic=1682.0

# EXHIBIT
# B

**Bitcoin Services Agreement**

This Bitcoin Services Agreement ("**Agreement**") is entered into as of the last signature below by and between CLI Holdings Inc., with its principal place of business at 71 Columbia St, Suite 300, Seattle, WA 98104 ("**CoinLab**") and Daniel H. Gallancy with residence at 315 West 36th Street Apt 18B New York, NY 10018 ("**Customer**"). For good and valuable consideration the parties agree to the terms and conditions of this Agreement.

1. **Definitions.**

   a. "**Bitcoin**" means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

   b. "**CoinLab Storage**" means the online storage system developed and hosted by or for CoinLab.

   c. "**Confidential Information**" means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure. "Confidential Information" includes the terms and conditions of this Agreement.

   d. "**Fees**" has the definition set forth in Section 3.

   e. "**Mined Bitcoins**" means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

   f. "**Services**" means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

   g. "**Term**" means 1 years unless the Agreement earlier terminated pursuant to the terms and conditions herein.

   h. "**Wind Down Period**" means the period of time extending 12 months after the Term of the Agreement

2. **Services.** CoinLab will make commercially reasonable efforts to mine 6734.00673499673 Bitcoins on Customer's behalf during the Term. CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab on the condition that Customer acknowledges and agrees that no delivery of Mined Bitcoins is expected to occur before July 1, 2013. After July 1, 2013, CoinLab will deliver to Customer a monthly account of Mined Bitcoins compared with Bitcoins ordered.

CoinLab will deliver to Customer Mined Bitcoins via the CoinLab Storage. Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period.

3. **Fees.** In exchange for performing the Services, Customer will pay CoinLab a total of $7.425 USD per Bitcoin, for a total of $50,000.00 USD (**"Fees"**). Customer will pay CoinLab the Fees within 10 days of the effective date. Each party will bear its own taxes as levied under applicable law.

4. **Termination.** Either party may suspend its performance or terminate this Agreement:

   a. If the other party materially breaches this Agreement (other than the confidentiality obligations in Section 6) and fails to cure that breach within 30 days after receiving notice;

   b. Immediately upon notice if the other party materially breaches the confidentiality obligations in Section 6;

   c. Immediately upon notice if the other party is Insolvent. **"*Insolvent*"** means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

   d. Immediately upon notice in the event that performing the Services becomes impracticable or impossible including, without limitation, in the event that applicable laws or regulations have changed in a way that materially affects the provision of Services under this Agreement in either party's reasonable discretion.

5. **Effects of Termination or Expiration.** Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive. Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab. In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, CoinLab will refund to Customer US Dollars by the following formula:

   USD Fee Paid - (Bitcoins Delivered / Bitcoins Ordered) * (USD Fee Paid)

6. **Confidentiality.** Neither party will use the other's Confidential Information except as reasonably required for the performance of this Agreement. Each party will hold in confidence the other's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than

reasonable care. Each party agrees not to disclose the other party's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

7. **Warranties.** CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws. Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins. Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

8. **Disclaimer of Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS. COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

9. **Limitation of Liabilities.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR THAT RELATE IN ANY WAY TO THIS AGREEMENT OR ITS PERFORMANCE. THIS EXCLUSION WILL APPLY REGARDLESS OF THE LEGAL THEORY UPON WHICH ANY CLAIM FOR SUCH DAMAGES IS BASED, WHETHER THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER SUCH DAMAGES WERE REASONABLY FORESEEABLE, OR WHETHER APPLICATION OF THE EXCLUSION CAUSES ANY REMEDY TO FAIL OF ITS ESSENTIAL PURPOSE. THE PARTIES WILL NOT BE LIABLE FOR ANY DIRECT DAMAGES THAT EXCEED THE AMOUNT OF FEES PAID UNDER THIS AGREEMENT. THIS SECTION WILL NOT APPLY TO ANY INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT.

10. **Miscellaneous.**

    a. **Assignment.** This Agreement may not be assigned by either party without the prior written approval of the other party. Notwithstanding the foregoing, CoinLab may assign this Agreement to: (i) a parent or subsidiary; (ii) an acquirer

of all or substantially all of CoinLab assets (or all or substantially all of the CoinLab assets relating to this Agreement); or (iii) a successor by merger or other combination. Any purported assignment in violation of this Section will be void.

b. **Governing Law.** This Agreement will be governed and interpreted in accordance with Washington State law. Any dispute relating to the terms, interpretation, or performance of this Agreement or the dealing of the parties under this Agreement will be resolved at the request of either party through binding arbitration. Arbitration will be conducted in the city of Seattle Washington under the rules and procedures of the American Arbitration Association ("AAA").

c. **Force Majeure.** Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("Force Majeure") provided that such party makes commercially reasonable efforts to promptly notify the other. In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

d. **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

e. **Entire Agreement.** This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter. No amendment or modification of this Agreement will be made except by a writing signed by both parties.

f. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

So agreed by the parties:

| CoinLab | [Customer] |
|---|---|
| By: | |
| | By: |
| Printed Name: Peter Vessenes | Printed Name: Daniel H. Gallancy |
| Title: CEO | |
| Date: 12-13-2012 | Date: December 13, 2012 |

# EXHIBIT C

# Domestic Wire (USA Destination)

Thank you for your submission. Should we require more information to complete your transfer, we will contact you by telephone before the end of the next business day following your submission. Please review your account profile to ensure all contact phone numbers are up-to-date. Most funds transfers are released on the business day they are submitted and without need for contact by phone. Please note that domestic and international Wire Transfer requests submitted after 4 P.M. Eastern Time may not debit your account until the following business day. All domestic and international Wire Transfer Requests submitted after 6 P.M. Eastern Time are considered next business day submissions.

Should you require further assistance with a Citibank Online transfer, please contact Citibank Online Customer Service at 1-866-583-2391.

International clients please call 210-677-0065 collect and choose the Citibank Online Wires option.

WIRE: From Account: XXXXXXXXXX814   Currency: US Dollars

Status: **Processed** - Confirmation Number is 348091115.
Saved as Model

Wire Fees: **$18.75**

| Beneficiary | Bank |
|---|---|
| **CLI Holdings Inc.**<br>71 Columbia St, Suite 300<br>Seattle, WA 98104 | **Name: U.S. BANK,N.A.**<br>ABA: **125000105**<br>Address: Seattle , WA |
| Phone: 8555222646 | |
| Beneficiary's account number: **1535642673356** | |
| Amount: **$50,000.00** | |
| Date of Transfer: **Immediate** | |

# EXHIBIT
# D

**Bitcoin Services Agreement**

This Bitcoin Services Agreement ("**Agreement**") is entered into as of the last signature below by and between CoinLab Inc., with its principal place of business at 71 Columbia St, Suite 300, Seattle, WA 98104 ("**CoinLab**") and <u>Daniel H. Gallancy</u> with its principal place of business or residence at <u>315 West 36th Street 18B, New York, NY 10018</u> ("**Customer**"). For good and valuable consideration the parties agree to the terms and conditions of this Agreement.

1. **Definitions.**

    a. "**Bitcoin**" means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

    b. "**CoinLab Storage**" means the online storage system developed and hosted by or for CoinLab.

    c. "**Confidential Information**" means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure. "Confidential Information" includes the terms and conditions of this Agreement.

    d. "**Fees**" has the definition set forth in Section 3.

    e. "**Mined Bitcoins**" means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

    f. "**Services**" means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

    g. "**Term**" means 1 years unless the Agreement earlier terminated pursuant to the terms and conditions herein.

    h. "**Wind Down Period**" means the period of time extending 12 months after the Term of the Agreement

**Services.** CoinLab will make commercially reasonable efforts to mine 1,250.00000000 Bitcoins on Customer's behalf during the Term. CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab on the condition that Customer acknowledges and agrees that no delivery of Mined Bitcoins is expected to occur before August 1, 2013. After August 1, 2013, CoinLab will deliver to Customer a monthly account of Mined Bitcoins compared with Bitcoins ordered. CoinLab will

deliver to Customer Mined Bitcoins via the CoinLab Storage. Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period.

2. **Fees.** In exchange for performing the Services, Customer will pay CoinLab a total of $20.00 USD per Bitcoin, for a total of $25,000 USD ("**Fees**"). Customer will pay CoinLab the Fees within 10 days of the effective date. Each party will bear its own taxes as levied under applicable law.

3. **Termination.** Either party may suspend its performance or terminate this Agreement:

   a. If the other party materially breaches this Agreement (other than the confidentiality obligations in Section 6) and fails to cure that breach within 30 days after receiving notice;

   b. Immediately upon notice if the other party materially breaches the confidentiality obligations in Section 6;

   c. Immediately upon notice if the other party is Insolvent. "***Insolvent***" means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

   d. Immediately upon notice in the event that performing the Services becomes impracticable or impossible including, without limitation, in the event that applicable laws or regulations have changed in a way that materially affects the provision of Services under this Agreement in either party's reasonable discretion.

4. **Effects of Termination or Expiration.** Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive. Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab. In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, CoinLab will refund to Customer US Dollars by the following formula:
   USD Fee Paid - (Bitcoins Delivered / Bitcoins Ordered) * (USD Fee Paid)

5. **Confidentiality.** Neither party will use the other's Confidential Information except as reasonably required for the performance of this Agreement. Each party will hold in confidence the other's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than

reasonable care. Each party agrees not to disclose the other party's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

6. **Warranties.** CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws. Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins. Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

7. **Disclaimer of Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS. COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

8. **Limitation of Liabilities.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR THAT RELATE IN ANY WAY TO THIS AGREEMENT OR ITS PERFORMANCE. THIS EXCLUSION WILL APPLY REGARDLESS OF THE LEGAL THEORY UPON WHICH ANY CLAIM FOR SUCH DAMAGES IS BASED, WHETHER THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER SUCH DAMAGES WERE REASONABLY FORESEEABLE, OR WHETHER APPLICATION OF THE EXCLUSION CAUSES ANY REMEDY TO FAIL OF ITS ESSENTIAL PURPOSE. THE PARTIES WILL NOT BE LIABLE FOR ANY DIRECT DAMAGES THAT EXCEED THE AMOUNT OF FEES PAID UNDER THIS AGREEMENT. THIS SECTION WILL NOT APPLY TO ANY INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT.

9. **Miscellaneous.**

   a. **Assignment.** This Agreement may not be assigned by either party without the prior written approval of the other party. Notwithstanding the foregoing, CoinLab may assign this Agreement to: (i) a parent or subsidiary; (ii) an acquirer

of all or substantially all of CoinLab assets (or all or substantially all of the CoinLab assets relating to this Agreement); or (iii) a successor by merger or other combination. Any purported assignment in violation of this Section will be void.

b. **Governing Law.** This Agreement will be governed and interpreted in accordance with Washington State law. Any dispute relating to the terms, interpretation, or performance of this Agreement or the dealing of the parties under this Agreement will be resolved at the request of either party through binding arbitration. Arbitration will be conducted in the city of Seattle Washington under the rules and procedures of the American Arbitration Association ("**AAA**").

c. **Force Majeure.** Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("**Force Majeure**") provided that such party makes commercially reasonable efforts to promptly notify the other. In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

d. **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

e. **Entire Agreement.** This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter. No amendment or modification of this Agreement will be made except by a writing signed by both parties.

f. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

So agreed by the parties:

| CoinLab | [Customer] Daniel H. Gallancy |
|---|---|
| By: *Joan M Brady* | By: |
| Printed Name: *Jodie Brady* | Printed Name: Daniel H. Gallancy |
| Title: *CFO* | |
| Date: *3.8.13* | Date: March 7, 2013 |

# EXHIBIT E

**WIRE**:   From Account: **XXXXXXXXX814**   Currency: **US Dollars**

Status:   **Processed** - Confirmation Number is **0670440515**.
Saved as Model

Wire Fees:   **$18.75**

| Beneficiary | Bank |
|---|---|
| **CoinLab Inc.**<br>71 Columbia St, Suite 300<br>Seattle, WA 98104<br><br>Phone: 8555222646 | Name: **U.S. BANK,N.A.**<br>ABA: **125000105**<br>Address: PD-WA-3301 723 1st Ave<br>Seattle , WA |

Beneficiary's account number: **153563046694**

Amount:    **$25,000.00**

Date of Transfer: **Immediate**

# EXHIBIT
# F

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made as of August 14, 2013, between Daniel H. Gallancy ("Assignor"), and Dalsa Barbour LLC, a New York limited liability company ("Assignee").

### *Recitals*

A.    Assignor is a party to that certain Bitcoin Services Agreement, dated as of December 13, 2012 between Assignor and CLI Holdings Inc. (the "Services Agreement").

B.    Assignor desires to assign, and Assignor desires to assume, all of Assignor's rights and responsibilities pursuant to the Services Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Assignor hereby sells, transfers, conveys, assigns and delivers to Assignee all of Assignor's privileges, right, title, interest and obligations under the Services Agreement.

2.    Assignee hereby assumes all of the obligations of Assignor from and after the date of this Agreement under the Services Agreement.

3.    Except as otherwise set forth in this Agreement, Assignee is not assuming any further liability or obligation of Assignor.

4.    This Agreement will not affect Assignee's right to assert any defense with respect to the Services Agreement, at law, in equity or otherwise, against the validity or enforceability of any liability or obligation with respect to the Services Agreement.

5.    This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

6.    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

[Signatures on following page]

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption Agreement to be duly executed as of the date first written above.

ASSIGNOR:

Daniel H. Gallancy

ASSIGNEE:

Dalsa Barbour LLC

By: 
Name: Daniel H. Gallancy
Its: Member

ACKNOWLEDGED AND AGREED:

CLI Holdings Inc.

By: 
Name: Peter Vessenes
Its: Chairman

2

# EXHIBIT G

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made as of August 14, 2013, between Daniel H. Gallancy ("Assignor"), and Dalsa Barbour LLC, a New York limited liability company ("Assignee").

### *Recitals*

A.     Assignor is a party to that certain Bitcoin Services Agreement, dated as of March 8, 2013 between Assignor and CoinLab Inc. (the "Services Agreement").

B.     Assignor desires to assign, and Assignor desires to assume, all of Assignor's rights and responsibilities pursuant to the Services Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     Assignor hereby sells, transfers, conveys, assigns and delivers to Assignee all of Assignor's privileges, right, title, interest and obligations under the Services Agreement.

2.     Assignee hereby assumes all of the obligations of Assignor from and after the date of this Agreement under the Services Agreement.

3.     Except as otherwise set forth in this Agreement, Assignee is not assuming any further liability or obligation of Assignor.

4.     This Agreement will not affect Assignee's right to assert any defense with respect to the Services Agreement, at law, in equity or otherwise, against the validity or enforceability of any liability or obligation with respect to the Services Agreement.

5.     This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

6.     This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

[Signatures on following page]

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption Agreement to be duly executed as of the date first written above.

**ASSIGNOR:**

Daniel H. Gallancy

**ASSIGNEE:**

Dalsa Barbour LLC

By: _____
Name: Daniel H. Gallancy
Its: Member

ACKNOWLEDGED AND AGREED:

CoinLab Inc.

By: _____
Name: Peter Vessenes
Its: CEO

2

# EXHIBIT
# H

### Amended and Restated Bitcoin Services Agreement

This Amended and Restated Bitcoin Services Agreement ("**Agreement**") is entered into as of August 14, 2013 by and among CLI Holdings Inc., with its principal place of business at 900 WINSLOW WAY EAST, SUITE 100, BAINBRIDGE ISLAND, WA 98110 ("**CLI Holdings**"), CoinLab Inc., with its principal place of business at 900 WINSLOW WAY EAST, SUITE 100, BAINBRIDGE ISLAND, WA 98110 ("**CoinLab Inc.**"), and Alydian Inc. ("**Alydian**" and collectively with CLI Holdings, CoinLab Inc. and Vessenes, and each of their respective affiliates, "**CoinLab**"), and Dalsa Barbour LLC, with its principal place of business at 315 West 36th Street #18B New York, NY 10018 ("**Customer**").

### RECITALS

Whereas, CoinLab Inc. and Customer are parties to that certain Bitcoin Services Agreement dated as of December 13, 2012 (the "**First Services Agreement**").

Whereas, CLI Holdings and Customer are parties to that certain Bitcoin Services Agreement dated as of March 8, 2013 (the "**Second Services Agreement**" and together with the First Services Agreement, each a "**Services Agreement**" and together the "**Services Agreements**").

Whereas, Vessenes, or one or more of his affiliates, is an equity holder of CLI Holdings, CoinLab Inc., and Alydian, and will benefit from this Agreement and the Services Agreement.

Whereas, Customer anticipates acting as an agent for ███████████████████ ███████████████) by providing diligence services for ███████████ in connection with a potential transaction between ███████████ and CoinLab (the "**Diligence Services**").

Whereas, in order to eliminate any and all potential conflicts of interest of Customer in its performance of the Diligence Services, the parties hereto desire to amend and restate each of the Services Agreements on the terms and conditions set forth herein, and for this Agreement to supersede each of the Services Agreements in its entirety, including without limitation by: (a) CoinLab releasing Customer from any confidentiality obligations imposed by the Services Agreements and (b) CoinLab agreeing to dedicate 100% of its mining output (other than mining output that is required to satisfy CoinLab's obligations to ███████████ and mining output that is required to meet CoinLab's appropriate mining operating expenses and capital expenditures subject as approved by all parties) from the date of this Agreement to producing Bitcoin for Dalsa Barbour until such time as Dalsa Barbour receives 7,984.006735 Bitcoins from CoinLab pursuant to this Agreement.

Whereas, CoinLab acknowledges that without the agreements set forth in the preceding Recital, a conflict of interest inherently arises between ███████████ and Customer because Customer would be put in a position of advocating on behalf of CoinLab to enter into a financing

1

transaction with ███████ regardless of the outcome of the Diligence Services, and CoinLab and Customer acknowledge that such a conflict of interest must be prevented.

NOW, THEREFORE, in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby amend and restate each of the Services Agreements in its entirety and further agree as follows:

1. **Definitions.**

    a. **"Bitcoin"** means the same-named, de-centralized, digital artifacts regulated by peer-to-peer networks and earned through an exchange for especially valuable numbers acquired through computing power and verified by nodes on the peer-to-peer network.

    b. **"CoinLab Storage"** means the online storage system developed and hosted by or for CoinLab.

    c. **"Confidential Information"** means non-public information, technical data or know-how of a party and/or its affiliates, which is furnished to the other party, whether in tangible or intangible form, in connection with this Agreement that would reasonably be deemed confidential in light of the nature of the information or the circumstances of its disclosure. "Confidential Information" includes the terms and conditions of this Agreement.

    d. **"Fees"** has the definition set forth in Section 3.

    e. **"Mined Bitcoins"** means Bitcoins mined by CoinLab for Customer pursuant to the terms and conditions of this Agreement.

    f. **"Services"** means the services that CoinLab provides to Customer under this Agreement as further described in Section 2.

    g. **"Term"** means the period of time necessary for CoinLab to deliver all Bitcoins to Customer under this Agreement.

    h. **"Wind Down Period"** means the period of time extending 12 months after the Term of the Agreement.

2. **Services.** CoinLab will use best efforts to mine 7,984.006735 Bitcoins on Customer's behalf, which, for the avoidance of doubt, will mean that CoinLab shall dedicate 100% of its mining output (other than mining output that is required to satisfy CoinLab's obligations to ███████ and mining output that is required to meet CoinLab's appropriate mining operating expenses and capital expenditures subject as approved by all parties) from the date of this Agreement to producing Bitcoin for Dalsa Barbour until such time as Dalsa Barbour receives 7,984.006735 Bitcoins from CoinLab pursuant to this Agreement. On a weekly basis, CoinLab will promptly deliver to Customer the Bitcoins ordered as they are mined by CoinLab. CoinLab will deliver to Customer a

2

weekly account of Mined Bitcoins compared with Bitcoins delivered to Customer. CoinLab will deliver to Customer Mined Bitcoins via the CoinLab Storage or other methods of delivery requested by Customer. Customer may retain Mined Bitcoins in the CoinLab Storage through the Wind Down Period. Customer may perform one or more audits, at CoinLab's expense, of CoinLab's Bitcoin output to confirm that Customer is receiving the mining output as agreed in section 2.

3. **Fees.** In exchange for performing the Services, Customer has paid CoinLab a total of $75,000.00 USD ("Fees"). Each party will bear its own taxes as levied under applicable law.

4. **Termination.** Customer may suspend its performance or terminate this Agreement:

   a. If CoinLab materially breaches this Agreement and fails to cure that breach within 30 days after receiving notice;

   b. Immediately upon notice if CoinLab is Insolvent. "*Insolvent*" means: (i) becoming insolvent; (ii) admitting in writing the inability to pay debts as they mature; making a general assignment for the benefit of creditors; (iii) suffering or permitting the appointment of a trustee or receiver for all or any assets (unless such appointment is vacated or dismissed within 60 days after appointment); (iv) filing (or having filed) any petition as a debtor under any provision of the federal Bankruptcy Code or any state law relating to insolvency, unless such petition and all related proceedings are dismissed within 60 days of such filing; being adjudicated insolvent or bankrupt; (v) having wound up or liquidated; or (vi) ceasing to carry on business.

5. **Effects of Termination or Expiration.** Upon expiration or termination of the Agreement, sections that were, by their nature, intended to survive will so survive. Customer will collect all of its Mined Bitcoins from the CoinLab storage by the end of the Wind Down Period; if it fails to do so, all rights in and to such Mined Bitcoins will and does revert to CoinLab. In the event that the Agreement expires or terminates before all Mined Bitcoins ordered by Customer have been delivered to Customer, at Customer's option, CoinLab will promptly refund all Fees to Customer.

6. **Confidentiality.** CoinLab will not use Customer's Confidential Information except as reasonably required for the performance of this Agreement. CoinLab will hold in confidence Customer's Confidential Information by means that are no less restrictive than those used for its own similar confidential materials and in no case less than reasonable care. CoinLab agrees not to disclose Customer's Confidential Information to anyone other than its employees or subcontractors who are bound by confidentiality obligations and who need to know the same to perform such party's obligations hereunder or who need to know the same for purposes of internal business administration such as the provision of legal or accounting services.

7. **Warranties.** CoinLab warrants that the Services will be performed consistently with industry standards for Bitcoin mining or manufacture. Customer warrants that it will not

3

REDACTED

exchange Bitcoins for any illegal material, illegal services, or contraband under any applicable laws. Customer also warrants that it will be responsible for all necessary government approvals and taxes with regard to the exchange of Bitcoins. Customer will indemnify, defend, and hold harmless CoinLab from any allegation, claim, or litigation proceeding (including all associated costs and attorneys' fees) arising from Customer's breach of this Section, and this indemnity obligation will survive termination or expiration of the Agreement.

8. **CoinLab Representations.** CoinLab represents and warrants that (a) all action required to be taken by CoinLab's respective directors, shareholders, managers and members in order to authorize CoinLab to enter into this Agreement has been taken, (b) CoinLab is not in violation of any term of its organizational documents, or, to CoinLab's knowledge, in any material respect of any term or provision of any mortgage, indebtedness, indenture, contract, agreement, instrument, judgment, order or decree to which it is party or by which it is bound, (c) CoinLab is not in violation of any material federal or state statute, rule or regulation applicable to CoinLab, (d) the execution and delivery of this Agreement by CoinLab and the performance by CoinLab of its obligations pursuant to this Agreement will not violate, or conflict with, or constitute a default under, any contract, agreement, instrument, judgment, order or decree to which it is party or by which CoinLab is bound, nor, to CoinLab's knowledge, result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of CoinLab, and (e) CoinLab has made available to Customer all material information reasonably available to CoinLab and no information provided to Customer contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

9. **Indemnification.** CoinLab hereby agrees to indemnify and hold harmless Customer and each member, partner, principal, manager, director, officer, advisor or employee thereof (each, an "**Indemnified Party**") from and against any and all loss, damage or liability due to or arising out of any inaccuracy or breach of any representation or warranty of CoinLab or failure of CoinLab to comply with any covenant or agreement set forth herein. CoinLab shall reimburse each Indemnified Party for its legal and other expenses (including the cost of any investigation and preparation) as they are incurred in connection with any such claim, action, proceeding or investigation. The reimbursement and indemnification obligations of the Investor under this Section shall survive the termination of this Agreement and shall be in addition to any liability which CoinLab may otherwise have, and shall be binding and inure to the benefit of any successors, assigns, heirs, estates, executors, administrators and personal representatives of each Indemnified Party.

10. **Disclaimer of Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, COINLAB DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER UNDERSTANDS AND AGREES THAT THE SERVICES AND BITCOINS ARE THE RESULT OF RELATIVELY NEW TECHNOLOGIES AND MARKET EXCHANGES AND MAY BE SUBJECT TO FUTURE LAWS, REGULATIONS, CHANGES IN TECHNOLOGY, AND OTHER FORCES, NOT WITHIN COINLAB'S CONTROL, AND THAT ANY

4

REDACTED

SUCH CHANGES COULD RENDER THIS AGREEMENT IMPRACTICABLE OR IMPOSSIBLE TO PERFORM. COINLAB MAKES NO WARRANTIES REGARDING THE MONETARY VALUE OR FUTURE EXCHANGE RATES OF BITCOINS. COINLAB MAKES NO WARRANTIES REGARDING THE ABILITY OF PEER-TO-PEER NETWORKS OR OTHER TECHNOLOGIES TO ISSUE BITCOINS OR TO REGULATE, OR OTHERWISE MANAGE THE BITCOIN MARKET. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT ALL ASSOCIATED RISKS RESIDE WITH CUSTOMER.

11. **Miscellaneous.**

    a. **Assignment.** This Agreement may not be assigned by either party without the prior written approval of the other party. Any purported assignment in violation of this Section will be void.

    b. **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. The parties hereto irrevocably and unconditionally agree that any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the U.S. District Court for the Southern District of New York or, if that court does not have subject matter jurisdiction, in any state court located in The City and County of New York. The parties consent to personal and subject matter jurisdiction in the State of New York.

    c. **Remedies Upon Breach.** CoinLab agrees that any breach, or threatened breach, of this Agreement by CoinLab could cause irreparable damage to Customer and that in the event of such breach Customer shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations under this Agreement, without the necessity of proving irreparable damage or posting a bond.

    d. **Force Majeure.** Neither party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies, internet outages or other cause beyond the control of such party ("**Force Majeure**") provided that such party makes best efforts to promptly notify the other. In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure.

    e. **Relationship of parties.** The parties are independent contractors and have no authority to act on behalf of or bind the other. This Agreement does not create an employment, agency, or partnership relationship or grant a franchise.

    f. **Entire Agreement.** This Agreement states the entire agreement between the parties on the subject and supersedes all prior negotiations, understandings, and agreements between the parties concerning the subject matter, including

5

REDACTED

without limitation each of the Services Agreements. No amendment or modification of this Agreement will be made except by a writing signed by both parties. This Agreement is effective and survives regardless of whether a transaction is consummated between ███████████ and CoinLab.

g. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one instrument.

h. **Recitals.** The recitals hereof are hereby incorporated into this Agreement by this reference.

**[SIGNATURE PAGE FOLLOWS]**

REDACTED

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Bitcoin Services Agreement to be signed as of the date first above written.

**CUSTOMER**

Dalsa Barbour LLC

By: _____
Name:  Daniel H. Gallancy
Its: Member

**COINLAB INC.**

CoinLab Inc.

By: _____
Name: _____ Peter Vessenes _____
Its: _____ CEO _____

**CLI HOLDINGS**

CLI Holdings Inc.

By: _____
Name: _____ Peter Vessenes _____
Its: _____ Chairman _____

**ALYDIAN**

Alydian Inc.

By: _____
Name: _____ Peter Vessenes _____
Its: _____ Chairman _____

7

# EXHIBIT I

**From:** Peter Vessenes [mailto:peter@coinlab.com]
**Sent:** Thursday, August 29, 2013 7:19 PM
**To:** Daniel H. Gallancy
**Subject:** Can we renegotiate your terms?

Hi,

I have another capital partner ready to go. They are willing to fund the 10k BTC, and want significantly lower returns on that 10k. They are also willing to, after the 10k is back (e.g. no more capital at risk) go 50/50 with pre-buyers.

I would like to suggest that we change our agreement so that you would, after the 10k BTC goes back, get 25% of the distributed coins until you're paid back in full.

So, it would look like:

Investor: 50%
Dalsa: 25%
Pre-buyers: 25%

I think this is fairer to people further down the stack, and also would get you coins back significantly sooner than your ███████ deal; since they wanted 20k coins back first, at whatever day you would have started, in this world, you would have already received 2.5k coins.

Let me know if you are willing to do this plan.

Best,

Peter

--

PETER **VESSENES**
CEO

**peter@coinlab.com** / 206.486.6856 / SKYPE: vessenes
900 WINSLOW WAY EAST / SUITE 100 / BAINBRIDGE ISLAND, WA 98110

CoinLab

# EXHIBIT
# J

**From:** Daniel H. Gallancy [mailto:dhg@gallancy.com]
**Sent:** Friday, September 06, 2013 7:53 PM
**To:** peter@coinlab.com
**Subject:** Other important items

Hey Peter

Regarding your email from a few days ago:

I am not interested in renegotiating our agreement. I am looking forward to receiving my bitcoins under our agreement.

That said, I am interested in a few other items:

1. I'd like to introduce you to one of my contacts in the data center industry. I have spoken with some of the folks at Digital Realty Trust (http://www.digitalrealty.com). DRT is a very large data center provider and perhaps you can negotiate favorable rates with them. I'll send an email introducing you and Hans to my contact at DRT.

2. It is clearly in everyone's best interests to maximize Alydian's mining production. An incremental capital infusion for mining equipment purchases can help in this regard. I am happy to continue to help put together a deal with ███████. The folks at ███████ are excellent people, and they can bring a lot of resources to the table. Regardless of whether you do a deal with ███████, I encourage you to consider adding capital to Alydian from other appropriate sources, including CoinLab directly.

3. As always, I am available if you want to discuss other transactions and I am happy to make other introductions.

As for the bitcoins I am due to receive: you had mentioned a while ago that for security reasons you'd prefer not to send bitcoins to an address you receive via email. I certainly understand that. If you're prefer to use PGP, please send along your key (I don't see it on any of the key servers) and I can send you an address in an encrypted email (which we should then verify via phone). I have my own secure storage, so I won't need to keep any bitcoins in CoinLab's storage facilities. But I appreciate the opportunity to do so, and I am happy to recommend your storage services to any of my friends and colleagues.

I look forward to receiving my first bitcoins next week!

Have a great weekend!
Dan

REDACTED

# EXHIBIT
# K

**From:** Daniel H. Gallancy [mailto:dhg@gallancy.com]
**Sent:** Wednesday, September 11, 2013 7:53 AM
**To:** peter@coinlab.com
**Subject:** Our discussion on Monday

Peter,

I have given thought to our discussion on Monday. I am not interested in renegotiating our agreement.

However, as a reasonable businessman, I am certainly willing to listen to any suggestions you have regarding alternative arrangements. Although the suggestions you made on Monday were not acceptable, if you have reasonable alternative suggestions, I am more than happy to listen to them.

I would certainly like for our relationship to remain on positive footing.

Regards,
Dan

# EXHIBIT L

**From:** Daniel H. Gallancy [mailto:daniel@dalsabarbour.com]
**Sent:** Thursday, September 12, 2013 10:18 AM
**To:** 'Peter Vessenes'
**Subject:** First batch of bitcoins

Peter,

I look forward to receiving my first batch of bitcoins on Friday (tomorrow, 9/13/13).   Please send them to 16bQoQs9BjsfJK8a3D1FJuLB1EY59MWG5s

For security purposes, I am also sending an encrypted version of this email to your gmail account.  Please verify that the address in the encrypted email matches the address in this email.  Also, feel free to call me to verify the address via phone.

Regards,
Dan

# EXHIBIT M

**From:** Peter Vessenes [mailto:peter@coinlab.com]
**Sent:** Friday, September 27, 2013 2:08 PM
**To:** Daniel H. Gallancy; Roger Townsend
**Subject:** Re:

Hi Dan,

I'm not trying to slow this down at all, however, there is real life intruding -- parts to be deployed, equipment to be purchased, we have a board meeting this week, etc.

Roger told your guy we're pulling together upcoming precise capital and operational expenditures so you can get a good look at what's coming up.

My current understanding is that it's very unlikely we will mine enough coins to deploy our 2.5 wafer starts; the network has grown so quickly that we can't even self fund the parts of the project we hoped to.

So, stay tuned, we'll send on our operational numbers and let's talk once you've digested them.

Peter

**From:** Daniel H. Gallancy [mailto:daniel@dalsabarbour.com]
**Sent:** Friday, September 27, 2013 2:30 PM
**To:** 'Peter Vessenes'
**Subject:** RE:

Peter – What you are saying doesn't make sense. This project isn't self-funded. The project is funded by capital that you have already raised. We both know that.

As we have previously discussed on multiple occasions, Alydian uses the capital you have raised plus capital from coinlab to fund capital expenditures and operating expenditures. The bitcoin output of the project is not to be used for those expenses, nor do I approve of the use of the output for those expenses. Additionally, per our agreement, I am to receive 100% of that output until I receive 7984 bitcoins.

In addition, you have made it clear that you don't intend to use your mining output for the above expenses, but rather to pay some other investor. That would be in direct conflict with our agreement (again, you know this).

If you want to settle this in another way, I am open to listening to your suggestions. But you haven't made any suggestions. The time for that is now.

# EXHIBIT N

🔒 QKOS SERVICES LIMITED [GB] | https://blockchain.info/address/18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC

 chain            Search    ☰

# Bitcoin Address
Addresses are identifiers which you use to send bitcoins to another person.

| Summary | | Transactions | | |
|---|---|---|---|---|
| Address | 18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC | No. Transactions | 162 | 📋 |
| Hash 160 | 531a904d98093733ec80b2502b1d4c08ff6e3cd6 | Total Received | 803.56015414 BTC | 📋 |
| Short Link | http://blockchain.info/fb/18aqub | Final Balance | 803.56015414 BTC | 📋 |
| Tools | Taint Analysis - Related Tags - Unspent Outputs | | | |

[ Request Payment ] [ Donation Button ]



## Transactions (Newest First)

▼ Filter ·

4d50b77543ee86f0dd6da36293 1aae87899319f3e3aa479f554257da8ccb6adc

(Fee: 0.0005 BTC - Size: 565 bytes) 2013-10-02 18:17:19

| | |
|---|---|
| 15R8C6ryJ7cgyELm9AQeV69GpZ5pZ56Ng8 | 0.04159632 BTC |
| 1B2GmXNNGNtj6UoihXanEuYKFG98gVzN1E | 1.38585589 BTC |
| 18aQubkBvMV9GqBCy7nPjfpdN8uCZiFQrC | 3.26397503 BTC |
| 127gtF7A7jMyZFjRQraxME4RcExQ6sDtub | 0.01479036 BTC |
| 14Cy1pdmfQeW7f1cvx2wSx7Sdij96PWjw | 0.07569968 BTC |

1LmdSFPysj53SgABrK9xwRN932eJ9T3Jrn (10.62529521 BTC - Output) ➡️

| | |
|---|---|
| 1Fm2zFx8FuwqZxWtAoH8nDZfyP73WBRAc | 1.66208317 BTC |
| 12GSWWSt9N8RYkzd3HBSwdEcHrtNdy6qJDA | 0.0546266 BTC |
| 1Lm3guTQxqcsv2JVf3UMedc9CGhAJv2fq6 | 0.08251295 BTC |
| 1JmzfW71AMjjRfsAnNTq6fvd2d2GD8SdB | 4.00304115 BTC |
| 1Fzsi462tiUBmfVsqZteXXKVZK9WfNRm2Z | 0.02172532 BTC |
| 1He2ZhkrE1tY2AAgyaNvRXcJvoVgdNdgDy | 0.02524959 BTC |
| 1348mQgRpEVPfmFxcA8j7iNha98pG3STdP | 0.01364916 BTC |

| 3.26397503 BTC |

# EXHIBIT O



file:///C:/Users/gallancy/Dropbox/bitcoin/Reykjani - Coinlab - shared Folder/SDNY Documents/Exhibits to Affidavit/bitcointalk post from Vesseness on Oct 2.JPG



Bitcoin Transaction 84fe398... ×

blockchain.info/tx/84fe3982faec6be934c97df3292a401a8d1d1368f4ad93a334d6b8812b58e10

# chain

## Transaction View information about a bitcoin transaction

84fe3982faec6be934c97df3292a401a8d1d1368f4ad93a334d6b8812b58e10

No Inputs (Newly Generated Coins)

→ 1EphvgKVvuJCfhUznd/mvdorEhF91XozXC - (Unspent)     25.0061546 BTC

25.0061546 BTC

**Network Propagation (Click to view)**

### Summary

| | |
|---|---|
| Size | 128 (bytes) |
| Received Time | 2013-10-02 22:59:22 |
| Reward From Block | 261353 |
| Scripts | Hide scripts & coinbase |
| Relayed by IP 🛈 | 66.221.254.76 (whois) |
| Visualize | View Tree Chart |

### CoinBase

03e9fc0318416c796469616e3533335303633353213130343923a92f0042dc701000686e013d9d09377875
(decoded) ◆◆/dtan533560352110490//◆◆◆?/◆◆◆?nu

About & Contact: About Us - Status: Ok (178 Nodes Connected) - Advanced Disable - Currency: Bitcoin

Blockchain iPhone & Android apps
now free in store

file:///C:/Users/gallancy/Dropbox/bitcoin/Reyhani - Coinlab - shared Folder/SDNY Documents/Exhibits to Affidavit/blockchain.info screen capture.JPG

# EXHIBIT
# P

**From:** Peter Vessenes [mailto:peter@coinlab.com]
**Sent:** Monday, October 14, 2013 7:04 PM
**To:** Daniel H. Gallancy
**Subject:** Followup

Hi Dan,

Thanks for getting in touch. The feedback from my board and investors -- it seems like we're still too far apart; like I told you, the economics are pretty implacable at this point for mining at Alydian.

Like I said, we are planning on returning rigs to prebuyers or possibly assigning contracts to a third party who could do a better job delivering. We'd be willing to work with you on either of those situations, like other pre-buyers. I think this is the best chance for you to get your money back and even get a reasonable return on investment. Unfortunately, it does not appear that there is any chance for the profits that we had hoped for when we began the project or even a few months ago.

I'm sure you can do the math yourself on the network speeds to validate this, but I'm happy to go over our numbers with you, under NDA of course.

Peter