# OPERATIONS AGREEMENT

THIS OPERATIONS AGREEMENT (the "Agreement") is made and entered into and effective this 4TH day of November 2013 (the "Effective Date"), by and between CoinLab, Inc. ("CoinLab"), a corporation organized and existing under the laws of the State of Delaware, having its primary office at 900 Winslow Way East, Suite #100, Bainbridge Island, WA, 98110 and CLI Holdings, Inc. dba Alydian ("Alydian"), a corporation organized and existing under the laws of the Republic of Seychelles under the International Business Companies Act, 1994 having its primary office at 900 Winslow Way East, Suite #100, Bainbridge Island, WA, 98110. CoinLab and Alydian shall each be referred to herein individually as a "Party" or jointly as the "Parties".

## RECITALS

WHEREAS:

Since August, 2012, Alydian has been developing an enterprise-scale BitCoin mining system, and owns the intellectual property rights to a BitCoin mining chip and certain other inventory and system designs necessary to implement a BitCoin mining system (the "System");

Since August 2012, CoinLab has served a BitCoin business incubator, building infrastructure to allow Alydian to build and work toward implementation of the System;

In order to implement the System, Alydian requires, and CoinLab is willing and able to provide, use of CoinLab's computer hardware, mining rigs, mining chips, inventory, hosting contracts, offices, management, administration, deployment specialists, manufacturing support, and services of Coinlab's engineers;

Since August 2012, CoinLab and Alydian have operated under an informal working relationship to implement the System;

CoinLab and Alydian seek to memorialize the terms governing their past business relationship;

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, and for other valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties hereto agree as follows:

1. **Advance and Expenditure of Direct Costs.** Subject to the repayment obligation set out herein, and the other terms and conditions of this Agreement, CoinLab agrees, for the purpose implementing the System, that it will advance and expend certain direct costs which shall include, but are not limited to
contracts, including hosting contracts with third parties which are reasonably necessary carry out the System (including Wowrack and Sabey), supplies, parts, inventory, consultants, personnel, employees, third-party professionals, work-related travel expenses for CoinLab personnel (the "Direct Costs").

2. **Alydian's Repayment Obligation for Direct Costs.** In consideration of the terms and conditions of this Agreement, Alydian agrees to repay CoinLab, due upon receipt, for its invoiced Direct Costs, plus an administrative fee of ten percent (10%) subject to a maximum of $5000.00 per invoice.

3.0 **Exclusive Authority**. CoinLab shall have exclusive authority and discretion to:

(i) Determine the scope of the Direct Costs hereunder;
(ii) Enter into contracts or agreements with any consultant, contractor, employee and professional for the purpose of implementing the System;

(iii) Enter into and administer all agreements and contracts with third parties as reasonably necessary to implement System including but not limited to, contracts with hosting providers;

(iv) Direct the activities of any persons working on the System.

4. **Form of Payment**. Alydian may, at its sole discretion, pay CoinLab, and CoinLab shall accept, remittance for its invoices in either U.S. dollars or BitCoins. If Alydian remits payment in BitCoin, the Bitcoins are marked to market at the day of CoinLab's purchase, and remitted as Alydian has BitCoins available.

5. **Term and Termination**. This Agreement will commence as of the Effective Date and continue for a 6 month period unless terminated earlier under the terms of this Agreement. This Agreement will automatically extend month to month, unless otherwise agreed to by the Parties. This Agreement may be terminated by either Party upon sixty (60) days' written notice to the other Party.

6. **General Representations and Warranties.** Each Party hereby represents and warrants that:

(i) Such Party is duly organized and validly existing under applicable laws and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof.

(ii) Such Party is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder.

(iii) This Agreement is a legal and valid obligation binding upon the Parties hereo and enforceable in accordance with its terms. The execution, delivery and performance of this Agreement by such Party does not conflict with any agreement, instrument or understanding, oral or written, to which it is a Party or by which it may be bound, nor violate any law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

7. **Limitation of Liability** COINLAB SHALL NOT BE LIABLE FOR ANY LOSS OF PROFITS, LOSS OF BUSINESS, LOSS OF DATA, INTERRUPTION OF BUSINESS, NOR FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, WHETHER IN CONTRACT OR IN NEGLIGENCE, WHICH MAY ARISE FROM THE USE BY THE SYSTEM.

8. **Indemnification**. Alydian will defend, indemnify, and hold harmless CoinLab and its officers, directors, employees, shareholders, representatives, affiliates, agents, licensees, successors and assigns, from and against any and all obligations, costs, claims, judgments, losses, expenses, liabilities and reasonable fees and costs of attorneys and experts arising from or related to: (a) any claim or allegation that, if true, would constitute a breach of any of Licensee's representations or warranties hereunder; (b) any acts or omissions by its employees, agents or consultants in performing its obligations under this Agreement including, without limitation, any property damage or bodily injury.

9. **Confidentiality.**
(a) "Confidential Information" means all information disclosed by the one Party (the "Disclosing Party") to the other Party (the "Receiving Party"), including, without limitation, any and all information or proprietary materials (in every form and media) which have been or are hereafter disclosed and which are not generally known in the relevant trade or industry of the Parties or their respective affiliates or third parties with which either Party conducts or may conduct business. Confidential information includes, without limitation: (i) the terms of this Agreement; (ii) all trade secrets and Intellectual Property Rights; and (iii) existing or contemplated products, business plans, market research data, whether containing historic, current or future-related information. Confidential Information shall not include information that: (A) is public or becomes known to the public through no breach of an obligation of confidentiality by the Receiving Party, (B) is independently developed by the Receiving Party with no access to the Disclosing Party's Confidential Information or (C) is received from a third party under no obligation of confidentiality. In addition, the Receiving Party may disclose

Confidential Information of the disclosing Party to the extent such disclosure is required by law, court order or order of a governmental agency with jurisdiction; provided that the Receiving Party notifies the Disclosing Party prior to such disclosure and gives the Disclosing Party a reasonable opportunity to seek a protective order or to contest such requirement.

(b) The Receiving Party shall treat all Confidential Information as strictly confidential, and shall use the same care to prevent disclosure of such information as such Party uses with respect to its own confidential information, which shall in no event be less than a reasonable degree of care. In any event, the Receiving Party shall: (i) disclose such Confidential Information to (A) only those authorized employees and directors of the Receiving Party whose duties justify their need to know such information and who have agreed in writing to maintain the confidential and/or proprietary status of such Confidential Information; or (B) only those third parties required for the performance of the Receiving Party's obligations under this Agreement pursuant to a written agreement containing provisions as least as extensive as the confidentiality provisions of this Agreement; and (ii) use such Confidential Information only in accordance with the terms of this Agreement.

10. **Proprietary Materials and Ownership.**
(i) As used in this Agreement, "Proprietary Materials" means all copyrightable works, ideas, discoveries, inventions, patents, products, devices, computer programs, techniques, know-how, algorithms, procedures, discoveries or inventions, and all materials, texts, drawings, specifications, source code and other recorded information, in preliminary or final form and on any media whatsoever, that are conceived, reduced to practice, developed, discovered, invented or made (whether solely or jointly with others) in connection with the System.

(ii) **Ownership.** Alydian will be the exclusive owner of all Proprietary Materials. To the extent permitted under the U.S. Copyright Act (17 U.S.C. §101 et seq., and any successor statute thereto), the Proprietary Materials will constitute "works made for hire", and the ownership of such Proprietary Materials will vest in perpetuity at the time they are created. In any event, CoinLab hereby assigns and transfers to Alydian without separate consideration, all right, title and interest that CoinLab may now or hereafter have in the Proprietary Materials, including, without limitation, all copyright, trademark, trade secret, patent and other intellectual property and proprietary rights of any kind or nature therein. To the maximum extent allowed, CoinLab hereby irrevocably and unconditionally waives, in perpetuity, any rights it may have with respect to the Proprietary Materials under any law relating to "the moral rights of authors" or any similar law throughout the world.

11. **Notice.** Any notice or other communication hereunder shall be in writing and sent to the principal address of the Parties set forth on the first page of this Agreement to the attention of those Parties indicated below, or to such other address or Parties as either Party may advise the other by written notice.

12. **No Assignment without Consent.** The rights under this Agreement shall not be sold, assigned, leased, hypothecated, pledged or otherwise alienated without both Parties express written consent.

13. **Amendment.** Unless otherwise provided herein, this Agreement may not be changed, waived, discharged, or terminated orally, but only by a written document signed by duly authorized officers of each of the Parties hereto.

14. **Headings.** The paragraph headings contained herein are for convenience or reference only and shall not control the interpretation of any term or condition hereof.

15. **Severability.** If any portion of this Agreement shall be held invalid or inoperative, then, so far as is reasonable and possible, the remainder of this Agreement shall be considered valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative.

16. **Waiver.** No failure or delay by any Party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial waiver thereof include any

other or further exercise thereof or the exercise of any other right, power or privilege.

17. **Relationship of Parties.** Nothing herein contained shall be deemed to create an agency, joint venture or partnership relation between the Parties hereto. It is understood and agreed that neither Party is, by reason of this Agreement or anything herein contained, constituted or appointed the agent or representative of the other Party hereto for any purpose whatsoever, nor shall anything herein contained by deemed or construed as granting to either Party any right or authority to assume or to create any obligation or responsibility, express or implied, for, on behalf of, or in the name of the other Party hereto, or to bind the other Party hereto in any way or manner whatsoever.

18. **Acknowledgment.** Each Party acknowledges that it has read this Agreement, understands it and agrees to be bound by its terms.

19. **Enurement.** Subject to the limitations herein before expressed, this Agreement will enure to the benefit of and be binding upon the Parties and their respective successor and permitted assigns.

20. **Governing Law.** This Agreement will be governed and construed in accordance with the laws of the state of Washington as applied to transactions taking place wholly within Washington between Washington residents. The Parties hereby expressly consent to the exclusive personal jurisdiction of and venue of the state and federal courts located in King County, Washington for any lawsuit filed there arising from or related to this Agreement.

21. **Arbitration.** All disputes arising out of or in connection with this Agreement, or in respect of any defined legal relationship associated herewith or derived therefrom, shall be referred to and finally resolved by arbitration administered by pursuant to AAA rules. The place of arbitration shall be Seattle, Washington and the cost of such arbitration shall be borne equally by the Parties.

22. **Entire Agreement.** This agreement together constitutes the entire agreement between CoinLab and Alydian and supersedes all prior communications or correspondence of the Parties in either written or oral form.

23. **Further Assurances.** From and after the date of this Agreement, upon the request of either Party, the other Party shall execute and deliver such instruments, documents and other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

IN WITNESS WHEREOF the Parties have executed and delivered this OPERATIONS AGREEMENT.

CLI Holdings, Inc.

By: _____
Peter J. Vessenes
Its Managing Director


CoinLab, Inc.
By: _____
Peter J. Vessenes
Its Chief Executive Officer