Charles R. Ekberg
Tereza Simonyan
Lane Powell PC
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338
(206) 223-7000
(206) 223-7107 Facsimile
Attorneys for Bitvestment Partners
 LLC f/k/a Dalsa Barbour LLC

The Honorable Karen A. Overstreet
Chapter 11
Hearing Date:  January 10, 2013
Response Date:  Date of Hearing

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In Re | Case No. 13-19746-KAO |
| CLI HOLDINGS, INC. dba ALYDIAN, | **DECLARATION OF TEREZA SIMONYAN IN SUPPORT OF OBJECTION TO MOTION TO APPROVE AUCTION SALE AND BIDDING PROCEDURES** |
| Debtor. | |

Tereza Simonyan states and declares as follows:

1.     I am an attorney with the firm of Lane Powell PC, counsel for Bitvestment Partners LLC fka Dalsa Barbour LLC, a creditor of the estate.  I am competent to testify and make the statements in this declaration based on my personal knowledge.

2.     Attached as Exhibit A is a true and correct copy of an excerpt from the Rule 2004 Examination of Peter Vessenes that took place on January 7, 2014.

3.     Attached as Exhibit B is a true and correct copy of an excerpt from the Rule 2004 Examination of Peter Vessenes that took place on January 7, 2014.

4.     Attached as Exhibit C is a true and correct copy of an excerpt from the Rule 2004 Examination of Peter Vessenes that took place on January 7, 2014.

DECLARATION OF TEREZA SIMONYAN IN SUPPORT OF
OBJECTION TO MOTION TO APPROVE AUCTION SALE AND
BIDDING PROCEDURES - 1
128054.0001/5914573.1

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
SEATTLE, WASHINGTON 98101
206.223.7000 FAX: 206.223.7107

Case 13-19746-KAO    Doc 101    Filed 01/09/14    Ent. 01/09/14 16:59:47    Pg. 1 of 24

1    5.    Attached as Exhibit D is a true and correct copy of an excerpt from the Rule

2  2004 Examination of Peter Vessenes that took place on January 7, 2014.

3    6.    Attached as Exhibit E is a true and correct copy of an excerpt from the Rule

4  2004 Examination of Peter Vessenes that took place on January 7, 2014.

5    7.    Attached as Exhibit F is a true and correct copy of an excerpt from the Rule

6  2004 Examination of Peter Vessenes that took place on January 7, 2014.

7    8.    Exhibit G is not included herein and a hard copy will be available with

8  Bitvestment's counsel at the hearing on January 10, 2014.

9    9.    Attached as Exhibit H is a true and correct copy of an excerpt from the Rule

10  2004 Examination of Peter Vessenes that took place on January 7, 2014.

11    10.    Attached as Exhibit I is a true and correct copy of an email exchange between

12  Debtor's counsel and Bitvestment's counsel.

13    11.    Exhibit J is not included herein and a hard copy will be available with

14  Bitvestment's counsel at the hearing on January 10, 2014.

15    12.    Attached as Exhibit K is a true and correct copy of an excerpt from the Rule

16  2004 Examination of Peter Vessenes that took place on January 7, 2014.

17    13.    Attached as Exhibit L is a true and correct copy of an email exchange between

18  Debtor's counsel and Bitvestment's counsel.

19    14.    Attached as Exhibit M is a true and correct copy of a post-petition Operating

20  Agreement between the Debtor and CoinLab, Inc.

21    15.    Attached as Exhibit N is a true and correct copy of an excerpt from the Rule

22  2004 Examination of Peter Vessenes that took place on January 7, 2014.

23    16.    Attached as Exhibit O is a true and correct copy of an excerpt from the Rule

24  2004 Examination of Peter Vessenes that took place on January 7, 2014.

25

26

DECLARATION OF TEREZA SIMONYAN IN SUPPORT OF
OBJECTION TO MOTION TO APPROVE AUCTION SALE AND
BIDDING PROCEDURES - 2
128054.0001/5914573.1

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
SEATTLE, WASHINGTON 98101
206.223.7000 FAX: 206.223.7107

Case 13-19746-KAO    Doc 101    Filed 01/09/14    Ent. 01/09/14 16:59:47    Pg. 2 of 24

1    I declare under penalty of perjury that the foregoing is true and correct.

2    DATED this 9th day of January, 2014.

3

4                              By /s/ Tereza Simonyan
                                  Tereza Simonyan, WSBA No. 41741
5                                 Attorney for Bitvestment Partners LLC,
                                  f/k/a Dalsa Barbour LLC, Party in Interest
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF TEREZA SIMONYAN IN SUPPORT OF
OBJECTION TO MOTION TO APPROVE AUCTION SALE AND          **LANE POWELL** PC
BIDDING PROCEDURES - 3                                  1420 FIFTH AVENUE, SUITE 4200
                                                        SEATTLE, WASHINGTON 98101
128054.0001/5914573.1                                   206.223.7000 FAX: 206.223.7107

# EXHIBIT A

1    A.    Yes.

2    Q.    So further up that food chain, 4:58 PM, on the

3    13th of December?

4          MS. GLYNN LEVIN:  What.

5          THE WITNESS:  The top two lines of page 3.

6    BY MR. REYHANI:

7    Q.    167 bitcoins were transferred out to an address

8    1JKG.  You don't see the address, but you see the 167.1

9    being transferred out, correct?

10   A.    Yes.

11   Q.    Who controls the recipient address 1JKG that

12   received that 167 bitcoin?

13   A.    That is a CoinLab address.

14   Q.    Alydian transferred 167 bitcoins to CoinLab.

15   What was the purpose of that transfer?

16   A.    To pay a November invoice.

17   Q.    To pay the November invoice?  Is that what you

18   said?

19   A.    I said to pay a November invoice.

20   Q.    I'm sorry, I actually didn't hear you to pay?

21   A.    To pay a November invoice, yes, that's correct.

22   Q.    How much was that invoice?

23   A.    I think you should have it in your discovery

24   docs.  There's a November 15th and a November 30th

25   invoice.  And those -- you haven't asked about the other

1    one, but those two payments are one for each invoice.

2    You know Bryan I think you are going to find like you can

3    argue this now, but December CoinLab took a big hit

4    spending a thousand dollar bitcoins.  Alydian is allowed

5    to remit it whatever it is going to be six or $700 coins.

6    You know, I don't know.  I mean this goes up and down.

7              MS. GLYNN LEVIN:  Wait for a question.

8              THE WITNESS:  I mean, I don't want everyone to

9    waste their time worrying about this right now, they can

10   spend the dep time how they want, I guess.

11   BY MR. REYHANI:

12       Q.    Did you consult with your bankruptcy counsel

13   before making those transactions?

14       A.    Which transaction?

15       Q.    The two transfers out CoinLab on December 13th?

16       A.    No.

17       Q.    You thought it was just okay to pay those bills

18   without consulting?

19       A.    It's a post-petition payment for a

20   post-petition service agreement for hosting.  Hosting and

21   employees for Alydian.  It seems legitimate to me.

22       Q.    So an insider?

23       A.    Do you want the mining rigs running?

24              MS. GLYNN LEVIN:  Is there a question just a

25   second.

# EXHIBIT B

1    A.    No, personally I rarely look.  The last time I

2  personally totaled them up was for the November report to

3  the U.S. trustee.

4    Q.    **You don't care how many bitcoins the debtor**

5  **possesses?**

6    A.    I care very much.

7    Q.    **How many bitcoins did the debtor mine in**

8  **December?**

9    A.    I don't know an exact number.

10   Q.    **You're operating as debtor in possession and**

11  **you don't know how many bitcoins the debtor mined in**

12  **December?**

13   A.    It is total immaterial.  There is a financial

14  audit that could tell us at any time.  I don't need that

15  number at the tip of my fingers.  You also could audit it

16  very easily looking at those addresses.  What is the

17  point of this line of questioning?  You could get down

18  the microsecond, exactly how many we had at any one

19  moment.

20   Q.    **Would over 2,500 bitcoins in December make**

21  **sense?**

22        **MS. GLYNN LEVIN:  Only if you know.**

23        THE WITNESS:  We mined between probably 60 and

24  80 bitcoins a day in the month of December.  So I would

25  say that's in the ballpark.

# EXHIBIT C

1    A.    Yes.

2    Q.    With whom did you discuss it?

3    A.    Deirdre Glynn Levin.

4    Q.    Anybody else?

5    A.    Not that I recall.

6    Q.    The Exhibit 3, the second declaration, did you

7    discuss that document with anybody?

8    A.    Yes.

9    Q.    Prior to today?  With whom?

10   A.    Deirdre Glynn Levin.

11   Q.    Anybody else?

12   A.    Roger Townsend.

13   Q.    Anybody else?

14   A.    No.

15   Q.    If I could turn your attention to paragraph 16

16   of the supplemental declaration that is in your hand,

17   Exhibit 3.  We have here the comment that we discussed

18   earlier that, and I quote, because Alydian's core team

19   has stated they likely do not wish to remain on after

20   January 31, 2014.

21          Who is this core team?

22   A.    Robert -- hold on.  My names got all funny.  I

23   say them in order.  Hans Olson, Bobby Seidensticker, and

24   Robert.  I just blanked on his last name.  I've said it

25   too many times today.  Robert.

1          MS. GLYNN LEVIN:  Batten.

2          THE WITNESS:  Robert Batten.  Thank you.

3    BY MR. REYHANI:

4       Q.   And who do these three individuals report to?

5       A.   To me.

6       Q.   And they are all CoinLab employees?

7       A.   No, that's not correct.

8       Q.   Who is a CoinLab employee?

9       A.   Bobby Seidensticker and Robert Batten.

10      Q.   And Mr. Olson is a contractor to CoinLab?

11      A.   That's correct.

12      Q.   Are you laying them off after January 31, 2014,

13   so that they can't work on the project anymore?

14      A.   No, they threatened to quit unless they were

15   paid retention bonuses, and this is the date they were

16   willing to stay to.

17      Q.   Do they have other jobs lined up about which

18   you are aware?

19      A.   I don't know.

20      Q.   If CoinLab continued to compensate them at

21   their current rate, would they stay on?

22      A.   Not to work on Alydian.  I don't believe any of

23   them would stay on.

24      Q.   So they would just all quit their jobs and

25   collect unemployment or quit their jobs and not collect

# EXHIBIT D

1   question.  I was fine with that?

2           MR. TOWNSEND: Okay.

3           MR. REYHANI:  That's okay.  Thank you.

4   BY MR. REYHANI:

5       Q.   Regarding Hans and -- Hans Olson and Mr.

6   Seidensticker and Mr. Batten, you indicated they wanted a

7   retention bonuses to stay on.  How much were they

8   requesting?

9       A.   I think the total amount in addition to the

10  November was about $250,000.

11      Q.   How much do each of them make per year?

12      A.   I told you Hans's numbers.  I don't have -- you

13  know, I don't remember off the top of my head.  I don't

14  want to give you wrong numbers.  Both of them are under

15  200, though.

16      Q.   So essentially they all wanted a 50 percent

17  retention signing bonus to stay on?

18      A.   Again, I can't do the math for you right now,

19  but.

20      Q.   Let's do one more document and then we will

21  break for lunch.  If Tereza could distribute what we are

22  going to mark as Exhibit 4.  It is the -- actually,

23  before we do that, if we can go back to Peter's

24  declaration, Exhibit 2.

25           You previously discussed in your declarations

# EXHIBIT E

```
 1   project management.  And I suppose possibly contractors

 2   between the two of them.  Executive compensation.

 3        Q.    Are the two --

 4        A.    I'm sorry.  Go ahead.

 5        Q.    Are the two engineers expected to maintain the

 6   systems Bobby and Robert?

 7        A.    Yes, that's correct.

 8        Q.    Okay, please go on to executive comp.

 9        A.    We have talked about that.  That's a budget for

10   me.  Severance is mislabeled.  It was a retention is a

11   better word for it.

12        Q.    So debtor paid $105,000 in retention moneys to

13   certain people?

14        A.    Not all of that yet.  So the total amount is

15   about $350,000 that the team asked for.

16        Q.    Wait, I'm sorry.  There's 105,000 listed there.

17   The total amount is how much?

18        A.    As I told you earlier, it's 250 -- it was 105

19   available in December and 250 the end of January.

20        Q.    So that's $355,000 in retention moneys?

21        A.    Yes.

22        Q.    And who is all that for?

23        A.    Hans, Robert and Bobby.

24        Q.    Earlier you testified that that trio wanted

25   $250,000 total.  How are we up to --
```

Case 13-19746-KAO   Doc 101   Filed 01/09/14   Ent. 01/09/14 16:59:47   Pg. 10 of 24

1      A.    I said additional from the November, December.

2   250 additional.

3      Q.    **So you paid them a retention bonus on top of**

4   **their salaries and now they're going to get another**

5   **retention bonus?**

6      A.    Yes, they wanted some to stay through end of

7   the year and more to stay through the end of January.

8      Q.    **There are other engineers that could assist**

9   **with this project, correct?**

10      A.    I think we've already had that conversation.

11      Q.    **I understand that, but you are now paid**

12   **$355,000 for three people for two months of retention**

13   **bonuses or planning to pay?**

14      A.    Yes, and in my judgment that's much better than

15   having them leave tomorrow and all the rigs turning off

16   since that's just six or seven days of downtime.  So if

17   we can't replace a whole functional team in seven days,

18   we've lost money.

19      Q.    **What about the contractors?**

20      A.    Contractors are -- those are people doing

21   installation, assembly, et cetera.  Mostly like day

22   labor, I would say.

23      Q.    **Keep going on.**

24      A.    Hosting expenses.  That's the sort of power

25   cooling and real estate costs for hosting the rigs.  NRE

# EXHIBIT F

1    **Q.    Does this document contain the six bitcoin**

2    **addresses that the debtor utilized?**

3        A.    It does not contain any full bitcoin addresses.

4    **Q.    Can you read what is under the watermark?**

5        A.    Can you give me a specific spot?  These are

6    photocopies, too.  So.

7    **Q.    How else are we supposed to pass out the**

8    **documents?**

9        A.    I don't know, I'm not a lawyer, but go ahead,

10   tell me what you want me to read.

11   **Q.    If you can read under --**

12            MS. SIMONYAN:  Why don't you turn to Bates

13   stamp 1100005.

14            THE WITNESS:  Okay.

15            MS. SIMONYAN:  Let's read, let's say, the last

16   line.

17            THE WITNESS:  You would like me to read the

18   last line?

19            MS. SIMONYAN:  Yes.

20            THE WITNESS:  All of it?

21            MS. SIMONYAN:  Actually, read the last ten

22   digits on the last line.

23            THE WITNESS:  72C2475844C5.

24            MR. REYHANI:  What page?

25            THE WITNESS:  1100005, last line.

---

**BUELL REALTIME REPORTING,**          206 287 9066          **Page: 118**



1   August 31st at the 14PXFR (chk doc) account; is that

2   correct?

3        A.    Sorry.  Just one moment.  Those were not

4   received on August 31st most likely. Did you generate --

5   if you generated this report with block chain, it will be

6   using GMT time, and we're Pacific time, so we're many

7   hours behind.  So it's likely August 30th.

8        Q.    Okay.  Let's use the 30th.  Did Alydian receive

9   2,535 bitcoins at address 14PXFR?

10       A.    Yes.

11       Q.    And that is currently an Alydian controlled

12  address?

13       A.    Yes.

14       Q.    14 PXFR?

15       A.    It has always been an Alydian address.

16       Q.    Can you show me -- well, maybe it's in the

17  thousands.  If you are going to tell me if it's in the

18  thousand-page document, then so be it.  Is the 14 PXFR in

19  address noted in Exhibit 6, which is the 27 page document

20  that is supposed to list all the Alydian addresses?

21       A.    I did not see this there.  Well, that document

22  does not list purport to list all Alydian address.  It is

23  a list of transactions that we previously generated and

24  included as part of the discovery, but I did not see it

25  in there.

# EXHIBIT I

**From:** Bryan Reyhani <bryan@rnlawfirm.com>
**Date:** Friday, January 3, 2014 at 5:06 PM
**To:** Deirdre Glynn Levin <dglynnlevin@KellerRohrback.com>
**Subject:** Re: Alydian's Bitcoin Addresses

Deirdre:

To be abundantly clear, we don't want addresses that were generated but never utilized. Only addresses that were in fact utilized for mining, transactions, transfers, storage, etc.

Thanks.

Bryan


Bryan I. Reyhani

 Reyhani
Nemirovsky LLP
**200 Park Ave., FL 17 | New York, NY 10166**
Direct: (212) 897-4022 | Cell: (917) 748-6580
Main: (212) 897-4030 | Fax: (212) 897-4031
bryan@rnlawfirm.com | rnlawfirm.com

# EXHIBIT K

1    A.    Mr. Reyhani, you often mix technical legal

2  words in with other questions and I think it's very fair

3  for me to ask or explain to you if I don't.

4    Q.    **Incumbent is not a legal word, Mr. Vessenes.**

5  **How many addresses were there -- how many addresses did**

6  **Alydian, the debtor, utilize to transact hold mine store,**

7  **sell bitcoins?**

8    A.    I believe it's six.  I would like to look at

9  what we produced to make sure that that's true, but.

10    Q.    **Did you bring any documents with you today?**

11    A.    I did not.

12    Q.    **Did someone else bring documents on your**

13  **behalf?**

14    A.    Not that I know of.

15    Q.    **Other than your attorney, did you discuss your**

16  **testimony with anyone else?**

17    A.    What testimony?

18    Q.    **The testimony that you are providing today,**

19  **have you discussed in advance your testimony here today**

20  **with anyone else other than your counsel?**

21    A.    Not particularly.

22    Q.    **Not particularly with whom?**

23    A.    Not particularly I think is no to the best of

24  my memory.

25    Q.    **You don't recall whether you spoke about your**

# EXHIBIT L

| | |
|---|---|
| **From:** | Deirdre Glynn Levin <dglynnlevin@KellerRohrback.com> |
| **Sent:** | Wednesday, December 18, 2013 3:48 PM |
| **To:** | Simonyan, Tereza |
| **Subject:** | RE: Scheduling of R 2004 Exam and Objections to Document Production |
| **Attachments:** | Bitvestment Response and Objections to Coinlab RFPs.pdf |

Tereza,
Alydian made three transfers: approximately 950 bitcoin, 950 bitcoin, and 424 bitcoin on December 12. However, they were transferred to another address or addresses held by Alydian. I do not see how that impacts your client or any other creditor.

Why did Bitvestment object to all the discovery in the NY case? See attached. No one else is asking for discovery. No one else thinks time is of the essence. We are not even seven weeks since the petition date.

Peter is willing to have his BR 2004 exam taken. This is a scheduling issue. There are holidays and everyone has vacations planned. You did not confer with me before you unilaterally chose the January 3 date. He is available on January 13. Can you explain why 10 days makes a difference?

Thanks.

---------------------------
Deirdre Glynn Levin
Attorney
Keller Rohrback L.L.P.
Phone: (206) 623-1900
Fax: (206) 623-3384
Email: dglynnlevin@kellerrohrback.com

CONFIDENTIALITY NOTE: This e-mail contains information belonging to the law firm of Keller Rohrback L.L.P., which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual entity named above. If you think that you have received this message in error, please e-mail the sender. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.

---

**From:** Simonyan, Tereza [mailto:SimonyanT@LanePowell.com]
**Sent:** Wednesday, December 18, 2013 10:33 AM
**To:** Deirdre Glynn Levin
**Cc:** Ekberg, Chuck; Bryan Reyhani (bryan@rnlawfirm.com)
**Subject:** RE: Scheduling of R 2004 Exam and Objections to Document Production

*https://blockchain.info/address/18aQ*▊▊▊▊▊▊▊▊

The above link shows transfers of 2,325 Bitcoins out of an Alydian address to a newly-formed address on Friday, December 12. That's approximately $2 million as of the date of the transfer, and significantly less today. As you understand time is of the essence, especially in light of the nature of the assets, the debtor's repeated failures to disclose basic information in this case and the large unexplained transfers of assets out of the estate. I have given your

client plenty of notice of the Rule 2004 exam and numerous alternative dates to accommodate his vacation schedule. Please remind Mr. Vessenes that he represents a debtor that receives significant protections in bankruptcy and he has duties to the estate and the creditors; he cannot have something more important than his bankruptcy case every day until January 13.

Our subpoena stands and we expect the debtor to produce the documents requested and appear at the exam on the time and date set forth in the subpoena and we will pursue appropriate remedies if the debtor fails to obey the subpoena and the court order. The burden is on you to file a motion to quash and explain to the court why the debtor is unwilling to submit to an examination until after an entire month following service of the subpoena.

Thank you.


**Tereza Simonyan**



Attorney at Law, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7082
Cell: 206.239.8227
www.lanepowell.com

---

**From:** Deirdre Glynn Levin [mailto:dglynnlevin@KellerRohrback.com]
**Sent:** Tuesday, December 17, 2013 3:45 PM
**To:** Simonyan, Tereza
**Cc:** Ekberg, Chuck
**Subject:** RE: Scheduling of R 2004 Exam and Objections to Document Production

Sorry, Tereza. We don't accept your premise that "millions of dollars are being transferred out of the estate on a weekly basis". My client denies this allegation.
If you have evidence, then best explain that to the court and I would be very interested to see what Bitvestment has to show in support.

The BR 2004 exam can be held on January 13 2014 and we will have Peter available on that date.

Thank you.
dpgl


---------------------------
Deirdre Glynn Levin
Attorney
Keller Rohrback L.L.P.
Phone: (206) 623-1900
Fax: (206) 623-3384
Email: dglynnlevin@kellerrohrback.com

CONFIDENTIALITY NOTE: This e-mail contains information belonging to the law firm of Keller Rohrback L.L.P., which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual entity named above. If you think that you have received this message in error, please e-mail the sender. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.

2

# EXHIBIT M

## OPERATIONS AGREEMENT

THIS OPERATIONS AGREEMENT (the "Agreement") is made and entered into and effective this 4TH day of November 2013 (the "Effective Date"), by and between CoinLab, Inc. ("CoinLab"), a corporation organized and existing under the laws of the State of Delaware, having its primary office at 900 Winslow Way East, Suite #100, Bainbridge Island, WA, 98110 and CLI Holdings, Inc. dba Alydian ("Alydian"), a corporation organized and existing under the laws of the Republic of Seychelles under the International Business Companies Act, 1994 having its primary office at 900 Winslow Way East, Suite #100, Bainbridge Island, WA, 98110. CoinLab and Alydian shall each be referred to herein individually as a "Party" or jointly as the "Parties".

## R E C I T A L S

WHEREAS:

Since August, 2012, Alydian has been developing an enterprise-scale BitCoin mining system, and owns the intellectual property rights to a BitCoin mining chip and certain other inventory and system designs necessary to implement a BitCoin mining system (the "System");

Since August 2012, CoinLab has served a BitCoin business incubator, building infrastructure to allow Alydian to build and work toward implementation of the System;

In order to implement the System, Alydian requires, and CoinLab is willing and able to provide, use of CoinLab's computer hardware, mining rigs, mining chips, inventory, hosting contracts, offices, management, administration, deployment specialists, manufacturing support, and services of Coinlab's engineers;

Since August 2012, CoinLab and Alydian have operated under an informal working relationship to implement the System;

CoinLab and Alydian seek to memorialize the terms governing their past business relationship;

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, and for other valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties hereto agree as follows:

1. **Advance and Expenditure of Direct Costs.** Subject to the repayment obligation set out herein, and the other terms and conditions of this Agreement, CoinLab agrees, for the purpose implementing the System, that it will advance and expend certain direct costs which shall include, but are not limited to
contracts, including hosting contracts with third parties which are reasonably necessary carry out the System (including Wowrack and Sabey), supplies, parts, inventory, consultants, personnel, employees, third-party professionals, work-related travel expenses for CoinLab personnel (the "Direct Costs").

2. **Alydian's Repayment Obligation for Direct Costs.** In consideration of the terms and conditions of this Agreement, Alydian agrees to repay CoinLab, due upon receipt, for its invoiced Direct Costs, plus an administrative fee of ten percent (10%) subject to a maximum of $5000.00 per invoice.

3.0 **Exclusive Authority.** CoinLab shall have exclusive authority and discretion to:

(i)     Determine the scope of the Direct Costs hereunder;
(ii)    Enter into contracts or agreements with any consultant, contractor, employee and professional for the purpose of implementing the System;

(iii)    Enter into and administer all agreements and contracts with third parties as reasonably necessary to implement System including but not limited to, contracts with hosting providers;
(iv)    Direct the activities of any persons working on the System.

**4.**    **Form of Payment**. Alydian may, at its sole discretion, pay CoinLab, and CoinLab shall accept, remittance for its invoices in either U.S. dollars or BitCoins. If Alydian remits payment in BitCoin, the Bitcoins are marked to market at the day of CoinLab's purchase, and remitted as Alydian has BitCoins available.

**5.**    (N) **Term and Termination**. This Agreement will commence as of the Effective Date and continue for a  month period unless terminated earlier under the terms of this Agreement. This Agreement will automatically extend month to month, unless otherwise agreed to by the Parties. This Agreement may be terminated by either Party upon sixty (60) days' written notice to the other Party.

6.    **General Representations and Warranties.** Each Party hereby represents and warrants that:

(i)    Such Party is duly organized and validly existing under applicable laws and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof.

(ii)    Such Party is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder.

(iii)    This Agreement is a legal and valid obligation binding upon the Parties hereo and enforceable in accordance with its terms. The execution, delivery and performance of this Agreement by such Party does not conflict with any agreement, instrument or understanding, oral or written, to which it is a Party or by which it may be bound, nor violate any law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

7.    **Limitation of Liability**  COINLAB SHALL NOT BE LIABLE FOR ANY LOSS OF PROFITS, LOSS OF BUSINESS, LOSS OF DATA, INTERRUPTION OF BUSINESS, NOR FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, WHETHER IN CONTRACT OR IN NEGLIGENCE, WHICH MAY ARISE FROM THE USE BY THE SYSTEM.

8.    **Indemnification**. Alydian will defend, indemnify, and hold harmless CoinLab and its officers, directors, employees, shareholders, representatives, affiliates, agents, licensees, successors and assigns, from and against any and all obligations, costs, claims, judgments, losses, expenses, liabilities and reasonable fees and costs of attorneys and experts arising from or related to: (a) any claim or allegation that, if true, would constitute a breach of any of Licensee's representations or warranties hereunder; (b) any acts or omissions by its employees, agents or consultants in performing its obligations under this Agreement including, without limitation, any property damage or bodily injury.

9.    **Confidentiality.**
(a) "Confidential Information" means all information disclosed by the one Party (the "Disclosing Party") to the other Party (the "Receiving Party"), including, without limitation, any and all information or proprietary materials (in every form and media) which have been or are hereafter disclosed and which are not generally known in the relevant trade or industry of the Parties or their respective affiliates or third parties with which either Party conducts or may conduct business. Confidential information includes, without limitation: (i) the terms of this Agreement; (ii) all trade secrets and Intellectual Property Rights; and (iii) existing or contemplated products, business plans, market research data, whether containing historic, current or future-related information. Confidential Information shall not include information that: (A) is public or becomes known to the public through no breach of an obligation of confidentiality by the Receiving Party, (B) is independently developed by the Receiving Party with no access to the Disclosing Party's Confidential Information or (C) is received from a third party under no obligation of confidentiality. In addition, the Receiving Party may disclose

Confidential Information of the disclosing Party to the extent such disclosure is required by law, court order or order of a governmental agency with jurisdiction; provided that the Receiving Party notifies the Disclosing Party prior to such disclosure and gives the Disclosing Party a reasonable opportunity to seek a protective order or to contest such requirement.

(b) The Receiving Party shall treat all Confidential Information as strictly confidential, and shall use the same care to prevent disclosure of such information as such Party uses with respect to its own confidential information, which shall in no event be less than a reasonable degree of care. In any event, the Receiving Party shall: (i) disclose such Confidential Information to (A) only those authorized employees and directors of the Receiving Party whose duties justify their need to know such information and who have agreed in writing to maintain the confidential and/or proprietary status of such Confidential Information; or (B) only those third parties required for the performance of the Receiving Party's obligations under this Agreement pursuant to a written agreement containing provisions as least as extensive as the confidentiality provisions of this Agreement; and (ii) use such Confidential Information only in accordance with the terms of this Agreement.

10.     **Proprietary Materials and Ownership.**
(i)     As used in this Agreement, "Proprietary Materials" means all copyrightable works, ideas, discoveries, inventions, patents, products, devices, computer programs, techniques, know-how, algorithms, procedures, discoveries or inventions, and all materials, texts, drawings, specifications, source code and other recorded information, in preliminary or final form and on any media whatsoever, that are conceived, reduced to practice, developed, discovered, invented or made (whether solely or jointly with others) in connection with the System.

(ii)     **Ownership.** Alydian will be the exclusive owner of all Proprietary Materials. To the extent permitted under the U.S. Copyright Act (17 U.S.C. §101 et seq., and any successor statute thereto), the Proprietary Materials will constitute "works made for hire", and the ownership of such Proprietary Materials will vest in perpetuity at the time they are created. In any event, CoinLab hereby assigns and transfers to Alydian without separate consideration, all right, title and interest that CoinLab may now or hereafter have in the Proprietary Materials, including, without limitation, all copyright, trademark, trade secret, patent and other intellectual property and proprietary rights of any kind or nature therein. To the maximum extent allowed, CoinLab hereby irrevocably and unconditionally waives, in perpetuity, any rights it may have with respect to the Proprietary Materials under any law relating to "the moral rights of authors" or any similar law throughout the world.

11.     **Notice.** Any notice or other communication hereunder shall be in writing and sent to the principal address of the Parties set forth on the first page of this Agreement to the attention of those Parties indicated below, or to such other address or Parties as either Party may advise the other by written notice.

12.     **No Assignment without Consent.** The rights under this Agreement shall not be sold, assigned, leased, hypothecated, pledged or otherwise alienated without both Parties express written consent.

13.     **Amendment.** Unless otherwise provided herein, this Agreement may not be changed, waived, discharged, or terminated orally, but only by a written document signed by duly authorized officers of each of the Parties hereto.

14.     **Headings.** The paragraph headings contained herein are for convenience or reference only and shall not control the interpretation of any term or condition hereof.

15.     **Severability.** If any portion of this Agreement shall be held invalid or inoperative, then, so far as is reasonable and possible, the remainder of this Agreement shall be considered valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative.

16.     **Waiver.** No failure or delay by any Party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial waiver thereof include any

other or further exercise thereof or the exercise of any other right, power or privilege.

17.    **Relationship of Parties.** Nothing herein contained shall be deemed to create an agency, joint venture or partnership relation between the Parties hereto. It is understood and agreed that neither Party is, by reason of this Agreement or anything herein contained, constituted or appointed the agent or representative of the other Party hereto for any purpose whatsoever, nor shall anything herein contained by deemed or construed as granting to either Party any right or authority to assume or to create any obligation or responsibility, express or implied, for, on behalf of, or in the name of the other Party hereto, or to bind the other Party hereto in any way or manner whatsoever.

18.    **Acknowledgment.** Each Party acknowledges that it has read this Agreement, understands it and agrees to be bound by its terms.

19.    **Enurement.** Subject to the limitations herein before expressed, this Agreement will enure to the benefit of and be binding upon the Parties and their respective successor and permitted assigns.

20.    **Governing Law.** This Agreement will be governed and construed in accordance with the laws of the state of Washington as applied to transactions taking place wholly within Washington between Washington residents. The Parties hereby expressly consent to the exclusive personal jurisdiction of and venue of the state and federal courts located in King County, Washington for any lawsuit filed there arising from or related to this Agreement.

21.    **Arbitration.** All disputes arising out of or in connection with this Agreement, or in respect of any defined legal relationship associated herewith or derived therefrom, shall be referred to and finally resolved by arbitration administered by pursuant to AAA rules. The place of arbitration shall be Seattle, Washington and the cost of such arbitration shall be borne equally by the Parties.

22.    **Entire Agreement.** This agreement together constitutes the entire agreement between CoinLab and Alydian and supersedes all prior communications or correspondence of the Parties in either written or oral form.

23.    **Further Assurances.** From and after the date of this Agreement, upon the request of either Party, the other Party shall execute and deliver such instruments, documents and other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

IN WITNESS WHEREOF the Parties have executed and delivered this OPERATIONS AGREEMENT.

CLI Holdings, Inc.

By:    _____
       Peter J. Vessenes
       Its Managing Director


CoinLab, Inc.
By:    _____
       Peter J. Vessenes
       Its Chief Executive Officer

# EXHIBIT N

1  date?

2    A.    He's still going.  He's a creditor.  He's a

3  potential buyer within the bankruptcy, like he and Tim

4  might be interested in buying the rigs (Chk.

5    Q.    You have had discussions with Mr. Yarmon about

6  purchasing the rigs?

7    A.    Yes.

8    Q.    What did you discuss with Mr. Yarmon concerning

9  buying the mining rigs?

10   A.    I told him that we were hoping to sell them,

11  and he like all creditors had received notice of the

12  motion for the sale.  He indicated to me that he and Tim

13  might be interested in purchasing them.

14   Q.    Was anything else discussed with Mr. Yarmon

15  concerning the potential sale of the mining rigs?

16   A.    No.  I referred him to Keller Rorback.

17   Q.    How many conversations did you have with Mr.

18  Yarmon concerning the potential sale of the mining rigs?

19   A.    One.

20   Q.    Was it in person on the telephone or email?

21  How was it?

22   A.    It was on the telephone.

23   Q.    I'm sorry.  I couldn't hear that answer.  How

24  did you communicate with Mr. Yarmon about that?

25   A.    It was on the telephone.

1      Q.      How long was the telephone call?

2      A.      I don't recall.

3      Q.      When was the telephone call?

4      A.      I don't recall.

5      Q.      Was it in 2014 or 2013?

6      A.      I don't recall.

7      Q.      Was it prior -- was it prior to or after the

8  debtor made a motion to sell the equipment?

9      A.      Like I told you, it was after because he had

10  received notice like all the other creditors.

11      Q.      Did you have any discussions with Joel Yarmon

12  concerning the fact that you were thinking about selling

13  all the equipment before filing the motion?

14      A.      I don't recall.

15      Q.      You don't recall if -- you don't recall if you

16  had a conversation with Joel Yarmon concerning the

17  potential sale of the debtor's mining equipment prior to

18  you filing that motion to sell?

19      A.      That's correct.

20      Q.      Did you speak with anyone else concerning the

21  potential sale of the mining rigs?

22      A.      Yes.

23      Q.      Who?

24      A.      Deirdre Glynn Levin.  Wendy Wallace at CoinLab.

25  Hans Olson.  Bobby Seidensticker.  That's it, I believe.

# EXHIBIT O

1      Q.     By whom?

2      A.     The only person I have spoken to directly is

3  Joel Yarmon.  The others have contacted Keller Rorback.

4  Well, there's one other.  I don't remember his name, the

5  guy are from Idaho.  Someone from Idaho.

6      Q.     I think you testified earlier and if I'm wrong,

7  Mr. Vessenes correct me, did you speak with Mr. Draper

8  about this?

9      A.     No.  Joel Yarmon.  And I just said Joel Yarmon.

10  I reiterated that.

11      Q.     Okay.  And somebody in Idaho?

12      A.     That's correct.

13      Q.     Anyone television about which you are aware?

14      A.     There are more.  I've heard there are more, but

15  I have not.  I have no direct knowledge of them.

16      Q.     Has any entity or individual in connection with

17  the purchase of the mining potential purchase of the

18  mining rigs conducted any due diligence?

19      A.     No.

20      Q.     Has the debtor -- what marketing efforts

21  regarding the potential sale has the debtor performed?

22      A.     I don't believe we're allowed to do marketing

23  until we have got a court order approving it, but we are

24  ready to do some marketing.

25      Q.     You are ready to do some marketing?