1

1          UNITED STATES BANKRUPTCY COURT

2       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    ------------------------------------------------
                                          )
4    In Re:                               ) No. 13-19746-KAO
                                          )
5    CLI HOLDINGS, Inc. d/b/a ALYDIAN,    )
                                          )
6              Debtor.                    )
                                          )
7    ------------------------------------------------

8                       HEARING

9        Before the Honorable Karen A. Overstreet

10                   January 10, 2014

11             Digitally Recorded Proceedings

12   ------------------------------------------------

13

14

15

16

17

18

19

20

21

22

23   Transcribed by:     Shanna Barr, CETD

24                       Reed Jackson Watkins

25                       206.624.3005

```
 1                    A P P E A R A N C E S

 2

 3         For CLI Holdings Inc.:

 4              DEIRDRE GLYNN LEVIN
                Keller Rohrback LLP
 5              1201 Third Avenue
                No. 3200
 6              Seattle, Washington 98101

 7

 8         For Bitvestment Partners LLC f/k/a Dalsa Barbour LLC:

 9              TEREZA SIMONYAN
                Lane Powell PC
10              1420 Fifth Avenue
                Suite 4200
11              Seattle, Washington 98101

12

           For Soule Investments:
13
                JERRY N. STEHLIK
14              Bucknell Stehlik Sato & Stubner LLP
                 2003 Western Avenue
15              Suite 400
                 Seattle, Washington 98121
16

17         For CoinLab:

18              JANE PEARSON
                Foster Pepper PLLC
19               1111 Third Avenue
                Suite 3400
20               Seattle, Washington 98101

21

22         Also Present:

23              WENDY WALLACE
                General Counsel for CoinLab
24

25
```

<pre>
 1                      January 10, 2014

 2                        --oo0oo--

 3

 4            THE COURT:  Good morning.  Please have a seat.

 5            MR. STEHLIK:  Good morning, Your Honor.

 6            THE COURT:  All right.  This is the time that I

 7   have set for the case CLI Holdings, Inc.  It's Case

 8   No. 13-19746.  It is a motion to establish bidding

 9   procedures in connection with a proposed sale.  So what

10   I'd like to do is start with appearances for the record.

11            Ms. Glynn Levin, we can start on your side.

12            MS. GLYNN LEVIN:  Thanks.  Deirdre Glynn Levin on

13   behalf of the debtor, Your Honor.  And next to me is the

14   principal of my client, Peter Vessenes.

15            THE COURT:  All right.

16            MS. GLYNN LEVIN:  And he is available today to

17   testify orally if that's what the Court --

18            THE COURT:  Okay.  I don't normally -- wouldn't

19   normally take --

20            MS. GLYNN LEVIN:  Yes.

21            THE COURT:  -- testimony on my calendar, but go

22   ahead.

23            Ms. Simonyan?

24            MS. SIMONYAN:  Your Honor, Tereza Simonyan on

25   behalf of Bitvestment Partners LLC.  Good morning,
</pre>

1 Your Honor.

2   MR. STEHLIK:  Good morning, Judge.  Jerry Stehlik

3 on behalf of Soule Investments LLC, a creditor.

4   MS. PEARSON:  And, Your Honor, Jane Pearson here

5 this morning for CoinLab.  And with me is general counsel

6 for CoinLab Wendy Wallace.

7   THE COURT:  All right.  Ms. Glynn Levin, it's your

8 motion, so why don't I turn the podium over to you first.

9   MS. GLYNN LEVIN:  Good morning, Your Honor.

10 Deirdre Glynn Levin again on behalf of the debtor, and it

11 is the debtor's motion under Section 363 to seek the

12 approval for bidding procedures.

13   The Court has had some familiarity with this case,

14 but I will briefly review for the record what I think are

15 the key facts, and would like to go through -- then

16 through the law and the elements that the debtor believes

17 it has -- will be able to establish by the end of today's

18 hearing, has established on the record, and then I'd like

19 to address the two objections that were filed.  One

20 objection was just filed yesterday at 5:00 p.m., so

21 suffice to say, there was --

22   THE COURT:  Okay.  Well, responses were due by

23 January 8th.

24   Yours was due later, right?  Right.  Because I

25 extended it, so it was timely.

1          MS. GLYNN LEVIN:  Oh, I'm not saying it wasn't

2     timely, Your Honor, just that there wasn't an opportunity

3     to prepare a written reply.  So to the extent I am able,

4     I am happy to address those in my oral arguments.  But

5     there are some specific factual allegations that seems

6     important to -- may be important on the record to refute,

7     although in my view, those are not related to the sale

8     motion.  They are -- there are other remedies available.

9          THE COURT:  Okay.  But in my view, they're the

10     elephant in the room.

11          MS. GLYNN LEVIN:  All right.

12          THE COURT:  Because if I can't trust the debtor to

13     operate post-petition in conformance with the code and I

14     can't trust the debtor's principal to use the monies as

15     required in a Chapter 11 proceeding, then we have a huge

16     problem.  So I do need you to address those factual

17     issues today.

18          MS. GLYNN LEVIN:  Well, I am happy to address

19     them, but they are -- I mean, they really require the

20     testimony because the basis for some of those objections

21     are in excerpts from a 2004 exam, which we saw, again,

22     yesterday for the first time after 5:00 p.m., and the

23     only way to really address them specifically is to be

24     able to allow Mr. Vessenes to testify.

25          THE COURT:  Okay.  Well, you can address them with

1    what you think his response will be to those contentions,

2    but I think fundamentally at issue in the case is whether

3    it makes any sense at all to sell equipment at this point

4    in time when the debtor appears to be generating

5    significant income through the mining of bitcoin.

6            MS. GLYNN LEVIN:  Yes.

7            THE COURT:  So you need to make that comparison

8    for me today.

9            MS. GLYNN LEVIN:  Absolutely.

10           THE COURT:  How much are we going to get for the

11   equipment versus how much is this debtor able to generate

12   on the monthly basis for the benefit of the creditors.

13           MS. GLYNN LEVIN:  Oh, absolutely, Your Honor.  And

14   there are -- this case is really all about time.  You

15   know, you might say, well, it's really all about bitcoin

16   or it's all about, you know, a virtual currency, but in

17   some ways it's all about time, and it's sort of a ticking

18   time bomb.  Not that it's going to explode, but rather

19   it's going to -- that the ability for the economic stream

20   and the business model is -- has changed so rapidly that

21   it makes it imperative to sell these rigs now.  And in

22   the debtor's business judgment, it is the right time to

23   sell them right now, and I'll go through that in a little

24   bit more detail.

25           I wanted to make sure that Your Honor had an

1    opportunity to see the supplemental declaration of

2    Mr. Vessenes that was filed on --

3         THE COURT:  I did --

4         MS. GLYNN LEVIN:  -- January 6th.  There are a

5    couple of exhibits to that declaration which I think are

6    really key and which perhaps with more elaboration can

7    help allay some of the Court's concerns.

8         So a little bit about the background to the --

9    again, we have a case that was filed on a fairly

10   expedited basis, November 1st, 2013, and the reason for

11   filing that, while it was alluded to, well, this is not a

12   case that was filed under sort of the typical debtor's

13   circumstances, in fact, it really was very typical in

14   that there was litigation that had commenced in the U.S.

15   District Court in New York, Southern District of New

16   York, and notably brought by the same creditor who is

17   objecting today, and that a stay of that proceeding was

18   necessary under 362.  And that actually triggered the

19   filing, and in the course of the next eight to ten weeks

20   we've seen an evolution of facts which will lead me up to

21   the point today where we assert that there are more than

22   adequate grounds for a sale.

23        First of all, how exactly does the debtor operate?

24   Your Honor heard at the 2004 hearing on December 30th

25   that there is an underlying operating agreement which

1    memorializes the past operating protocols between one of

2    the owners of the debtor -- that's CoinLab, Inc. --

3    again, represented by Jane Pearson today -- who owns 65

4    percent of the common stock.  The other owner is also a

5    creditor.  And all creditor claims, by the way, have --

6    shall I say the deadline has passed.  They have not all

7    filed, but the deadline has passed.

8           THE COURT:  Deadline for claims.

9           MS. GLYNN LEVIN:  Correct.  The debtor is in this

10    arrangement, this operating agreement with CoinLab

11    whereby CoinLab sources out the vendors, sources out

12    the -- all the equipment, all the -- all of the parts,

13    really, for these --

14           THE COURT:  Okay.  But let me stop you for just a

15    second --

16           MS. GLYNN LEVIN:  -- mining rigs --

17           THE COURT:  -- because there's all kinds of stuff

18    going on in here, like there's ringing and there's

19    vibrating.  So if everybody could just turn whatever

20    these things are off.

21           MS. GLYNN LEVIN:  Let's make sure everything is

22    off.

23           THE COURT:  It's sort of interrupting the flow of

24    Ms. Glynn Levin's argument.  I think the buzzing has

25    stopped.

1              MS. GLYNN LEVIN:  Under that operation agreement,

2     the -- CoinLab invoices the debtor and the debtor

3     reimburses CoinLab for all of its products, all of its

4     inventory, everything that has been --

5              THE COURT:  So you're talking about their

6     prepetition operating agreement, right?

7              MS. GLYNN LEVIN:  It's --

8              THE COURT:  Because I think, according to the one

9     that Mr. Vessenes signed post-petition, it indicates that

10    they have operated under an informal working

11    relationship, so I don't believe I have seen a

12    prepetition written agreement between these two entities.

13             MS. GLYNN LEVIN:  To the best of my knowledge,

14    there is no --

15             THE COURT:  Okay.

16             MS. GLYNN LEVIN:  -- written agreement, but that

17    has been the protocol.  So the -- this operating

18    agreement memorializes the past and makes it clear as to

19    the companies' relative rights and responsibilities.

20    Under that arrangement, CoinLab invoices the debtor for

21    its direct costs plus an administrative fee up to ten

22    percent subject to a maximum of $5 ,000 per invoice.  All

23    of those invoices for the last year were turned over

24    in -- under the Rule 2004 production, and the SOFA --

25             THE COURT:  To Bitvestment?

1          MS. GLYNN LEVIN:  Yes.  And the SOFA 3(b) and 3(c)

2     were amended also to ensure that there was an index of

3     all of those invoice dates, dates of payments and

4     amounts, and there is a -- there's a sort of an

5     evolution.  At the beginning, those were paid in dollars.

6     Later they were paid in bitcoin, which is permitted under

7     the operating agreement.  CoinLab was not paid out in

8     full.  There were some points made about payments made

9     within the first few days prepetition --

10          THE COURT:  Two days before the petition.

11          MS. GLYNN LEVIN:  Prepetition.  Those were based

12    on documented invoices, and CoinLab is, in fact, not paid

13    out in full.  It is a general unsecured creditor, and

14    that's documented --

15          THE COURT:  So doesn't that make it like a really,

16    really large preference?

17          MS. GLYNN LEVIN:  They were -- one would need to

18    go through the preference analysis.

19          THE COURT:  One would need to go through that

20    because a payment of in excess of a million dollars two

21    days before the petition date would certainly be the

22    subject of a concern over preference recoveries.

23          MS. GLYNN LEVIN:  And we can certainly get into

24    that.  In terms of the dollar amount, I'm going to be

25    really careful about talking about dollar amounts when --

1    because these exchange rates that have been used, I mean,

2    they fluctuate in -- with a great deal of -- there's a

3    great deal of variation in them, so to say that there was

4    a transfer made in a certain amount of dollars, at least

5    in the objections that I've seen, there is no real way of

6    calculating how those dollar figures came up.  But it's

7    undeniable that those were amounts that were invoiced

8    over the prior couple of months.  There has been a

9    regular pattern -- invoice and then payments in either

10   dollars or bitcoin -- and CoinLab -- I mean, CoinLab is

11   essentially the only provider of services, goods and

12   services.

13        THE COURT:  But Ms. Pearson can represent

14   CoinLab --

15        MS. GLYNN LEVIN:  Yes.

16        THE COURT:  -- as to whether these were payments

17   in the ordinary course of business.

18        MS. GLYNN LEVIN:  Indeed.  Over the course of

19   approximately eight, nine months between December 2012

20   and August 2013, the debtor entered into this -- a number

21   of bitcoin service agreements, and essentially what those

22   were were presales with several customers.  The debtor

23   brought a motion to reject those as executory contracts.

24   Only two of those customers objected and a hearing took

25   place on December the 6th.  The Soule Investment hearing

1      was continued to next Friday, the 17th.  Bitvestment made

2      its arguments, and the debtor's motion was denied.  But

3      as to all the other customers, the executory contracts

4      have, in fact, been rejected under the Court's ruling.

5      And all of those creditors, again, except one, actually,

6      filed a proof of claim.  There are, as well, two other

7      creditors:  XRay Holdings, which is both a shareholder

8      and lender, has a $3 million claim; and as, again, I

9      said, CoinLab has a trade credit of over $400,000.

10             Let's get to the assets for the -- that are for

11     sale here.  I hope I have done an adequate job in my

12     pleadings to articulate what these assets are, and I --

13             THE COURT:  Well, I'm confused, to tell you the

14     truth, because I don't know what they're called.  If I

15     look on Exhibit B, where do you actually find them?  You

16     have Exhibit 1 that has a really detailed listing, and

17     some of the items on there have large values ascribed,

18     but where do I actually find the rigs on Schedule B?

19             MS. GLYNN LEVIN:  I'm not sure that the rigs --

20     well, I should be careful about saying that.

21             THE COURT:  And I only ask because in Exhibit N,

22     the operations agreement that Mr. Vessenes signed

23     post-petition, it says, "In order to implement the system

24     Alydian requires, and CoinLab is willing and able to

25     provide, use of CoinLab's computer hardware, mining rigs,

1     mining chips, inventory, hosting contracts, offices,

2     etc.," which implies to me that it's CoinLab which owns

3     the rigs and not the debtor.  So then when I go to

4     Exhibit B, I'm wondering, where are they?  What are they

5     called on here?

6               MS. GLYNN LEVIN:  So I had the same questions when

7     I started working on this case, so let me explain.  And I

8     might add that Schedule B was also amended, although it's

9     used, to add bitcoin balances held in accounts totaling

10    approximately $5,000 as of the petition date.  But

11    Your Honor is referring to, really, hardware.  So the

12    process is that CoinLab goes out, sources all of this,

13    brings in all of these parts from multiple vendors.  And

14    we're talking everything from the screws that the

15    computers are -- used to the chips.  Very, very

16    complicated rigs that are then put together into systems.

17    The Schedule B outlined some inventory, which are the

18    parts which were not yet put into systems.  In other

19    words --

20               THE COURT:  Right.

21               MS. GLYNN LEVIN:  -- the miscellaneous parts not

22    yet part of the -- of a launched system.  The launched

23    systems actually at the time of the -- at the filing,

24    there really weren't that many launched systems.  All of

25    those parts were in the process of being launched, and I

1      think as of --

2              Correct me if I'm wrong, around mid November, the

3      first systems were launched?  Would that be correct?

4              MR. VESSENES:  No.  The first ones were launched

5      in July.

6              MS. GLYNN LEVIN:  The first ones launched in

7      July?

8              MR. VESSENES:  And then we just finished -- should

9      have finished today, I think, with the last ones.

10             MS. GLYNN LEVIN:  The last ones were finished

11     today.  So it's an evolving process, but -- so what we

12     have for sale today is really sort of the culmination of

13     all the services and parts and intellectual --

14             THE COURT:  Thirty-four systems.

15             MS. GLYNN LEVIN:  Correct, 34 systems.  The way

16     it's -- we have framed this for sale is rather by selling

17     the -- rather than selling them for system, in this

18     industry it's -- they are -- it's described as

19     "terra-hash," which is really power or, in my sort of

20     novice way of looking at this, is really kind of like

21     horsepower.  It's the power that a system has.

22             THE COURT:  Okay.  But doesn't that mean that you

23     would then amend Schedule B again to turn this work in

24     process into 34 systems which are generating a total of

25     170 terra-hashes of power?

```
 1              MS. GLYNN LEVIN:  Actually, and approximately 200
 2    now.  I mean, if we were to have to amend Schedule B
 3    every time we added power, I would probably be amending
 4    that --
 5              THE COURT:  Right.  Agreed.
 6              MS. GLYNN LEVIN:  -- multiple, multiple times
 7    with --
 8              THE COURT:  Then how do I figure out how the
 9    debtor values these systems, and why is it that CoinLab
10    claims to own rigs in this agreement that Mr. Vessenes
11    signed for himself and CoinLab?  I mean, who --
12              MS. GLYNN LEVIN:  I'm not sure which agreement
13    you're looking at.
14              THE COURT:  Well, what I don't understand is we --
15    when we try to sell something in bankruptcy, we actually
16    have to demonstrate to the buyers what's being sold.  And
17    I think this is a question Mr. Stehlik asks --
18              MS. GLYNN LEVIN:  Yes.
19              THE COURT:  -- on behalf of his client.  Where is
20    the description of what is being sold, and does the
21    debtor have proof that the debtor actually owns what's
22    being sold?
23              MS. GLYNN LEVIN:  Absolutely, Your Honor.  I'm not
24    sure what agreement you're referring to that says that
25    the CoinLab owns --
```

```
 1          THE COURT:  I'm referring to the operations

 2     agreement dated November 4th, 2013, between CoinLab and

 3     the debtor, which was clearly signed post-petition, and

 4     it's signed by Mr. Vessenes as the managing director of

 5     the debtor, and it's signed by Mr. Vessenes as the chief

 6     executive officer of CoinLab.  And it says in the

 7     recitals that CoinLab is willing and able to provide use

 8     of its hardware, mining rigs, mining chips, inventory,

 9     etc., making it sound like it's CoinLab that really owns

10     everything.  And the only thing referenced in this

11     agreement that appears to be owned by the debtor is

12     called proprietary materials.

13          MS. GLYNN LEVIN:  Well, those -- they may start

14     out being owned -- I mean, they are -- the parts which

15     then become launched into systems by the debtor start out

16     as being owned by CoinLab.  CoinLab pays for them, for

17     the parts, but then they are effectively manufactured.

18     Like any manufacturing process, it's going through a

19     series of steps, and in our timeline, in our sequence,

20     once those are -- once they are invoiced and the debtor

21     pays for them, then effectively they're owned by the

22     debtor.  I don't think -- certainly, counsel for CoinLab

23     can make these arguments as well, but there's no question

24     at all that the debtor owns these.  The debtor is on the

25     record saying it's selling them.  It has the rights to
```

1    sell them.   No one else is claiming the rights to sell

2    them or own them.

3         THE COURT:   So the debtor owns these 34 systems.

4    And I haven't seen the CoinLab invoices, so I don't know

5    whether -- I assume based upon the position you've taken

6    that they do not reserve a security interest in these

7    systems and that the monies they claim they are owed in

8    the proof of claim file are completely unsecured monies.

9         MS. GLYNN LEVIN:   Absolutely correct.   There is no

10   security.

11        THE COURT:   All right.

12        MS. GLYNN LEVIN:   There is no security instrument

13   at all here.   Does that --

14        THE COURT:   So based upon your evidence that's in

15   the record, what do you say is the value that the debtor

16   believes it can obtain by selling these 34 systems?

17        MS. GLYNN LEVIN:   Okay.   So let's go to value and

18   let's go to sale and let's go to the marketplace.

19        THE COURT:   Right.

20        MS. GLYNN LEVIN:   Because this isn't a selling --

21   these aren't selling used cars.   There's no Blue Book

22   value.   There's no appraisal where one comes in and

23   says -- you know, has an independent appraiser who has

24   special qualifications and says, "I think this is what

25   these are due."   In fact, the expert -- probably one of

```
 1    the worldwide experts in what these things are valued at
 2    is sitting to my right.  It's Mr. Vessenes himself.  And
 3    the objections about the value, I noticed, were not
 4    supported by any evidence at all other than some
 5    miscellaneous excerpts of his own testimony.  There's no
 6    other opposing testimony of any expert to say, you know,
 7    you're selling these way too low or you're selling these
 8    way too high so that, you know, no potential buyer could
 9    ever potentially --
10            THE COURT:  Well, how I'm --
11            MS. GLYNN LEVIN:  -- would ever want to buy that.
12            THE COURT:  How I'm looking at it, though, is if
13    the debtor has income of $1.8 million for one month, the
14    first month of bankruptcy -- in other words, this is a
15    unique debtor because this debtor apparently doesn't
16    suffer any problems as a result of being in bankruptcy.
17    For example, a retail store everybody knows is in
18    bankruptcy, now the sales drop.  It's not one of those
19    debtors.  This is a debtor that seems to be able to make
20    a lot of money in the post-petition period, so what I
21    need to be convinced is that selling the -- this
22    equipment is going to yield more money than, say --
23            MS. GLYNN LEVIN:  Absolutely.
24            THE COURT:  -- three, four, five, six months worth
25    of operations.  And so that's the question I'm asking is
```

1    where in the evidence can I find that more money can be

2    made by selling this than just generating bitcoin.

3         MS. GLYNN LEVIN:  I do want to address that, and I

4    think the supplemental declaration of Mr. Vessenes and

5    the two exhibits chart that.  And it does require a

6    little bit of sort of a combination of economics and

7    science in understanding the risk in the market.  And

8    this is a very unique industry.  This is not selling

9    stores.  This is not selling coffee shops.  This is

10   selling essentially the mining rigs, the hardware and all

11   of the software and all of the -- everything that goes

12   along with it to a third-party buyer, either in whole or

13   in parts, to a third-party buyer.

14        And the reason why we are looking at a key

15   change -- in fact, it's not a change right now.  It's

16   been a change that has been happening over -- since the

17   debtor actually filed and perhaps even before.  It's that

18   the industry is changing so rapidly.  The evidence on the

19   record is that more and more miners are joining this

20   industry, way, way more than was ever anticipated, and

21   because more miners are joining this industry and because

22   there is a fixed number of bitcoins that may be mined

23   daily, the profit margin is going down for every miner.

24   Every miner is now having to work harder, and the

25   production -- the demands for production are that much

1    more difficult in order to produce it.

2         Now, yes, the debtor had an excellent December,

3    but the trend is not continuing.  The trend is not

4    continuing to go up.  In fact, the trend is going the

5    other way.  The curve is going the other way, and that's

6    partly because of more and more parties entering this

7    mining space.  And, also, the demand for bitcoin is also

8    very fluctuating.  It's a -- again, and one could do an

9    entire course in economics just on the demand for bitcoin

10   and all the different factors that go into the demand,

11   everything from Chinese government to what's going on in

12   Germany to whether Overstock.com is accepting it.  I

13   mean, there are lots of market forces pro and con.

14        The key thing for your -- for the Court's concern

15   here today is -- and perhaps we should turn to that

16   declaration -- is to look at that and to see if I can

17   answer that, look at those exhibits or offer my client to

18   be able to answer them, answer those questions.

19        So let's look at Exhibit A.  It's one that is

20   Document 92-1 on -- in the docket.  So if we look at the

21   projection from January 8th going -- of last year, the

22   mining difficulty, which is a function of how many -- is

23   a function of a number of factors, but including how many

24   other miners there are in the market, is very, very low.

25   It's practically at zero.  If you look over the next six

1    months, it starts to increase very slowly.  It's now

2    going up.  We see over at around July 11th it's now going

3    up.  It's starting to climb.  And by -- say by the

4    petition date, the scale is now increasing, and the

5    figure in our record is that the increase of mining

6    difficulty is now at 43,000 percent, which is a figure I

7    don't think I've ever used before in any, ever, context.

8         Exhibit B shows -- goes to another economic

9    question.  It goes back to the question of hardware, the

10   mining rigs.  What about those?  They are being

11   manufactured by other companies all over the world.  A

12   couple were referenced in Mr. Vessenes's declaration.

13   What's happening with the price of mining rigs?  Let's

14   look at that, Exhibit B.  The mining rigs, which is what

15   we have to sell here, just in the last 30 days -- this

16   graph starts December 8th, 2013, and it ends just the

17   first week of January 2014.  Again, we have a clear

18   decline here.  And there's no argument that this is not

19   objective evidence.  Again, Mr. Vessenes can elaborate --

20        THE COURT:  I want to ask you about the monthly

21   report that was filed and how it lists the equipment.

22   The November report listed deployed systems with a

23   value -- or, you know, maybe this is a cost value, but it

24   says $547,176.

25        MS. GLYNN LEVIN:  Yes.  Cost value.

1          THE COURT:  Right.  And then it showed accumulated

2     depreciation of $364,412.  Well, that's a lot if what

3     you're telling me is they only just deployed these

4     systems.  So now the debtor says total fixed assets

5     182,765.  So I'm still trying to figure out, you sell

6     these rigs, what do you get?  Do you get 400,000?  Do you

7     get 1.5 million?

8          MS. GLYNN LEVIN:  But let --

9          THE COURT:  Do you get 10 million?

10          MS. GLYNN LEVIN:  So --

11          THE COURT:  How do I compare monthly revenue of

12     $1.8 million to what you're going to get if you sell the

13     equipment?  I mean, I agree with you.  It's difficult to

14     value, but you're asking that the debtor just be able to

15     go out and sell the equipment, and we have no idea what

16     we're going to get for it and --

17          MS. GLYNN LEVIN:  So let's go to that.  And there

18     are --

19          THE COURT:  Then maybe we should provide that if

20     we don't get more than we want, we just say:  Forget it.

21     We're not going to sell it this way.

22          MS. GLYNN LEVIN:  I mean, there could be that

23     contingency.  But let's address those two points.  First

24     of all, shouldn't the debtor just continue to work these?

25     Well, clearly on the record we've got some very -- we've

1   got some highly technically trained people.  Not that it

2   necessarily requires, you know, rocket scientists to

3   operate these, but we do have very highly technically

4   trained people who have been working, who have put in

5   their blood, sweat and tears to make these things

6   operate, and they are on the record to say they're only

7   staying until the end of January.  So that --

8        THE COURT:  So let me understand this clearly,

9   because according to Ms. Simonyan's pleadings that she

10  put in, Mr. Vessenes paid them 300-and-some-thousand

11  dollars to stay, and that was just for one month?  Or is

12  that --

13       MS. GLYNN LEVIN:  They actually --

14       THE COURT:  Are those facts just completely wrong?

15       MS. GLYNN LEVIN:  The actual bonuses that were

16  paid in December were only a total of $46,000 to two of

17  the three members of the team.  The third member of the

18  team, Hans Olsen, who has -- was projected to receive a

19  $54,000 bonus, did not.  Did not receive that.  Has not

20  been paid that bonus.  So two of the underlying --

21       THE COURT:  So I'm trying figure out --

22       MS. GLYNN LEVIN:  Yes.

23       THE COURT:  -- how in a Chapter 11 proceeding the

24  debtor pays random bonuses without any court approval at

25  all and without demonstrating that there's a contract in

1    place.

2        MS. GLYNN LEVIN:  Well, they --

3        THE COURT:  How does that happen?

4        MS. GLYNN LEVIN:  They --

5        THE COURT:  I haven't read the bankruptcy code

6    provision, but there is even a provision in the

7    bankruptcy code for the payment of incentive

8    compensation.

9        MS. GLYNN LEVIN:  There are, and they are not

10   employees of the debtor.  They are employees of CoinLab.

11       THE COURT:  So that concerns me even more.  Now

12   what you're saying is the debtor agreed to pay

13   significant incentive compensation to employees of an

14   insider without any court approval at all.

15       MS. GLYNN LEVIN:  Well, we can certainly go back,

16   and if the Court thinks this is important we can

17   certainly go back and outline of -- it all and --

18       THE COURT:  I think it's important, because what

19   I'm not understanding is where Mr. Vessenes draws the

20   line between what he can do outside of bankruptcy and

21   what he can do inside of bankruptcy.

22       MS. GLYNN LEVIN:  I'm certainly happy to --

23       THE COURT:  And what he can't do is spend money of

24   the estate outside the ordinary course of business

25   without court approval.

1           MS. GLYNN LEVIN:  I'm certainly happy to put that

2     forward.  But to be clear, these -- this is the team that

3     is operating them, and without any of them, without one

4     of them, the systems don't go.  So it's a little --

5           THE COURT:  In which case we would have had that

6     in a motion --

7           MS. GLYNN LEVIN:  Yes.

8           THE COURT:  -- with declarations.  People could

9     have objected or not and agreed with you that these

10    people were critical, but instead we find out because

11    Ms. Simonyan or somebody else from her firm took the

12    deposition of Mr. Vessenes and he had to say what

13    occurred.  I guess that's --

14          MS. GLYNN LEVIN:  Again --

15          THE COURT:  -- the problem.

16          MS. GLYNN LEVIN:  -- we're talking the total that

17    have actually been paid of bonuses is $46,000 to two

18    people at Christmastime.  So I am certainly happy to put

19    that before the Court and make full disclosure, and the

20    Court can look at that, can look at the basis of the

21    contract.  CoinLab can explain why these are employees --

22    well, two of them are employees of CoinLab and one is an

23    independent contractor.  There were January bonuses

24    projected or allowed for in a budget, but nothing has

25    been paid.  And that's why -- I mean, that's why it's

1    really unfair to have the 2004 excerpts being thrown

2    around without the entire transcript.  We don't even have

3    the entire transcript.  It's not even a formal

4    transcript.  It's a draft.  So those are the facts.  And

5    I'm certainly happy to -- again, to put Mr. Vessenes on

6    the stand, and he can testify as to those facts.  The

7    Court doesn't have to take my word for it.

8         Let's go to the question of what are these things

9    worth.  Again, we don't have an independent valuation.

10   There is no Blue Book.  There is no appraisal standard

11   for these.  This is -- these are, in fact, sort of custom

12   made mining rigs.  So where does one go to get a pulse on

13   what that's worth?  Well, Exhibit B in Mr. Vessenes's

14   supplemental declaration has some graphing on what these

15   things are being sold for.  And this is a very highly --

16        THE COURT:  Well, let's read the graph, then.

17   Read it for me.

18        MS. GLYNN LEVIN:  Okay.

19        THE COURT:  And tell me what it says.  What it

20   says is there's a -- there's 20,000 -- I mean, I have to

21   look at it online.  So what does it actually say is the

22   per-system price that could be received for the systems?

23   Is it $30,000?

24        MS. GLYNN LEVIN:  Can I have my client help

25   interpret this chart?  Because it's pretty technical.

```
 1              THE COURT:  Well, I mean, it's tiny, for one
 2      thing.  I can't see it.  If he's the expert, you know,
 3      his declaration should just say, "I should be able to
 4      sell these for $30,000 a system."
 5              MR. VESSENES:  If I -- can I finish --
 6              MS. GLYNN LEVIN:  Well, Your Honor, they're not
 7      being sold per system.
 8              THE COURT:  Okay.
 9              MS. GLYNN LEVIN:  They're being sold -- the sale
10      is framed in terms of terra-hash.  And the terra-hash, as
11      I said, is really a measure of power, like horsepower,
12      because that's the way it's measured.  It's not "I'm
13      buying Computer A or Computer B."
14              THE COURT:  So we know how much power we have to
15      sell.
16              MS. GLYNN LEVIN:  Approximately 200,000
17      terra-hash.
18              THE COURT:  Right.
19              MR. VESSENES:  200.  200.
20              THE COURT:  So at what price?
21              MS. GLYNN LEVIN:  Approximately 200,000
22      terra-hash.  But we --
23              THE COURT:  For?
24              MS. GLYNN LEVIN:  In our motion, we have proposed
25      that a minimum bid is $2,000 per terra-hash, and we spent
```

1   some time looking at what really would be a reasonable

2   minimum bid.  And, again, keeping in mind even at the

3   time that we filed the motion to today we could have had

4   fluctuations in the market for what a terra-hash is being

5   sold for in the open market.  We came up with a minimum

6   bid of $2,000 because in our business judgment, and that

7   has not been challenged, in the debtor's business

8   judgment that is a good entry level point for getting as

9   much interest as possible from perspective purchasers.

10  This auction that we are going to propose -- and I have a

11  supplement to our order -- this auction is actually going

12  to be a worldwide auction, and we're actually proposing

13  to -- and I have actually spoken to the Court's very

14  favorite auctioneer to bring that into -- bring that sort

15  of live.

16          THE COURT:  Murphy's going to auction --

17          MS. GLYNN LEVIN:  Mr. Murphy --

18          THE COURT:  -- mining rigs?

19          MS. GLYNN LEVIN:  I have spoken to Mr. Murphy, and

20  he said he is available and ready to do it.  He is -- I

21  mean, there's nobody else who has any more expertise in

22  auctioning generally than Mr. Murphy, and it seemed to me

23  really -- it seemed to be incumbent on the debtor to

24  ensure that we had sort of a neutral process because --

25          THE COURT:  So there isn't some clearinghouse for

1    these sales?

2        MS. GLYNN LEVIN:  There is no clearinghouse for

3    these sales.  And, really, in order to achieve the best

4    price, we really do need to make sure that it's noticed

5    out worldwide, in addition to having Mr. Murphy as a

6    neutral to help facilitate this auction and to assure

7    that every possible bidder gets the opportunity to come

8    in so we know who they are all, all their requirements

9    for qualified bidders.

10        In addition to that, we have engaged a company out

11    of Florida to help do the PR work, and that contract has

12    been executed today, and we will be asking Your Honor to

13    approve that company to -- as a professional to do the PR

14    and marketing to make sure it gets out there.  And they

15    are used to doing this on a sort of crisis, immediate

16    process to put the news out on the Web, to do interviews,

17    to do press releases, to do whatever it takes to get that

18    information out there.  And this potential purchaser base

19    is -- I mean, these aren't people hanging out in their

20    offices.  They're not venture capitalists.

21        THE COURT:  They're not insiders, as

22    Ms. Simonyan's client believes.

23        MS. GLYNN LEVIN:  And then -- there is not one

24    interest from any insider as far as I know in this.

25    There have been -- I mean, there has been contact for a

1    number of potential purchasers, and the one thing that

2    Mr. -- that is not -- was not put in the record is

3    Mr. Vessenes's testimony from his 2004 exam that said he

4    is not making an offer, CoinLab is making an offer, so

5    the -- and whether XRay makes an offer, I don't know.  It

6    doesn't have counsel.

7        But the whole premise that this is designed

8    somehow to -- because it's some sort of an insider

9    collusion and only people with the special knowledge and

10   the special handshake know how to make a bid, I mean,

11   it's -- to be honest, Your Honor, it's baseless.  This

12   debtor has no other purpose in selling these other than

13   to maximize the return to creditors.  And as I said, the

14   alternative -- and we're on January 10th.  The

15   alternative is that in 21 days, approximately, the staff

16   who are going to continue to operate these and maintain

17   it and run it and track the records and, you know,

18   produce the bitcoin production, they're going to be gone.

19   So at most, if we don't have a sale, we have 21 days left

20   of production.

21       Going back to the numbers.  And this -- these

22   large numbers were sort of thrown around: "Oh, there's

23   millions of dollars of production."  Again, it's a play

24   on words.  The net is not millions and millions of

25   dollars.  The debtor has significant cost.  Each of the

1    hosting locations is -- are very pricey leases.  They use

2    massive amounts of power.

3         THE COURT:  Well, let's talk about the leases --

4         MS. GLYNN LEVIN:  All right.

5         THE COURT:  -- just for a second.  Because I got

6    the impression when we were here before that the leases

7    were already something that CoinLab had in place, yet

8    when I looked at the declarations filed, your

9    declarations, I see that only the Sabey lease was in

10   place in August.  The Wow -- one Wow lease for 18 rigs

11   was allegedly entered into on the petition date between

12   CoinLab and the lessor, and the second Wow lease was

13   entered into, according to the declaration, on

14   December 19th, so well after the petition was filed.

15   So --

16        MS. GLYNN LEVIN:  So --

17        THE COURT:  -- now we have CoinLab, which

18   supposedly has the right to charge the debtor dollar for

19   dollar for expenses, entering into what appear to be very

20   expensive leases post-petition, and I was just wondering

21   what the lease rates were before the case was filed

22   because these are --

23        MS. GLYNN LEVIN:  The --

24        THE COURT:  -- new leases.  These aren't leases

25   that were in existence as of the petition date.

```
 1              MS. GLYNN LEVIN:  They have all been negotiated
 2      with some hard-fought negotiating, as I understood --
 3              THE COURT:  Well, how do you know that?
 4              MS. GLYNN LEVIN:  I --
 5              THE COURT:  I mean, have you been in --
 6              MS. GLYNN LEVIN:  I have not been --
 7              THE COURT:  Have you been a part of these
 8      negotiations?
 9              MS. GLYNN LEVIN:  I have not been directly.
10              THE COURT:  Because this is -- one of them is
11      $198,000 a month.
12              MS. GLYNN LEVIN:  That is the cost of --
13              THE COURT:  For ten rigs.
14              MS. GLYNN LEVIN:  That is the cost of -- these
15      things don't go in an office building.  These things go
16      in very highly specialized environments that have proper
17      cooling, that have proper temperature control, that have
18      proper security.
19              THE COURT:  Okay.  But if you just stop and think
20      about it, you can see how now I would want to have some
21      background information about what the debtor was paying
22      before so that I know that the debtor and CoinLab haven't
23      significantly trumped up the value.  Because I don't see
24      any of this on the debtor's monthly report for November.
25      Where is the payment --
```

1              MS. GLYNN LEVIN:   That's --

2              THE COURT:   -- made to CoinLab on the debtor's

3        November monthly statement?

4              MS. GLYNN LEVIN:   So the leases are between

5        CoinLab --

6              THE COURT:   Right.

7              MS. GLYNN LEVIN:   -- and these third parties,

8        Sabey and Wowrack.

9              THE COURT:   But the debtor pays CoinLab.

10             MS. GLYNN LEVIN:   Yes.

11             THE COURT:   And the debtor did --

12             MS. GLYNN LEVIN:   They are --

13             THE COURT:   -- pay CoinLab.

14             MS. GLYNN LEVIN:   They are passed through.   The

15       leases -- there may be some new leases, but they -- there

16       weren't --

17             THE COURT:   Right.

18             MS. GLYNN LEVIN:   There weren't earlier leases for

19       the same space that were then changed or modified.   These

20       are new leases.   Remember, these are things that are

21       being launched over time.   So there may have been one

22       lease on a month.   Then one --

23             THE COURT:   So it's amazing because on the

24       petition date the debtor had only six rigs that were

25       operating -- well, plus 18, because that happened right

1    on the petition date, and then ten new rigs were placed

2    into service in the middle of December.  That's what --

3    how this works?

4         MS. GLYNN LEVIN:  Yes.

5         THE COURT:  Okay.  So then going back to the

6    November monthly statement, I was still looking for a

7    line item for the invoiced payments that the debtor makes

8    to CoinLab for those past due expenses, and I don't know

9    which line item it's on.  That's all I'm saying.

10        MS. GLYNN LEVIN:  Would Your Honor like me to look

11   for that now?

12        THE COURT:  Well, somebody should tell me, yeah,

13   because I'm trying to figure out -- I was, like you,

14   trying to figure out, okay, I assume $1.8 million isn't

15   the net monthly income.  I assume there were some

16   expenses that need to be deducted from that.  And then

17   when I looked at the expenses, I didn't really see -- I

18   see an officer salary of $20,000.  I mean, is that one

19   person?

20        MS. GLYNN LEVIN:  That's Mr. Vessenes' salary,

21   which was not paid.

22        THE COURT:  And he makes $20,000 a month?

23        MS. GLYNN LEVIN:  As I said, that's Mr. Vessenes's

24   salary, which was not paid.  He is not paid.  He has not

25   received a dime since the --

```
1          THE COURT:  So rent I see 3,058.  General and

2     administrative, 43,000.

3          MR. VESSENES:  Here's, like -- so here, example,

4     these are the Wowrack.  Like, there's Vessenes A and E.

5     That's a Wowrack bill.  And then here -- and this is what

6     we gave to the trustee -- here are the budget estimates

7     for hosting.

8          MS. GLYNN LEVIN:  Okay.  So I'm --

9          THE COURT:  So there's a loss of $66,913, but only

10    because there was no profit shown on the original

11    November statement, and then depreciation is the other

12    big number on here.

13         MS. GLYNN LEVIN:  Right.

14         THE COURT:  So where's CoinLab?

15         MS. GLYNN LEVIN:  So the -- I think what I'd like

16    to do, Your Honor, is turn over a document that has

17    actually already been produced in the 2004 exam.  It's

18    actually Bates stamped here at the bottom, and it's a

19    budget that was produced to the U.S. trustee, who is here

20    today, by the way, and he has told me he's not objecting

21    today 's motion.  I think he can vouch for the fact that

22    we turned out -- we turned over this budget.  May I pass

23    up a copy to Your Honor?

24         THE COURT:  Go ahead.

25         MS. GLYNN LEVIN:  So --
```

1        THE COURT:  So it's one I haven't seen, right?

2        MS. GLYNN LEVIN:  I think that this is not -- I

3    don't believe this is part of the -- of the U.S. -- of a

4    monthly operating report.  It may have been.  We were

5    asked to turn it over.  I just can't recall.  So this is

6    Bates stamped.

7        THE COURT:  So Ms. Simonyan has seen it?

8        MS. GLYNN LEVIN:  Yeah.  It's Bates stamped 11 --

9    CLI Chapter 11, and it's numbered starting at 115 through

10    136.  And this is probably a -- well, it's about 30 or --

11    let's say 20 or so pages of probably well over 2-, maybe

12    3,000 pages that were produced under the 2004 exam.

13        THE COURT:  So this shows what the actual payments

14    are supposed to be.

15        MS. GLYNN LEVIN:  This were the operating

16    expenses, yes.

17        THE COURT:  So it's hosting expense.  That's the

18    line item.  Contractors.

19        MS. GLYNN LEVIN:  Yes.  Hosting expense.

20        THE COURT:  Hosting expense.

21        MS. GLYNN LEVIN:  It's the fifth line down.

22        THE COURT:  Wow, severance of $105,000 in December

23    and January?

24        MS. GLYNN LEVIN:  Again, as I articulated before,

25    the only severance that was paid was the 40- -- I think I

1    said $46,000.  That was budgeted.  It was set aside.

2    It's still sitting there.  It's been untouched.  Ensuring

3    that the key staff people stay on is a pretty

4    important --

5         THE COURT:  Okay.  Well, I want to keep arguing

6    that one because --

7         MS. GLYNN LEVIN:  Right.

8         THE COURT:  -- what I think is it violates the

9    bankruptcy code to pay severance and bonuses without a

10   motion and court approval.  So we're going to have to

11   get -- I'm going to have to get past that --

12        MS. GLYNN LEVIN:  I will certainly make sure --

13        THE COURT:  -- with this debtor or the case is not

14   long for debtor in possession or we'll have to have some

15   kind of trustee, but there have to be some limits on what

16   the debtor can do with the money that follows the

17   bankruptcy code.  That's all.  I mean, I see it on here

18   on this budget.  This was not a budget that --

19        MS. GLYNN LEVIN:  It's on --

20        THE COURT:  -- I saw or ever approved, so...

21        MS. GLYNN LEVIN:  It's on a budget.  It is not --

22   as I said, the only -- I mean, they were basically

23   Christmas bonuses to two staff employee people in

24   December.  Nothing has been paid in January.  Nothing.

25        THE COURT:  Okay.

1      MS. GLYNN LEVIN:  Mr. Vessenes has been paid

2   nothing.

3      So you were -- the Court was concerned about the

4   hosting and exactly how that works?

5      THE COURT:  Well, is that the -- so the CoinLab

6   line items are contractors, right?  Is that one?  59,750.

7      MS. GLYNN LEVIN:  CoinLab line items.

8      THE COURT:  Contractors.  I assume those are

9   the -- well, I'm trying to figure out what are the --

10  which line items show the pass-through expenses, and I'm

11  guessing contractors would be.

12     MS. GLYNN LEVIN:  All of them.

13     THE COURT:  Right.

14     MS. GLYNN LEVIN:  All of them.

15     THE COURT:  So hosting expense, contractors.

16  What's NRE?

17     MR. VESSENES:  Nonrecurring engineering costs for

18  installation of systems.

19     MS. GLYNN LEVIN:  There we go.  Nonrecurring

20  engineering costs for installation of systems.

21     THE COURT:  And administrative services?

22     MS. GLYNN LEVIN:  It's explained in the column on

23  the right-hand side.

24     THE COURT:  Oh, okay.  And administrative

25  services.  Travel?

```
 1          MS. GLYNN LEVIN:  There are -- members of the team

 2     work in various places, and the systems are hosted in

 3     various places.  They're not all in one place.  They're

 4     in Eastern Washington.  They're in Western Washington.

 5     There are offices in Portland.  So it requires travel and

 6     it requires people to be on site to take care of this

 7     and --

 8          THE COURT:  And then small office rent.

 9          MS. GLYNN LEVIN:  Very small office rent.

10          THE COURT:  All right.

11          MS. GLYNN LEVIN:  I mean, I really want to make

12     sure that the Court is satisfied that there isn't some

13     hiding of information.  I mean, this is as transparent

14     as --

15          THE COURT:  Well, I'm not satisfied that there

16     isn't some hiding of information, but I'm willing to -- I

17     mean, what we're here today is -- what we're doing is

18     we're here today to talk about whether or not the

19     debtor's equipment should be sold versus continuing to

20     operate the business.

21          MS. GLYNN LEVIN:  Yes.

22          THE COURT:  I know full well that our -- one of

23     our panel trustees is likely not going to be able to

24     operate this business, so we need to find a way to get

25     some money to creditors that makes sense.  But if you're
```

1      asking me am I satisfied with the credibility of

2      Mr. Vessenes?  No, I am not.  And so what I need is to

3      get to a believable scenario for selling the equipment

4      and realizing more income than the debtor can realize by

5      operating even for a couple of months.  And that's why

6      the income and expenses are important to me, because, I

7      mean, Ms. Simonyan is going to get up, and she's going to

8      argue that this debtor can make more money by operating,

9      and I still can't get to November, because the way

10     November worked was there was an amended report filed

11     that only had income on it.  So am I just supposed to

12     substitute that number --

13          MS. GLYNN LEVIN:  There --

14          THE COURT:  -- gross sales, and then do the math,

15     and that's what the net -- what is the debtor's net

16     profit for November?

17          MS. GLYNN LEVIN:  That's because there were

18     invoices issued from CoinLab to the debtor in the month

19     of November, but they were not paid.  So the expenses

20     that were actually paid, disbursed dollars or coins

21     actually paid out in the month of November 1 through 30?

22     The answer was zero.  They have been paid out in

23     December.

24          THE COURT:  So they --

25          MS. GLYNN LEVIN:  That report's not due yet.

1          THE COURT:  I see.  So I don't -- you don't know

2     or nobody's figured out yet what the net profit for

3     November and what the net profit for December is?

4          MS. GLYNN LEVIN:  We will -- we can certainly give

5     estimates.  And, again, Mr. Vessenes is here.  I

6     understand the Court's concerns, Your Honor, but to do --

7     I mean, we were operating -- I mean, this is as close to

8     rotting fish as you get.  And any case where a lawyer,

9     where a counsel comes in and says, "My client has rotting

10    fish, can we please sell it," yes, everybody's

11    credibilities gets scrutinized because of the heightened

12    time and the urgency of it all.  But if there is any

13    concern about Mr. -- about there not being sufficient

14    documentation in the record, well, I will take that upon

15    myself.  I would certainly hate to have my own client's

16    credibility be questioned when it -- if it was my fault.

17         THE COURT:  I mean, my preference would certainly

18    be that CoinLab shouldn't be paid anything except by a

19    motion and order of the Court, or somebody needs to be

20    looking at the invoices.  Because this is a lot of money

21    being transferred to what is clearly an insider.

22         MS. GLYNN LEVIN:  Yes.

23         THE COURT:  Before and after bankruptcy with

24    virtually no oversight by anyone, and that concerns me.

25         MS. GLYNN LEVIN:  I understand, Your Honor.

1        THE COURT:  I don't know how legitimate these

2     expenses really are because what I see is a debtor that

3     has absolutely zero existence, zero -- the debtor is

4     nothing.  The debtor has -- doesn't have -- I can't tell

5     whether the debtor has the assets.  Mr. Stehlik raised an

6     issue about who owns the -- you know, who owns the

7     technology.  I don't know what it takes to prove what the

8     debtor owns.  The debtor has no employees.  The debtor

9     has no office.  The debtor has nothing.  And so I want to

10    make sure that when we do this worldwide advertising we

11    are not misrepresenting to the world what we have to

12    sell, because the integrity of the bankruptcy process is

13    at stake.

14        MS. GLYNN LEVIN:  Clearly, Your Honor, and --

15        THE COURT:  So that's -- and then I want to

16    compare apples to apples.  In other words, how much did

17    this debtor make in November and December, and how much

18    can the debtor make by selling rigs?  If you tell me the

19    minimum price is 2,000 per terra-hash, all right, I've

20    got $400,000.

21        MS. GLYNN LEVIN:  That's right.  That's going to

22    be the minimum if all of the terra-hashes are sold.

23        THE COURT:  Maybe that's all we get, 400,000.

24        MS. GLYNN LEVIN:  Our estimates is that is a

25    really good entry level.  That's a floor.  But we

1    anticipate that we're going to have purchasers -- more

2    than one purchaser, because as I said, the

3    terra-hashes -- the systems are divided among more than

4    one hosting place, and a -- one purchaser might say, "I

5    want, you know, a given number of terra-hashes, and I

6    want to operate them in -- you know, at, say, these --

7    location in, you know, this place," and so on and so

8    forth.

9         To the extent that we were talking about what can

10   the debtor -- what could the debtor mine if all systems

11   continue to go ahead as is, no changes?  I really would

12   like to put Mr. Vessenes on the stand because I can't

13   testify.  These are projections that an expert needs to

14   make, and we are --

15        THE COURT:  Well, you have the profit and loss

16   statement that you just handed me.  You have a budget.

17   But I guess that doesn't have a -- it has 2013 and it has

18   2012.  It goes to January '13, right?  But if you take

19   out the things that aren't appropriate at all, like

20   $105,000 in severance pay, that changes.  Capital

21   expenditures.  Inventory write-offs.  I mean, this

22   doesn't sound like the budget that I would expect for a

23   Chapter 11 debtor, I guess.  I don't understand the

24   budget, but -- operating expenses.

25        MS. GLYNN LEVIN:  I want to address the Court's

1    question, because it's a good one and it's a sensitive

2    one because, as we said, this is really an industry and

3    this is a company that is as transparent as you possibly

4    could get because even its accounts are out there

5    available for the world to see.

6         One of the exhibits that came up in the

7    declaration was a set of records that Bitvestment had

8    created showing transfers and so on.  I mean, it's pretty

9    available for most -- for any kind of savvy user to

10   figure out what is mined and what are being held in

11   various accounts.  The concern and the sensitivity part

12   has to do with -- is connection with the sale, in that

13   the sale, as we propose, that these rigs will be on an

14   "as is/where is" basis, and there are going to be -- are

15   not -- while we have records as to what mining production

16   has been, we don't want to be making representations as

17   to what mining production will be.  In this industry, no

18   one could make such predictions.  It's not like you're

19   selling a, like a -- you know, you're selling a -- car

20   sales.

21        THE COURT:  Okay.  But I understand that.  So

22   there are no reps and warranties about how well these

23   machines will do.

24        MS. GLYNN LEVIN:  Correct.  And in the same way --

25        THE COURT:  We just know how much power they have.

1          MS. GLYNN LEVIN:  We need to know how much power

2     they have, and any -- we are anticipating that the buyers

3     of -- the prospective buyers are going to have that level

4     of understanding.  They will probably be individuals and

5     companies who are already in the bitcoin mining industry

6     and who are already operating, but want to expand their

7     capacity.  So that's what we're anticipating.  I -- we're

8     not going to be selling to someone who can't decide

9     whether they want to buy a 7-Eleven or a mining rig.  I

10    mean, these are going to be people from all over the

11    world who are already in this industry.  And it's a

12    finite industry, although it is growing, which is part of

13    the whole premise for how the business model is changing.

14          I'd like to make sure I address the elements of

15    the sale.  Really, we have been talking for the last hour

16    or so about whether a sound business reason exists for

17    the proposed transaction.  And in the record, between

18    Mr. Vessenes's declaration, supplemental declaration, and

19    Hans Olsen's declaration, the net conclusion that the

20    debtor has come to is that these mining rigs need to be

21    sold.

22          And I want to address the objection because --

23    both the source of the objection and sort of the merits

24    of the objection.

25          Why is it that we have one of many creditors --

1   well, two, but basically one substantial objection of

2   many creditors that is objecting and none of the others

3   are? We have one and why is that? We have a very, very

4   litigious plaintiff in New York, who did not get their --

5   who did not get what they want. They did not get the

6   specific performance, which is what they've been asking

7   for, and that's what's underlying this. They believe,

8   and I will let Counsel speak to that, but my

9   understanding is that Bitvestment believes that it has an

10  inherent right under its contract to specific

11  performance, and if it were -- if it received the rights

12  it was asking for that it felt were its remedy, it would

13  demolish the claims of every other creditor here. Its

14  claim, which has absolutely no support, I might add, is

15  for $8 million, which is just such a beautiful round

16  number it's sort of hard to believe that it has any

17  legitimacy to it.

18          All of the other claims -- we have a claim for

19  loans, a large one, 3 million, and we have claims in

20  various amounts, some based on the exchange rate of the

21  bitcoins as of November 1st, others I can't really tell.

22  I mean, we just -- we have a -- sort of a range of

23  claims.

24          But if we sort of step back and say: Wait a

25  second. Why is Bitvestment objecting here? I mean, yes,

1          they want the debtor to continue to pump out those

2          bitcoins as much as possible.  The part that they do

3          not -- that they are missing or the deceit here is that

4          there is a huge cost to be able to do that, and we have a

5          finite timeline here in that the actual service people,

6          the software engineers who are on their -- on the ground

7          to do this say they're going to stop doing it as of the

8          end of January.  So I do want to look at that, these

9          objections in that context.

10             The -- we addressed the sale price, and I think

11         we've been addressing the good faith of the process

12         throughout, and I can address my concerns or my prospects

13         later as to how we would envision an auction.

14             As to the element of reasonable and accurate

15         notice, everyone always complains that notice is too

16         short.  I mean, it's sort of the complaint number one.

17         Well, actually, there has been pretty -- this has been

18         pretty good notice considering the rapid pace of this

19         industry.  The word of mouth has gone out already.  Our

20         pleadings and shortened time was approved on

21         December 24th.  Everything went out to all creditors that

22         day.  That was three weeks ago.  We have a prospective

23         date for an auction bid of January 22nd, so that will be

24         approximately four weeks from the date the service and

25         notice went out.  We have --

1          THE COURT:  But no advertising has been done yet.

2          MS. GLYNN LEVIN:  No.  But as I said, we -- there

3     has been a company retained to blasts --

4          THE COURT:  Right.  But we don't get to go from

5     the original date.  We get to go from, you know, today,

6     which is the 10th.  So there is basically 12 days between

7     now and when you'd want to have the auction.

8          MR. VESSENES:  No.

9          MS. GLYNN LEVIN:  So the auction -- let me go back

10    to our dates.  From today is the 10th.  We would propose

11    to have bids in by noon on the 22nd, deposits for any

12    qualified bidders due on the 24th, and then an auction

13    to -- an auction at 9:00 in the morning on the 27th of

14    January.  And I have checked with Mr. Murphy, and he is

15    available on the 27th as well.

16         MR. VESSENES:  I have that number, Deirdre.  I

17    have our price estimates for the rigs if the judge would

18    like to hear it.

19         MS. GLYNN LEVIN:  Okay.  Hold on to that.

20         I want to deal with a couple of -- well, deal

21    quickly with the objections of Soule, and then I am going

22    to go to look at Bitvestment's objections.  Soule's

23    concerns was what are the assets being sold.  I think we

24    are clear on that.  There was some concern that there

25    was -- the quote was "an unfamiliar nature of the assets

1    being sold."  And I guess familiarity really is in the

2    context of the person who is looking at this, because

3    those who are interested in these assets, this is not

4    unfamiliar at all to them.  These are -- even the

5    investors, who are part of the -- who invested in the

6    debtor early on, they're not unfamiliar at all with

7    bitcoin.  Everybody understands what bitcoin is.

8         THE COURT:  Well, does the proposed order actually

9    describe the assets in detail?  I mean, that's what I'm

10   going to be concerned about is what is the order --

11        MS. GLYNN LEVIN:  I will ensure that we have an

12   exhibit that describes those assets in detail, yes.

13        We addressed the concern about is $2,000 per

14   terra-hash the, quote, market value.  And, again, you

15   know, market value is sort of an amorphous concept.  It

16   is the floor price for an opening bid.  It's not

17   necessarily the market value.  And I say that in

18   quotation.  We do anticipate that bringing in this floor

19   will generate a lot of interest, and the true market

20   value ultimately will be in the bidding process.  This is

21   sort of truly capitalism at its best.

22        I want to turn to the objection of Bitvestment.  I

23   think I've addressed Soule's concerns.  Again, what is

24   Bitvestment?  Where does it stand in this case?  We don't

25   have any -- we only have one -- well, we have

1    administrative creditors and we have unsecured creditors.

2    Bitvestment is an unsecured creditor, no more, no less.

3    The value of its claim, proof of claim, $8 million,

4    highly skeptical.  The amount, the dollar amount that it

5    invested, I'm going to say this really slowly.  $75,000.

6    That is all it invested, and for all of that $75,000 it

7    has created all this litigation, all this production, all

8    this objection, and is trying to basically squeeze the

9    debtor into forcing to continue to produce for it so

10   that -- to the jeopardy of the other creditors.

11        Thousands and thousands of pages of 2004 documents

12   were produced.  Your Honor said it was onerous.  It was

13   onerous.  The timeline was onerous.  And I really have to

14   add that it's pretty distressing to have taken the time

15   to have put together a 2004 motion so that we could find

16   out what's the basis of Bitvestment's claim.  How does it

17   value it?  We got a court order under 2004.  Immediately

18   they turned around and said, "No.  We're asking for

19   reconsideration."  Your Honor denied that immediately.

20   We went ahead and said, "Great.  There's no

21   reconsideration allowed.  We want -- where are our

22   documents under 2004?"  They were due under -- on

23   January 6th.  We have not received one, and neither

24   counsel is willing to accept service of the subpoena.  So

25   I think that might give Your Honor a flavor of the kind

1    of approach here.  We're not dealing with a professional

2    approach here.  In almost every other case that I've been

3    dealt with Counsel will willingly accept the service of

4    the subpoena.

5         Mr. Gallancy has refused to -- will not come to

6    Seattle for a 2004 exam.  He's forcing us to expend the

7    debtor's resources to go to New York to the extent that

8    we -- and we will decide if that's necessary or not, to

9    have him deposed under 2004.  But he won't -- no one will

10   accept the subpoena.  I think that really does give a

11   flavor of what's gone on.

12        I think the Bitvestment objection, Your Honor,

13   really sort of has two parts.  It's got the legitimate

14   parts.  It's got the legs where it's really talking about

15   the sale, and I respectfully -- we've dealt with those,

16   but I respect those objections.  I respect the fact that

17   they wanted us to continue to mine.  I respect the fact

18   that they are looking out for their own client's best

19   interests.  I mean, those are legitimate bases for

20   objections.  You know, is it being sold?  Is it being

21   sold to insiders?  And I think we've dealt with them.  We

22   don't even have insiders bidding.  If they'd like to come

23   and stand and watch the bidding or if they'd like to come

24   bid, they are certainly welcome to do so.

25        The other part of the objection is really kind of

1      more a personal attack, and some of it is legitimate.  I

2      can -- I understand their concerns about the

3      transparency.  We have done our best to provide them all

4      the financial information that we believe that they're

5      entitled to.  We have not held anything back.  Some of it

6      was confidential.  We wanted to ensure it was kept

7      confidential and not spread around the Internet like

8      trash.  This is a court proceeding, and we did want to

9      maintain the integrity of that.

10             As to -- I want to mention also a couple of

11     things.  As to the timelines, again, we can't really

12     stress enough that the timeline is really critical here.

13     We wouldn't have been working on the eve of the holidays,

14     Christmas and New Years, and asked Your Honor to deal

15     with this on either of those holidays if the timeline was

16     not critical.  Moving this forward apace is in the best

17     interests of the estate.  It is the way to maximize the

18     estate.  And the debtor is really going to be at a loss

19     to figure out what to do after -- I mean, ultimately it's

20     going to have to turn the keys off if the staff people

21     walk away.  It would not --

22             THE COURT:  But the debtor could easily mine

23     bitcoin until the end of January and then do just that,

24     turn it off and auction the equipment.

25             MS. GLYNN LEVIN:  The concern at that point is

1    we're going to have equipment that is going to have

2    nominal value.  We'd be essentially selling it for scrap

3    so --

4         THE COURT:  Why?

5         MR. VESSENES:  But that's our schedule.  The

6    schedule of the judge to --

7         MS. GLYNN LEVIN:  Well --

8         MR. VESSENES:  It is the schedule.

9         MS. GLYNN LEVIN:  Well, it is --

10        MR. VESSENES:  To turn it over on Feb 1 to the new

11   owner.

12        MS. GLYNN LEVIN:  To sell it -- well, are you

13   proposing that we --

14        THE COURT:  1 mean, why does it become scrap --

15        MS. GLYNN LEVIN:  Are you proposing that we --

16        THE COURT:  -- if it stops operating?

17        MS. GLYNN LEVIN:  Our schedule is -- well, I want

18   to make sure we're not dealing with semantics here.  Our

19   schedule --

20        THE COURT:  It is not scrap.

21        MS. GLYNN LEVIN:  Our schedule is to allow a new

22   owner to take it over and actually have a sale close

23   exactly as Your Honor has proposed.

24        THE COURT:  Okay.

25        MS. GLYNN LEVIN:  The end of January.  I thought

1        Your Honor was suggesting that we stop this process and

2        start the process of a sale after that time.

3               THE COURT:  I guess what I'm suggesting is based

4        upon the way you've described this equipment to me, it

5        doesn't sound like it becomes scrap unless the market

6        completely collapses.  That whether you stop today or the

7        end of January or the end of February, you still have a

8        system which can operate.

9               MS. GLYNN LEVIN:  Right.  And it --

10              THE COURT:  In other words, it's not scrap --

11              MS. GLYNN LEVIN:  But it's --

12              THE COURT:  -- at any time.

13              MS. GLYNN LEVIN:  It's a --

14              THE COURT:  It's just about the market and whether

15       the cost of that equipment is -- the value of that

16       equipment is going to go up or down.  But in other words,

17       it's not like -- well, okay.  Let me give you a better

18       example.  It is not like a retail store which loses value

19       immensely as soon as it closes.

20              MS. GLYNN LEVIN:  Well, as soon as it stops

21       operating --

22              THE COURT:  Right.

23              MS. GLYNN LEVIN:  -- it does lose value because --

24              THE COURT:  Whereas if you stop operating this

25       system, there is no evidence in the record that indicates

1     that somehow it loses all of its value just because the

2     switch is turned off, right? You can still sell it to

3     someone who can turn the switch on.

4          MS. GLYNN LEVIN: The buyers, in my

5     understanding -- and, again, I have to refer to my client

6     because this is a -- such a technical industry. And I

7     have learned as much as I possibly can, but buyers are

8     going to want to be able to walk in and have an operating

9     system in a hosted environment. That is what they are

10    looking for, and to be able to say, "Here is your cold,

11    dark stuff in a warehouse," is not going to generate the

12    kind of sale proceeds that we are looking for.

13         THE COURT: So when they walk in, they're going to

14    want to do business with CoinLab. They're going to want

15    to hire Mr. Vessenes, and they're going to want to hire

16    these other three people because this is the kind of

17    business where you've got to buy it in operating form?

18         MS. GLYNN LEVIN: They --

19         THE COURT: Is that what you're saying?

20         MS. GLYNN LEVIN: I'm not necessarily saying

21    anything about the Human Resources that are going to be

22    attached, no. If a buyer wants --

23         THE COURT: And they're going to need to take over

24    these leases --

25         MS. GLYNN LEVIN: Yes.

1          THE COURT:  -- that CoinLab has executed.

2          MS. GLYNN LEVIN:  If a buyer wants to negotiate a

3    separate contract to have the individuals who are

4    familiar with the equipment do so, that is up to the

5    buyer and that is up to -- that is not part of our sale.

6          THE COURT:  Well, I mean, I want to make sure I

7    understand what you're saying.  Because you're either

8    saying this is equipment that cannot be moved and it must

9    be operated where it is located, or it's equipment that

10   you bring in a big truck and you can ship it to Australia

11   if you want.  Which is it?

12         MS. GLYNN LEVIN:  It may be moved, but "may" is

13   the operative word.  The reality is that the buyers will

14   not want to move it.  It's highly sensitive.  It's very

15   expensive.  It needs to be maintained under special

16   conditions.  There are already places where it is set up.

17   So it would be like picking up, you know, an auto parts

18   factory.  Yeah, you could have it in Seattle or you could

19   have it in Gainesville, Florida, but do you want to?  No.

20   You want to have it exactly where it is.  You don't want

21   to move --

22         THE COURT:  Okay.

23         MS. GLYNN LEVIN:  -- the -- you don't necessarily

24   want to move it.

25         MR. VESSENES:  It's lost revenue too.

1          MS. GLYNN LEVIN:  The cost it would -- the buyer

2     would incur that cost, so it would make no economic sense

3     for a buyer to pick it up and want to move it.  Besides,

4     the production of it creates virtual -- a virtual product

5     which can be used anywhere.  It's not like it's

6     producing -- you know, pumping out a concrete product

7     that has to then be picked up and shipped and sold.  So

8     these buyers, who will be coming in from all over the

9     world, probably don't -- may not care where it is, but

10    are -- probably would be very happy to know that there

11    are existing contracts that they can consider stepping

12    into, and if they're qualified can go ahead and negotiate

13    with those hosting providers to continue to operate the

14    rigs in those locations.

15          And Ms. Pearson can address that a little bit

16    more, as she -- I know she's taken a little bit of time

17    to -- although she's only been recently retained in this

18    case, she's taken a little bit of time to try to

19    understand those leases.

20          Before the hearing today, I provided copies to

21    Mr. Stehlik and counsel for Bitvestment on a proposed

22    appendix, which has -- appendix to the order, which has

23    an outline of sort of sale procedures.  And I'm happy to

24    turn to those, but I think maybe it's time to allow my

25    opposing counsel to speak or my cocounsel.

1          THE COURT:  Well, let me ask -- I want to ask one

2     more.  I have a couple -- I want to make sure I asked all

3     my questions.  I guess I don't understand how the mining

4     works such that when the November monthly report was

5     filed on December 17th, it showed no revenue, and it

6     wasn't until the day after Mr. Vessenes's deposition that

7     it was amended to show $1.8 million.

8          MS. GLYNN LEVIN:  Well, the fact that the

9     deposition intervened was really kind of a coincidence.

10    Actually asking to -- asking us to clarify the statement

11    of financial affairs had nothing to do with Bitvestment

12    at all.  It had to do with the U.S. trustee, who said,

13    "Can you help us clarify this so" -- and we did, and we

14    amended it.  And we amended it, I think, just to --

15         THE COURT:  Okay.  You missed my question.  My

16    question is about bitcoins --

17         MS. GLYNN LEVIN:  Yes.

18         THE COURT:  -- and how you know when you've

19    actually mined them.

20         MS. GLYNN LEVIN:  Yes.  So --

21         THE COURT:  Okay?  So let me finish.

22         MS. GLYNN LEVIN:  Yes.

23         THE COURT:  On December 17 when this report is

24    filed, you either know or you do not know how many

25    bitcoins have been mined.  And I don't know how the

```
 1      process works.  Is it a surprise?  You don't find out

 2      until 30 days later how much you've mined or --

 3              MS. GLYNN LEVIN:  No.  No.

 4              THE COURT:  -- you can't calculate it?

 5              MS. GLYNN LEVIN:  No.

 6              THE COURT:  Well, how do you do it?

 7              MS. GLYNN LEVIN:  So there really -- there are two

 8      questions here.  There's no surprise.  It's not like

 9      opening up your stocking Christmas day and wondering

10      what's in there.

11              THE COURT:  But it is an algorithm.

12              MS. GLYNN LEVIN:  No.

13              THE COURT:  So you don't know exactly when you're

14      going to get one?

15              MS. GLYNN LEVIN:  You -- well, yes.  In fact,

16      there is some predictability --

17              THE COURT:  All right.

18              MS. GLYNN LEVIN:  -- in that extent.  You know

19      when you've earned it.  You don't know when you're going

20      to earn it, but you know -- when you have earned it, it's

21      clear.  It's in your account.

22              THE COURT:  Okay.

23              MS. GLYNN LEVIN:  And I want to make one point

24      because this trumped me a couple of times, and that is

25      the -- these accounts, the deposits in the accounts
```

1    under -- for bitcoin are timed as of Greenwich Mean Time

2    because this is an international system.  So there may

3    have been -- there may be a deposit in the account, let's

4    say, on -- you know, on a Tuesday.  Now, Greenwich Mean

5    Time, it's a ready Wednesday.  In Seattle, it may be

6    still Tuesday depending on the time of day.

7         THE COURT:  I get all of that, but you filed a

8    monthly report in the middle of December which said, "We

9    earned no income."  Zero.  Meaning nothing.

10        MR. VESSENES:  It's Moss Adams' recommendation.

11        MS. GLYNN LEVIN:  So I'll get to that.

12        MS. SIMONYAN:  Your Honor, I object to

13   Mr. Vessenes' testifying.

14        MS. GLYNN LEVIN:  Okay.

15        THE COURT:  Well, he's not testifying.  I mean,

16   here's the problem.  I am being left with the impression

17   that Mr. Vessenes got caught at his deposition when

18   confronted with these numbers and had to disclose them --

19        MS. GLYNN LEVIN:  No.

20        THE COURT:  -- that, in fact, the company had

21   earned $1.8 million.  And the debtor needs to do

22   something to dispel that impression.

23        MS. GLYNN LEVIN:  No.  That really is not the case

24   at all, and I do need to clarify this.  And we have

25   counsel for the U.S. trustee here.  Why is he here?