1   Because he's been talking to me about these reports.

2   That's one reason.  And he and I have had a long -- a

3   fairly long -- at least two discussions, plus I had

4   discussions with Mr. Smith, who actually took the 340 --

5   the 341 meeting.  And everybody said, you know,

6   "Interesting industry.  How do we account for these

7   bitcoins?  What is it?"  And I said, "You know, that is

8   right now a little bit of a question, but my client's

9   advice that it has received from Moss Adams is that when

10  it receives bitcoins in accounts that isn't income.  It's

11  not income until it's sold."  So that has been the --

12  that's been the operating procedure that it's been

13  working from, and we are about --

14          THE COURT:  So they got sold, all of these got

15  sold on January --

16          MS. GLYNN LEVIN:  Well --

17          THE COURT:  -- 8th, the day after Mr. Vessenes got

18  deposed?

19          MS. GLYNN LEVIN:  No.  No.  Let's go back to the

20  amended UST 14.  We were operating under this Moss

21  Adams -- well, I won't say directive.  We'll call it

22  their opinion that that's how it should operate.  And

23  there's been many months, I understand, and maybe even

24  years of discussion as to the accounting principles as to

25  how to account for that.  We are about to get Moss Adams'

1    receipt to have them retained as tax counsel to do the

2    income tax returns.  So the original US 14, UST 14 that

3    was filed basically presented the facts, the accounting,

4    as we had been -- as the opinion had been given to us by

5    Moss Adams.  That is, as of the date that even if you're

6    mining there's -- there aren't any deposits like --

7    because it's bitcoins that are sitting in a bitcoin

8    account, but it's not -- they're not being sold.  So

9    after a long discussion with counsel for the

10    U.S. trustee, we decided, well, it's really fair for a

11    number of reasons.  It's fair to creditors.  It's fair

12    for full disclosure.  It's fair for -- well, it's

13    actually also fair for -- in terms of figuring out what

14    the --

15        THE COURT:  Well, whether it's fair or not, just

16    tell me what you agreed to do.

17        MS. GLYNN LEVIN:  Well, what we agreed to do is

18    right here on -- does Your Honor have the amended UST 14?

19        THE COURT:  I do.

20        MS. GLYNN LEVIN:  Yes?

21        THE COURT:  I do.

22        MS. GLYNN LEVIN:  Okay.  So on the amended UST 14,

23    the first line -- I mean, it's a simple form with

24    complicated answers.  The amended UST 14 says:  Deposits

25    from -- deposits are for the month of November.  So

```
1        November 1 through 30, as of November 30 --

2               THE COURT:  Now I can't find it.

3               MS. GLYNN LEVIN:  Oh.  I'll give Your Honor a

4        copy.

5               THE COURT:  But it's one page basically, right?

6               MS. GLYNN LEVIN:  Deposits for that month --

7               THE COURT:  Okay.  Right.  I have this.

8               MS. GLYNN LEVIN:  -- 1,650.061 bitcoin.  And I

9        think we dropped off the other smaller digits after the

10       decimal point.  At the rate of 1,132.  That was a -- it's

11       a complicated averaging weight system, and I will let my

12       client who is the math whiz explain that.

13              THE COURT:  I saw it.  It's on the Internet.  It

14       was 848 when I walked out here.  Anywhere between 847 and

15       848 today.

16              MS. GLYNN LEVIN:  It fluctuates.

17              THE COURT:  Right.

18              MS. GLYNN LEVIN:  So having --

19              THE COURT:  So this is the --

20              MS. GLYNN LEVIN:  So that was the rate --

21              THE COURT:  This is the rate as of when the report

22       was filed?

23              MS. GLYNN LEVIN:  No.  As of the date -- as of

24       December -- as of November 30th.  So it's reflecting --

25              THE COURT:  Okay.
```

```
 1          MS. GLYNN LEVIN:  -- the November 30th figures,

 2     and that's what we were directed to do by the

 3     U.S. trustee.  So we were coming up with the total

 4     deposits of $1,891,377.  That's the dollar equivalent.

 5     And then we've already discussed the disbursements and

 6     why there were no disbursements that month.  There were

 7     invoices, but they were not paid in the month of

 8     November.  So the net cash flow --

 9          THE COURT:  Well, there weren't exactly zero,

10     because I assume there were still the expenses from the

11     original November report that was filed.  The way I was

12     reading this was that you had already -- you had already

13     disclosed the disbursements, and so the receipts were --

14          MS. GLYNN LEVIN:  I don't --

15          THE COURT:  -- to be substituted there.

16          MS. GLYNN LEVIN:  I don't think so.  I don't think

17     that that part changed at all.

18          THE COURT:  So I should ignore the expenses that

19     were shown for rent, general administrative.  You say the

20     $20,000 officer was -- officer expense wasn't paid.  So

21     these expenses were not paid?

22          MS. GLYNN LEVIN:  Budgeted but not paid.

23          THE COURT:  No.  I'm looking at your income --

24     this is the income statement for the original November

25     report, and it shows officer salaries, 20,000.
```

1        MS. GLYNN LEVIN: Correct.

2        THE COURT: Rent, 3,000. General and

3    administrative, $43,855. I assumed I had to take those

4    expenses from this number.

5        MS. GLYNN LEVIN: No. There were -- all of the

6    debtor's expenses are -- in some ways it's very simple,

7    because they are all incapsulated in an invoice which is

8    line by line item detailed and for which we do have the

9    backup. Your Honor asked about that back in December.

10        THE COURT: So but --

11        MS. GLYNN LEVIN: Yes.

12        THE COURT: -- total disbursements is not zero.

13    Are you saying it's just because they didn't pay any

14    in --

15        MS. GLYNN LEVIN: They were paid.

16        THE COURT: Okay.

17        MS. GLYNN LEVIN: Those invoices were not paid in

18    the month of November.

19        THE COURT: So I'm sure, then, that Mr. Buford

20    understands that there were $1.8 million in revenue,

21    potential revenue that hasn't been turned into cash yet,

22    and zero expenses for November.

23        MS. GLYNN LEVIN: But the expenses for November

24    will actually get -- become incurred in December. I

25    mean, November was an odd month. So the end of the month

1    when I think invoices would normally be paid, it was

2    Thanksgiving.

3           THE COURT:  All right.  I got you.

4           MS. GLYNN LEVIN:  And so on and so forth.  So that

5    was a concern of Your Honor on --

6           THE COURT:  All right.  Let me --

7           MS. GLYNN LEVIN:  I really want to make --

8           THE COURT:  -- make sure -- let me look at just

9    one more.  I want to make sure I asked all my questions.

10   Okay.  That's it.

11          So why don't we have Mr. Stehlik make his argument

12   first because I think his seems a little simpler to me.

13          MR. STEHLIK:  It's probably due to a simple mind,

14   probably, Your Honor.

15          THE COURT:  Well, I mean, it seems to me,

16   Mr. Stehlik, and probably to you, that there should be

17   some exhibit attached to the order that describes this

18   property that's for sale in detail, whatever detail it

19   can be described.

20          MR. STEHLIK:  Yeah.  Just let me make it clear,

21   though.  My clients are just interested in maximizing the

22   value of the assets --

23          THE COURT:  Right.

24          MR. STEHLIK:  -- of this estate, whatever they may

25   be.  And so we don't have an ax to grind to that extent,

1       and I really don't think anybody else does that's on the

2       creditors' side of this.  The problem really lies in

3       believing what we're told and getting the information

4       that backs up what we're told.  And, frankly, this whole

5       thing is kind of a big mess.  It's just difficult to

6       understand any of this stuff.

7               And then some of the things that are being said

8       don't make sense to me.  Why were there -- why were they

9       asking for investment money in August if they realized

10      that these things were on the way out, rapidly becoming

11      obsolete?  Why did they enter into leases in November

12      post-petition if they thought this was all going to go by

13      the wayside; again, immediate obsolescence in two months?

14      Why were they putting rigs into place in December if they

15      thought these were going to be obsolete in a month or two

16      later?  I don't understand any of this stuff.  It doesn't

17      make fundamental rational sense to me.

18              All of a sudden we are being told after this

19      activity of building up this business that it's going to

20      be obsolete and they have to sell everything.  This

21      happened in a very short period of time.  Either there

22      was a huge miscalculation to begin with, which raises

23      other issues about responsibility at some of these

24      creditors and my client, or things have changed so

25      dramatically that what made sense two months ago doesn't

1    make any sense anymore, and I don't understand why.  It

2    just doesn't make a lot of sense to me, and I really

3    haven't been, I guess, educated sufficiently to

4    understand how that can happen.

5         The people are leaving?  Why are they leaving?

6    They just decided that they're going to move to Florida?

7    How do we know this isn't a manufactured crisis now, all

8    of this stuff, to justify resolving a sale that's coming

9    up for assets we don't really understand?  I mean, the

10   Court is doing a marvelous job trying to understand it,

11   and I'm trying to understand it, as you are too, but I

12   don't think that creditors and the Court should have to

13   do that much work to figure out the economics of this

14   proposed sale.  We're getting information as it's being

15   dribble out or being allowed to be given to us.

16        And I haven't gotten this thing I was supposed

17   to -- I supposedly got.  I came up here a little bit

18   early.

19        THE COURT:  What thing?

20        MR. STEHLIK:  This --

21        THE COURT:  The budget?

22        MR. STEHLIK:  -- appendix or something or a

23   proposed order.

24        MS. GLYNN LEVIN:  Just, I just handed --

25        MR. STEHLIK:  Well, I'm in a hearing.  I can't

1    read all this stuff today.  I'm here to make my arguments

2    and listen to the Court.  And, you know, I should have --

3    if this is important to the process, we should have all

4    had it.

5          And we know Mr. Murphy is going to be auctioneer.

6    Well, I found out that today.  We know they're going to

7    hire a PR firm.  I found that out today.  Who is that?

8    What are they going to do?  Who is going to pay them?

9    How much are they going to get paid?  All this stuff is

10    being done on the fly.  And I understand that there are

11    circumstances that may justify quick action and emergency

12    types of proceedings, but it seems to me a lot of this is

13    manufactured and/or being made up as they go along.  And

14    I just think that they're asking a lot of the Court and

15    creditors on faith to go along with this as based on what

16    we know so far.  I just think there needs to be a little

17    more time and a little more deliberation as to what is

18    going to happen here.

19          And I am concerned that there are significant

20    insider connections that are problematic.  The one thing

21    that disturbs me greatly, this CoinLab relationship.

22    When the schedules were filed, the payments in bitcoin

23    were laid out according to the dates of invoices.  Well,

24    the statement of financial affairs clearly says the date

25    of the transfer, not the date of the invoices.  And now

1      we find out all of this was transferred to CoinLab right

2      before the filing.  And that's not an ordinary course

3      payment, and Your Honor put her thumb on that

4      immediately.  That's a preference.  And who's going to be

5      dealing with all of these things?  And this is just one

6      of the few things that I've seen that's disturbing.

7           And, you know, if at the end of the day this is

8      the right thing to do, then we should do it, but how do

9      we know that?  I am very suspicious because of some of

10     the things I've seen.  I can't really have a lot of faith

11     in what we're being told and what Mr. Vessenes says.

12     There's insider connections.  There are insider

13     transfers.  There are deals being made.  CoinLab has

14     unfettered discretion to charge whatever it wants to this

15     debtor.  We haven't seen anything that tells us what

16     they're charging or that that's reasonable.  I haven't

17     seen anything.  Maybe it's there, but the reports don't

18     seem to suggest really what's there.  And it's just

19     somewhat of a grand illusion to me.  I just don't see,

20     really, what the reality of the situation is.

21          And, again, I don't want to just be up here

22     saying:  Don't sell it, don't sell it, don't sell it.  It

23     may very well be the best thing to do, but I don't know

24     how we can tell based upon what we've been told.

25          THE COURT:  All right.

1          Ms. Simonyan?  Presumably you are the only one who

2     has seen the invoices, or have you seen the invoices?

3          MS. SIMONYAN:  We have seen the invoices,

4     Your Honor, but we have only seen the invoices from --

5     that were billed to the debtor.  We haven't seen any of

6     the underlying invoices, and that's a significant concern

7     to us and should be to all the other creditors because --

8     and I will get to this in a little more detail.  But to

9     answer the Court's question, I would ask that the Court

10    turn to the operations agreement, the post-petition

11    operations agreement, where -- which, by the way, is

12    signed on behalf of both CoinLab and the debtor by

13    Mr. Vessenes giving CoinLab the unbridled power to bill

14    whatever it finds appropriate.  So, yes, there are some

15    invoices that have been generated and have been produced,

16    but we don't know the basis of these invoices, so unless

17    we do further discovery -- and I understand that during

18    the hearing for the motion to compel the Court had some

19    procedural constraints as to what was allowed to be

20    produced.

21         THE COURT:  Right.

22         MS. SIMONYAN:  However, the Court also noted

23    that -- the debtor's continued efforts to hide behind

24    CoinLab to produce information that is critical for the

25    administration of this case and for the relief that it

1      seeks.

2            Your Honor, this is a profitable debtor.  There's

3      no question about it.  We're not making this up.  The

4      information we've gathered is from the record established

5      in this case by the debtor.  Now, they have been not very

6      forthcoming with the production of information, to say

7      the least; however, what has been produced and what we

8      have been able to review shows a highly profitable

9      company.

10           So let's address the timing of this sale that the

11     debtor has proposed.  You know, there was a lot of

12     beating around the bush about the price that will be

13     generated if we move forward with the sale auction

14     pursuant to the procedures that are before the Court

15     right now.  Like Mr. Stehlik, I haven't had a chance --

16     the new procedures motion or order was handed to me

17     moments before the hearing, so --

18           THE COURT:  Okay.  But I got the impression from

19     Ms. Glynn Levin that it's just -- it just shows a chart

20     about what the procedures are.  Does it have substantive

21     changes from what was in the motion?  I mean, some of it

22     had to change based upon the date that I set, right?

23           MS. GLYNN LEVIN:  The date.  Some of the dates

24     changed, and I articulated to what those were.  The

25     January 22nd to be the deadline for bids, the 24th for

```
 1      deadline for deposits, and 27th for an auction.  I

 2      mean --

 3            THE COURT:  Well, but they make it sound like

 4      whatever you gave them today is completely different than

 5      what the proposed order was before.

 6            MS. GLYNN LEVIN:  It --

 7            THE COURT:  Is that --

 8            MS. GLYNN LEVIN:  It's not.  I mean, we could do

 9      literally a line-by-line comparison.  It's not.

10            THE COURT:  All right.  Well, I --

11            MS. GLYNN LEVIN:  What we --

12            THE COURT:  I don't want to do a line-by-line --

13            MS. SIMONYAN:  Your Honor --

14            MS. GLYNN LEVIN:  What we've added was something

15      to explain what directive, what procedures would be given

16      to an auctioneer.

17            THE COURT:  Oh, okay.  Well, do I --

18            MS. GLYNN LEVIN:  This was specifically --

19            THE COURT:  -- actually have -- that order hasn't

20      been filed, right, so I don't have it.

21            MS. GLYNN LEVIN:  No.  No.  And this --

22            THE COURT:  All right.

23            MS. GLYNN LEVIN:  This is proposed, and we wanted

24      to make -- I mean, this is to respond to the objection.

25            THE COURT:  Okay.  Well, let me --
```

1          MS. GLYNN LEVIN:  We wanted to make sure the

2     process is fair.

3          THE COURT:  -- have Ms. Simonyan go on, then.

4          MS. SIMONYAN:  Your Honor, like, we don't know

5     what we don't know.  It was handed to us.  I was under

6     the impression that it actually addresses some of the

7     concerns that were raised to the procedures of this

8     auction.  If it doesn't address those concerns, then I

9     think that's even worse for the debtor; however, that's

10    irrelevant.  The point that I was making is that we --

11    according to the debtor's schedules and the reports that

12    they have filed, the projections they have made,

13    everything points to a highly profitable company.  Now,

14    the timing of the sale, they want to do this on an

15    extremely expedited basis, but it's very clear that there

16    is no need for such an expedited sale because every day

17    that these rigs are not sold the company is bringing in

18    value into the estate like it should.

19         THE COURT:  Okay.  But without seeing the

20    expenses, the way they teed it up, if all the expenses

21    hit in December, and I don't know when that report is

22    due, then we determine whether they're profitable and we

23    have to get behind whether the expenses are legitimate,

24    right?  I mean, how can -- you're saying they were

25    profitable because now what they have is a November

1      report that says $1.8 million in revenue and zero

2      expenses.  I agree with you.  I'd rather go with that

3      every month than pretty much anything else.

4           MS. SIMONYAN:  Well, Your Honor, the testimony and

5      the record that the debtor produces changes so often it's

6      actually really hard to keep up with what the actual

7      revenue and what the actual expenses of the company are.

8      At the time that we were filing our response, and at the

9      time -- you know, at every stage of this case when we

10     investigate the financial condition of the company, yes,

11     it's a little different, but all the information gathered

12     together still points to a profitable company.  And I'm

13     looking for this information.  I'm relying on the

14     testimony of Mr. Vessenes at the Rule 2004 exam.  I'm

15     relying on their Schedules I and J that are on the

16     record.  I'm relying on their monthly financial reports.

17          And, Your Honor, I understand that these reports

18     keep changing to whatever is convenient for the debtor at

19     the time.  So, for example, one moment we hear that there

20     are some operating expenses that include severance pays

21     and payments to the officers of the company and some

22     other invoices, and when they're -- when it's pointed out

23     to the debtor that these are in violation of the

24     bankruptcy code and should have been done pursuant to a

25     court order, then it turns out that none of these

1  payments are actually made.  So when it's necessary to

2  show that the company does not -- is not profitable, all

3  the operating expenses are listed.  When it's convenient

4  that the debtor not have made these payments, then these

5  payments have not been paid.  So --

6         THE COURT:  Well, let's go -- so what you're

7  saying is if we go to his deposition testimony we're

8  going to see that he said -- that he said -- that these

9  payments had been made.

10         MS. SIMONYAN:  What we are going to -- that the

11  payments?  No, I'm not saying that, Your Honor.  What

12  I'm --

13         THE COURT:  No.  The incentive compensation.  Are

14  you saying that he said that this money had actually been

15  paid?

16         MS. SIMONYAN:  He said that -- during the

17  Rule 2004 examination, Mr. Vessenes said that some of the

18  incentive compensation was made and it was justified

19  because the company needed to continue operating, and

20  although it was an exorbitant amount it was still better

21  than having the rigs shut down.  This was his testimony.

22         And, Your Honor, it's actually a little difficult

23  for me to represent Mr. Vessenes's testimony here because

24  all the answers -- almost all the answers that we

25  received were in the -- were prefaced by "I don't know."

1      "I'm not sure."  "I have to talk to my accountant."  "I

2      don't know."  "I'm not sure what these transfers are."

3      "I don't know exactly how many addresses the debtor

4      utilizes."  All of this information were conjectures,

5      leaving the door open for the debtor to come back at a

6      later date and again change the testimony to match

7      whatever is convenient for --

8           THE COURT:  Okay.  Well, I see what you're talking

9      about, but here it says -- finally, at the end of all

10     this questioning -- I'm on page -- I can't tell which

11     page this is, but it says --

12          The question:  "So you paid them a retention bonus

13     on top of their salaries, and now they're going to get

14     another retention bonus?"

15          "Yes."  Answer:  "Yes.  They wanted some to stay

16     to the end of the year and more to the stay -- more to

17     stay to the end of January."

18          So I guess from that --

19          And then it says:  "I understand that.  But you

20     are now paid $355,000 for three people for two months of

21     retention bonuses or planning to pay?"

22          Answer:  "Yes.  In my judgment, that's much better

23     than having them leave tomorrow and all the rigs turning

24     off since that's just six or seven days of downtime."

25          So I'm like you.  When I read that, I read that to

1    say that the debtor has paid $355,000 to three people for

2    two months of retention bonuses.  So that's kind of, I

3    guess, where I'm coming from.

4         MS. SIMONYAN:  And the testimony -- my

5    understanding walking out of the Rule 2004 exam was that

6    some of it was paid and some of it was to be paid.  Like

7    I said, we weren't getting clear answers to our

8    questions, but Your Honor has the transcript before it.

9    It's on the record.

10        So we are -- there is some level of speculating we

11   have to do, because even though we did have Mr. Vessenes

12   at the Rule 2004 exam he was not able to answer with

13   certainty a lot of the questions that were asked, a lot

14   of some basic questions.  Payments that were paid in very

15   large amounts, not very recently, he was not able to

16   remember, and he had to -- and he resorted to his

17   accountant making the payment, effectuating the payment,

18   and preparing the bankruptcy schedules.

19        But what we do know, Your Honor, with certainty is

20   that the debtor continues to mine bitcoins, bitcoins have

21   high value.  As of today, I believe, as I was walking out

22   of the office, they were at about 8- -- between 820 to

23   850 per bitcoin.  As of today, just in January the debtor

24   has probably mined approximately $600,000 worth of

25   bitcoins.

1      THE COURT:  Why do you say probably?

2      MS. SIMONYAN:  Well, because the debtor could not

3      tell us with certainty exactly how many bitcoins it

4      mines.  It said -- because the debtor testified that --

5      Mr. Vessenes testified that the debtor mines between 65

6      to 75 bitcoins per day.  So he wasn't able to tell us

7      with certainty exactly how many bitcoins the debtor had

8      mined in November, how many it had mined in December, how

9      many it had mined as of the date of the Rule 2004 exam.

10     So I do have to say "probably" because we are relying to

11     some extent on the testimony of Mr. Vessenes.

12         But so the point is, Your Honor, that every day

13     that we wait and these assets are not sold, more value is

14     coming into the estate.  Based on the projections and the

15     testimony of Mr. Vessenes regarding the operating

16     expenses of the company and looking at the history of the

17     operating expenses of the company, it appears that even

18     if we just wait one extra week we're going to generate

19     more value for the estate than if the rigs are sold

20     today.  If we wait just one extra week, there will be

21     more value in the estate even if we have to completely

22     abandon the rigs at the end of the week than if we were

23     to sell the rigs today.

24         Again, there was some -- a lot of back and forth.

25     The Court wanted a simple answer to a simple question of

1    what is the proposed minimum bid amount, and the

2    answer -- and I don't know why it was so difficult to

3    answer because this was in Mr. Vessenes's testimony at

4    the 2004.  It's on the record in the form of

5    Mr. Vessenes's declaration in support of the sale motion.

6    The answer is very simple.  It's $400,000.  So just in

7    one week the debtor is able to produce more value, more

8    dollar value than it proposes to sell the rigs.

9         Second of all, it's important to note that

10    throughout this whole proceeding the debtor has made --

11    has misled the Court by trying to shift the focus from

12    the fact that it is able to generate extraordinary value

13    to the fact that it's become a little more difficult --

14    increasingly difficult to mine bitcoins.  That is

15    intuitively true.  It's obvious.  Yes, the bitcoins are

16    worth more so there's more competition.  There are more

17    people who want to earn some bitcoins and do mining

18    operations.  That's no secret.  But what the debtor

19    repeatedly avoids producing is the fact that these

20    bitcoins just in one year since the debtor -- just in one

21    year have increased in value 80 times, and that's the

22    true test of the profitability of this company.  We have

23    this incredibly successful, uniquely positioned

24    enterprise that is able to produce this product.  While

25    it's operating expenses can be paid -- are in dollar

1     amounts, it's able to continue to produce a product that

2     it can sell 80 times the price of the product a year --

3     only a year ago.

4          So, Your Honor, it's very simple.  This is a

5     highly profitable enterprise.  It doesn't need this

6     bankruptcy.  It has no business filing a bankruptcy

7     petition, and the sale motion that is a big piece of this

8     puzzle should be denied.

9          I really don't have too much to add to the flaws

10    in the procedures that the debtor has proposed for the

11    sale of these assets.  You know, it's -- what's important

12    to note is that they clearly favor an insider purchase.

13    You know, again, we can't rely on what's in the -- it's

14    in the revised order that was handed to us moments ago.

15    We must look at what was sent out to creditors, what's

16    before the Court, and what's before the Court is -- are

17    procedures that clearly favor only an insider purchasing,

18    and it's evidenced by the fact that the debtor has set an

19    extremely short time frame of five days between the time

20    that the Court enters the order approving the procedures

21    and the deadline to submit the bids.  And within those

22    five days, those five days the debtor finds sufficient to

23    do marketing, to solicit bids, to have the credit -- to

24    have any potential purchasers do due diligence, get the

25    information necessary to determine what the bids should

1    be, to -- and to formulate and submit their bids after

2    having understood the true value of the assets.

3    Your Honor, the absurdity of the time frame that the

4    debtor had initially proposed is evident on its face, and

5    it exposes clearly the debtor's intent to sell the mining

6    rigs to the -- to an insider and shed all these

7    contractual responsibilities that it has to its

8    creditors.

9         Some of the other concerns are that there are no

10   clear procedures for any due diligence to be conducted by

11   any potential purchasers.

12        THE COURT:  I'm not sure we know -- we even know

13   what the due diligence would be.  I assume somebody has

14   to look at the equipment or know exactly what its

15   components are so that they can verify its terra-hashing

16   capabilities.

17        MS. SIMONYAN:  It's terra-hashing capabilities.

18   Whether they work properly.  And these are uniquely

19   engineered rigs, Your Honor.  I don't know exactly the --

20   all the technical details of the due diligence that would

21   by required to make an informed decision about the

22   purchase; however, there is no question that there needs

23   to be some extensive due diligence to understand the

24   mechanism in which they operate, to understand their true

25   value and their -- to understand their revenue-producing

1    capacity.

2           The debtor has testified that it has made no

3    marketing efforts to date.  In fact, the debtor testified

4    at the Rule 2004 exam that the only party that it could

5    identify that had expressed any interest to purchase the

6    assets was an insider, Mr. Joel Yarmon.  So up until

7    today, the only parties that have been consulted about

8    the sale of these mining rigs were only insiders.  Well,

9    I shouldn't say as -- I should say as of the date of the

10   Rule 2004 exam.

11          So the procedures, Your Honor, are extremely

12   flawed, and for that reason alone this -- the motion

13   should be denied.

14          But I next want to turn to what was extensively

15   discussed moments ago, and that's whether or not the

16   debtor may be trusted to make sound business decisions in

17   the best interests of the estate and its creditors, and

18   the debtor's conduct up to this date demonstrate that the

19   answer is absolutely no.  We have a monthly operating

20   report that shows that no bitcoins were mined, that there

21   was no bitcoin value --

22          THE COURT:  So you don't buy the Moss Adams

23   opinion?

24          MS. SIMONYAN:  Your Honor, the Moss -- absolutely

25   not.  The Moss Adams opinion is completely irrelevant

1   here.  We have a monthly operating report that requires

2   the debtor to show what -- to show its assets.  If the

3   debtor is saying that it cannot disclose the mined

4   bitcoins in the form of revenue because it has to be as

5   of the date that the bitcoins are sold, if that, in fact,

6   is the Moss Adams advice, then that value needs to be

7   disclosed elsewhere on the report.  It needs to be

8   disclosed either as assets, inventory.  You can't just

9   ignore on a balance sheet --

10          THE COURT:  Well, there is some inventory listed

11   on here.  It says "Accounts Receivable, Net Bitcoins."  I

12   don't know what that is.

13          MR. VESSENES:  There's an explanation on the

14   second page, Your Honor.

15          MS. SIMONYAN:  I can explain, Your Honor.  The

16   explanation is that because there was no specific line

17   item for bitcoins they have inserted it in accounts

18   receivable, and they value --

19          THE COURT:  So that would be given, wouldn't it?

20          MS. SIMONYAN:  Yes, except it's valued at $129,000

21   when the true value is, in fact, 1.8 million.

22          THE COURT:  Well, I see what you're saying.  Okay.

23          MS. SIMONYAN:  And we went -- at the Rule 2004

24   exam, we actually explored the monthly operating report

25   quite in detail.  We spent a lot of time on it going line

1    item by line item, and, not surprisingly, the monthly

2    operating report was amended the next day to show what

3    the actual revenue for the company was in the form of

4    bitcoins.

5          THE COURT:  So just so I'm clear, if I multiplied

6    129,168 by \$848, I get about a million -- 4,085,000 --

7    no, that's not right.  So there's no scenario under which

8    that's the number of bitcoins?

9          MS. SIMONYAN:  Oh, no.  The number --

10        THE COURT:  Yeah.  There's no way.

11        MS. SIMONYAN:  -- of bitcoins that it's --

12        MS. GLYNN LEVIN:  Right.

13        MS. SIMONYAN:  There's no way that --

14        THE COURT:  Right.  There's no way.

15        MS. SIMONYAN:  No mathematical formula --

16        THE COURT:  That had to be a dollar valuation

17    inserted into that line item?

18        MS. SIMONYAN:  Yes.  Absolutely.

19        THE COURT:  Okay.

20        MS. SIMONYAN:  And the debtor has actually

21    testified to that.  But if Your Honor turns to the

22    amended report, the actual number of bitcoins that were

23    mined was 1,650.061, and at a rate -- at the rate as of

24    that date of \$1,132 per bitcoin, it would render

25    \$1.89 million, approximately.

1          But, Your Honor, that's only one example of the

2     multiple lies that have been put in front of this court

3     and have been produced in this case.   We have an

4     operations agreement that was entered post-petition, as I

5     said, giving CoinLab the unbridled power to bill

6     Alydian -- to bill the debtor whatever it found

7     appropriate, and the debtor has adamantly refused to

8     produce any underlying invoices to -- as evidence that

9     there was no bad faith and the actual expenses were

10    accurate and reasonable.

11         There were payments to insiders two days before,

12    and as of the date -- only a couple of hours before the

13    bankruptcy petition was filed, the debtor transferred as

14    of today's value over $12 million worth of bitcoins.   The

15    debtor repeatedly lied about it in his schedules, on

16    Schedule 3B at the 341 meeting of creditors, and only

17    amended SOFA No. 3 the day after the Rule 2004 exam,

18    during which time it was confronted with evidence that

19    these payments were actually made immediately before the

20    bankruptcy petition.   We have multiple other

21    misstatements in the schedules, including Schedule D,

22    which states that the debtor had no bitcoins as of the

23    date of the filing of the petition.

24         And we have continued discovery violations that

25    are still ongoing in this case, Your Honor, and that's

1    what I would like to turn to next.

2        Oh, and before I move on, I want to answer a

3    couple of questions that the Court asked earlier, and I

4    don't believe the questions were adequately answered.

5        So one of the questions was whether the debtor is

6    immediately notified of the amount of bitcoins that its

7    mined and how many bitcoins that it has, and the answer

8    is, yes, it almost immediately knows.  Once the bitcoins

9    are mined, they are in an Alydian address.  They appear

10   in an Alydian address that are used for mining bitcoins,

11   so there is no chance that the debtor at the time of

12   filing the monthly operating -- the original monthly

13   operating report could have miscalculated the value of

14   bitcoins it had.

15       And now, turning to the discovery violations,

16   Your Honor, I want to go back to the hearing on the

17   motion to compel, which was actually a quite extensive

18   hearing, and a lot of -- my client has spent a lot of

19   time on these discovery motions and a lot of attorneys'

20   fees on discovery motions and the Court spent almost a

21   full day entering the order.  And the debtor was

22   specifically required to produce all of the bitcoin

23   addresses that it had -- it used or had previously used

24   to mine, transfer, hold, control bitcoins.  The Court set

25   a specific deadline for that production of 24 hours,

1    given that that was a key piece in the puzzle of

2    determining what the transfers of bitcoins out of the

3    estate were.  The deadline was set at 24 hours, and

4    within the 24 hours, after some struggle, I might add,

5    we -- the debtor produced a 20-page -- 27-page document

6    which is subject to a confidentiality agreement.  So I

7    haven't printed that document, but I would like to -- I

8    have a copy with me, and I'd like to pass it to the

9    Court, if I may.

10         THE COURT:  All right.  I'm sure I don't want to

11   keep it, but I'll look at it.

12         MS. SIMONYAN:  Your Honor, this --

13         THE COURT:  Yeah.  It's worthless.

14         MS. SIMONYAN:  Not only is it worthless --

15         THE COURT:  Okay.  But this watermark --

16         MS. GLYNN LEVIN:  That's not the form.  It's been

17   photocopied in a way --

18         THE COURT:  Well, that's what I was about to

19   ask --

20         MS. GLYNN LEVIN:  That is not the way we had it.

21         THE COURT:  Let me ask the question.  I mean, this

22   happens with a watermark when it's photographed.  So the

23   question is, did you receive one with a watermark through

24   which you could see?

25         MS. SIMONYAN:  I received one through a watermark

1      through which I can see, but the content of this

2      information is so highly technical that I am not the one

3      that analyzes the data.  I need some people with the

4      technical knowledge to analyze the data and --

5             THE COURT:  So your client doesn't have that

6      knowledge?  Mr. Gallancy can't look at this and know

7      whether these are, in fact, addresses?

8             MS. SIMONYAN:  Well, so there -- the answer to

9      that is twofold, Your Honor.

10            THE COURT:  Okay.  Ms. Glynn Levin, I can tell

11     you, because I sit up here, that Ms. Simonyan didn't make

12     any noises or anything like that when she heard you say

13     things that she didn't like, so you need to give her the

14     same respect.

15            So you're telling me your client can't read this?

16            MS. SIMONYAN:  What my client can read is in the

17     version that Your Honor has in front of her at the

18     moment.  He can read with the darkened watermark, and he

19     can only make out some of the information that is on

20     there that is not obscured by the watermark.  That's --

21            THE COURT:  Okay.  But why can't you give your

22     client the one that doesn't obscure --

23            MS. SIMONYAN:  The original?

24            THE COURT:  Yeah.  That isn't obscured by the

25     watermark.

1          MS. SIMONYAN:  Because my client is in New York,

2     Your Honor, so that would require me to take the only

3     original copy and forward it to my client and have no

4     other copies.  And, Your Honor, I want to remind the

5     Court of the importance of the time frame in which they

6     were supposed to produce these documents.

7          THE COURT:  Right.

8          MS. SIMONYAN:  We needed to this information going

9     into the Rule 2004 examination.  But, you know, the

10    watermark is simply indicative --

11         THE COURT:  But I could just order the debtor to

12    provide you with a copy that does not have a watermark on

13    it and instead on the first page says all of these pages

14    are confidential, and that's it.  No watermark.  Just

15    something on the first page.

16         MS. SIMONYAN:  Exactly, Your Honor.

17         THE COURT:  Okay.

18         MS. SIMONYAN:  And we would ask that the Court

19    make that order.  However, this shows the -- this is only

20    indicative of what the debtors have produced and how

21    forthcoming they have been with the production that were

22    subject to several court orders.

23          In addition to watermark which is absolutely

24    unnecessary, Your Honor, the production does not contain

25    a single full bitcoin address.  The -- Mr. -- I have

1    attached the excerpt from the Rule 2004 exam where

2    Mr. Vessenes testifies that the 27-page production does

3    not contain a single full bitcoin address. All it

4    contains are short form addresses that are listed at the

5    top of the document, and there are only five of those,

6    and we know now that the debtor has at least six bitcoin

7    addresses. Again, to this date the only testimony that

8    we have -- we still don't know with certainty how many

9    addresses the debtor has. Mr. Vessenes came to the

10   Rule 2004 exam and testified that there are probably six,

11   but "probably" is not good enough. We should have had

12   that information with certainty. If there are six

13   addresses, those six addresses should have been typed

14   into an email and forwarded to us in response to the

15   court order, something that could have been done within

16   five minutes.

17        But this is not the end of the story, Your Honor.

18   We notified -- instead of filing a motion for sanctions

19   or another motion to compel, we notified debtor's counsel

20   that they had entirely failed to respond to our

21   production request, and we asked that debtor's counsel

22   produce the actual addresses that were used that would be

23   responsive to our request. And in response, we get a

24   thousand-page document that contains -- over a

25   thousand-page document, that contains probably over

1      100,000 addresses, also covered with a watermark.  If I

2      may, even even a more obnoxious watermark.  If I may pass

3      that to the Court.  And this, Your Honor, constitutes

4      only probably one-tenth of what was produced to us in

5      response to the -- to our RFP No. 1.  And when we

6      actually were able to verify these addresses, we

7      discovered that most of these addresses are addresses

8      that were generated by the debtor but were never used.

9      So, again, Your Honor, we are buried -- the debtor buried

10     us in response to the court order compelling discovery.

11     Four days later, buried us with a production consisting

12     of 1,200 pages and over 100,000 addresses that were

13     completely useless.

14            That was the evening before the Rule 2004 exam,

15     and at the Rule 2004 exam Mr. Vessenes came unprepared to

16     even answer with certainty the very simple question, "How

17     many addresses has the debtor used to mine bitcoins?"

18     Mr. Vessenes testified that there are probably six, and

19     if that's the case, well, then that clearly indicates the

20     bad faith in which they have complied with any discovery

21     requests.

22            And one final item with regard to discovery,

23     Your Honor.  We had asked the debtor to produce some

24     emails and some correspondence that accompany some of

25     our -- some of the agreements that were entered pre- and

1     post-petition by the debtor, and I want to give the Court

2     a little glimpse of what was produced there.

3          THE COURT:  Morgan you can give these back.

4          MS. GLYNN LEVIN:  I'm sorry.  What is this?  Are

5     there Bates stamps?

6          MS. SIMONYAN:  This is the production that was

7     made to us on January 6th, in the evening of January 6th,

8     the day before the Rule 2004 exam was scheduled.  And so

9     let me just explain to the Court -- and, you know, we

10    didn't have, obviously, the opportunity to review this as

11    of -- before the Rule 2004 exam, and it appears -- it's

12    hard to read, but it appears that from what we can tell

13    there is some important information that needs to be

14    explored further.  But let me tell the Court some of the

15    problems there are -- that there are with this discovery.

16         First of all, as the Court can see, many of these

17    emails are gibberish.  There are characters that are

18    completely unreadable.  Some of the font sizes are so

19    small that it's impossible to even read the parts that

20    are in actual English.  Most importantly, these emails

21    are not produced in their original format, and we are

22    entitled to see the emails in their original format

23    because we need to be able to analyze the metadata of the

24    emails and to ensure that the content of the emails and

25    the various information accompanying the emails has not

1    been altered.  There are no attachments to the emails

2    that were included, and there were -- some of the emails

3    were produced in sideways so the watermark that's on them

4    actually obscured them even more than it would otherwise.

5    And the production contains numerous duplicates, so we

6    had to go through approximately 300 pages of the same

7    five emails, Your Honor.

8        These are some of the problems with the production

9    that we've dealt with.  And, you know, I would ask that

10    the Court today make a ruling requiring the debtors to

11    produce this information without the watermark or putting

12    some sort of a confidentiality notice somewhere at the

13    top of the document, which would be perfectly sufficient

14    under the circumstances.  But we know what's covered

15    under the confidentiality agreement.  We have no

16    intention to violate the confidentiality agreement --

17    which, by the way, Your Honor, this confidentiality issue

18    is also -- was another excuse to delay production of

19    documents because all the bitcoin addresses, that's

20    public information.  People can go on publicly available

21    websites and see all the bitcoin addresses that are out

22    there that are transaction --

23        THE COURT:  But can you tell when you go out there

24    and look who they belong to?

25        MS. SIMONYAN:  You can't tell who they belong to,

1  but the point is that --

2         THE COURT:  So then it's not public information.

3         MS. SIMONYAN:  The actual addresses are public

4  information.  It's not public information who they belong

5  to, but the point is that there is no intellectual

6  property that needs to be protected to this

7  confidentiality agreement, although I --

8         THE COURT:  Well, if somebody knew your bitcoin

9  addresses, could they hack into that account?

10        MS. SIMONYAN:  There is absolute -- there have

11  been no incidents of hacking into Alydian addresses.

12  There's nothing on the record to indicate one way or

13  another, and --

14        THE COURT:  Okay.

15        MS. SIMONYAN:  -- this concern was never raised

16  with us.  Just at some point, in order to delay

17  production -- for the apparent reason of delaying

18  production, the debtor raised the confidentiality issue.

19        So, Your Honor, I think I've gone through most of

20  the arguments as to why the motion today should be

21  dismissed.  There were some issues raised about

22  Bitvestment's good faith in this case that I would like

23  to address before I sit down.

24        So, first of all, debtor's counsel calls for the

25  Court to reprimand Bitvestment for taking upon itself the

 1      labor of ensuring that the debtor has complied with the

 2      bankruptcy code; has not looted the estate; has disclosed

 3      the insider transfers prepetition, post-petition; has

 4      disclosed the various agreements it has entered into; has

 5      disclosed that it has unilaterally decided to award

 6      Mr. Vessenes a $20,000 monthly salary that, by the way,

 7      started only post-petition; and basically taken upon

 8      itself the labor and the cost of ensuring that the

 9      integrity of the bankruptcy process is preserved.

10          Second of all, Bitvestment -- it's completely

11      irrelevant how many creditors are objecting to the sale

12      motion and to the various other reliefs that have been

13      submitted to this -- have been requested.  However, it

14      must be noted that Bitvestment is a uniquely positioned

15      creditor in this case.  Its contract has a provision that

16      is significantly different from the -- all the other

17      presale contracts of all the other creditors, and the key

18      difference is that Bitvestment's contract does not

19      contain a provision which says that upon a certain date

20      the contract expires.  So all the other contracts expire

21      on a certain date, mostly around December of 2013.  These

22      contracts state that upon a certain date if the debtor

23      has not submitted the -- to the creditors the bitcoins

24      that it's required to submit under the contract the

25      contract expires and these creditors are entitled to a

1   refund of their original investment.  So these contracts

2   expire at some point, and the debtor has an option to

3   repay those contracts in dollar value.  Bitvestment

4   contract does not have that provision, making Bitvestment

5   a unique creditor in this case.

6          And, finally, I need to address the subpoena

7   issue, Your Honor.

8          THE COURT:  Their subpoena to your client?

9          MS. SIMONYAN:  Subpoena to my client.

10         There have been allegations made that we have not

11  complied with the subpoena.  Well, it's a little

12  difficult to comply with a subpoena that has never been

13  served.  My client has not given me express authority to

14  accept service on his behalf.  My firm has a very strict

15  policy to comply with the client's permission whether or

16  not to accept service.  It's my understanding that

17  Mr. Reyhani, who is Mr. -- who is Bitvestment's counsel

18  in New York, is also admitted here pro hac vice, he also

19  does not have the authority to accept service.  However,

20  Your Honor, this is a very simple -- there's a very

21  simple solution to this purported problem.  All the

22  debtor needs to do is serve the registered agent, which

23  is publicly available information.  I don't understand

24  how this creates any difficulty or demonstrate any sort

25  of bad faith upon Bitvestment.

```
 1              Oh, and one more thing I want to address,

 2    Your Honor.  The debtor has repeatedly stated that the

 3    debtor's core team is unwilling to stay after a certain

 4    day.  The testimony that's been submitted is highly

 5    dubious.  It only comes from Mr. Vessenes, and in very

 6    ambiguous terms, if I may add.  Mr. Vessenes testified

 7    that they may or they likely will not stay.  Again, we

 8    see no certainty.  At the Rule 2004 exam, it was

 9    discovered that this team will stay on only if they're

10    paid a retention bonus of $250,000.  Upon further

11    exploration, it was discovered that the team had already

12    received a large sum only a month ago, and that is on top

13    of their $200,000 monthly salary.  These are --

14              THE COURT:  200,000 -- you mean total?

15              MS. SIMONYAN:  No, not --

16              THE COURT:  Not just for one person.

17              MS. SIMONYAN:  No, each.  Each.  Each person has a

18    $200,000 monthly salary.

19              THE COURT:  Monthly salary?

20              MS. SIMONYAN:  I'm sorry.

21              MS. GLYNN LEVIN:  What?

22              MS. SIMONYAN:  I'm sorry.  Yearly salary.

23              THE COURT:  Okay.

24              MS. SIMONYAN:  I'm sorry.  I made -- it was my

25    mistake.  They have a $200,000 yearly salary.  They got a
```

```
 1    retention bonus of -- or at least they were promised --
 2    it's possible that it was never delivered.  We still
 3    don't know after the debtor has been questioned so many
 4    times, but it's been represented in the debtor's reports
 5    that $105,000 at least, as of today, has been paid.  And
 6    these people -- Mr. Vessenes was unable to testify
 7    whether these people have other jobs, whether they have
 8    other commitments or whether they've just threatened to
 9    leave and just sit at home and collect Unemployment.  So,
10    Your Honor, the contention that the debtor is unable to
11    operate after a certain day because its team is -- has
12    expressed unwillingness to stay on under very favorable
13    circumstances and having received some significant sums,
14    it's incredulous.  And also, Mr. Vessenes has made no
15    showing that his team is -- cannot be easily replaced.
16          That's all for now, Your Honor, if the Court has
17    no more questions.
18          THE COURT:  I don't.
19          So, Ms. Glynn Levin, do you want to respond?  I'll
20    just give you an opportunity to briefly respond.
21          MS. PEARSON:  Your Honor, can I be heard briefly?
22          THE COURT:  Oh, okay, Ms. Pearson.  Go ahead.
23          MS. PEARSON:  Jane Pearson for CoinLab.
24          I just wanted to make a couple of broad points,
25    and one of them is, you know, the thing that strikes
```

1      me -- I'm new to the case, but is that if the company is

2      so highly profitable, I mean, certainly CoinLab would be

3      interested as the majority shareholder in the continued

4      operations of the company.  So I think that the action of

5      being supportive of the auction demonstrates the

6      fundamental conviction that the company cannot -- if it

7      is profitable now, and I'm not -- I don't think that's

8      been established, but that it's not anticipated because

9      of the market forces that are at work --

10             THE COURT:  So let's talk --

11             MS. PEARSON:  -- that it will continue to be

12     profitable.

13             THE COURT:  -- about, though, who you think -- who

14     else from CoinLab would have had authority to sign this

15     post-petition operations agreement.  Because so far I've

16     only seen one person associated with CoinLab, and that's

17     Mr. Vessenes.  So I think these companies do whatever he

18     wants to do, so how can I find -- I guess what I'm asking

19     you, and you're new, but I mean, how do I find any

20     separate existence at all so far with regard to

21     CoinLab --

22             MS. PEARSON:  Well, I --

23             THE COURT:  -- from the debtor?

24             MS. PEARSON:  Your Honor, I think, you know,

25     common management doesn't necessarily mean that there

1    isn't separate existence.

2         THE COURT:  So I asked you, who else in the

3    company, then, in CoinLab would have the authority to

4    sign this contract?

5         MS. PEARSON:  I believe that the general -- well,

6    the general counsel, Ms. Wallace, would have authority to

7    sign a contract.  A CFO would have authority to sign a

8    contract.  I'm not sure who the current CFO is.  Those

9    are people that strike me as having that kind of

10   authority.

11        THE COURT:  So hopefully they know about this.

12        MS. PEARSON:  Well, I think they --

13        THE COURT:  Or participated in some way.

14        MS. PEARSON:  Well, I'm not sure when Ms. Wallace

15   came on board.  I don't know if she participated with

16   respect to that contract.  I'm not sure who was on board,

17   if there was a CFO on board at that time.

18        But I also wanted to point out with respect to

19   that contract, that it doesn't provide for unbridled

20   discretion on CoinLab's part in terms of payment of

21   invoices.  In fact, it authorizes the payment of direct

22   costs plus an administrative fee of ten percent.  So it

23   appears on the face, and I understand that it was -- this

24   was drafted by highly competent outside counsel, that on

25   the face of this agreement it appears to be a typical

1      kind of agreement.  And, in fact, the arrange -- I think

2      one of the unfortunate pieces with respect to the debtor

3      right now is that all of us who aren't involved in

4      bitcoins are -- I think are struggling a little bit just

5      to understand --

6              THE COURT:  We are.

7              MS. PEARSON:   -- the industry.  And that makes it,

8      I think, maybe appear somewhat differently from how, in

9      fact, it might be.  There are terms that we're used to

10     dealing with that I think don't accommodate themselves

11     easily to this industry, and I think we're all trying to

12     figure that out, and so I think that there have perhaps

13     been some representations which were intended in good

14     faith, but perhaps because they don't fit into certain

15     forms or ways in which we're used to hearing the

16     information might not seem as clear as maybe they could

17     have been in retrospect.

18             So I also -- I would also just generally comment

19     that it wouldn't be that unusual for a parent to be

20     involved in the bankruptcy case of an affiliate and for

21     there to be common management.

22             I also want to comment with respect to the concern

23     about an expedited sale.  You know, it appears to me that

24     the actual assets that are going to be sold are quite

25     discreet, and I think a good point has been made that

1    they should be able to be described on an exhibit to an

2    order that's clear, that interested purchasers could look

3    into.  I think that this -- it appears that this -- the

4    market for this sale is highly specialized, but that it's

5    a known group that can be marketed to, and they aren't --

6    you know, with respect to Mr. Stehlik and I guess to

7    myself, they aren't necessarily aging lawyers sitting

8    around at their desks.

9         THE COURT:  They're not us.

10        MS. PEARSON:  Yeah, they're -- it's not me.  And

11   so there are places that these people look and -- pretty

12   continuously and become -- and are aware of and can act

13   quickly.  And so I don't think that -- and the debtor is

14   also going to seek to hire a particular PR firm to be

15   directed to those people.  So I think the communication

16   is not going to be the same as selling bricks-and-mortar

17   types of assets.

18        I don't see how the proposed procedure favors

19   insider purchasers.  CoinLab is not going to be a bidder.

20   Mr. Vessenes says that he's not going to be a bidder.

21   Certainly, the nature of any bidder's relationship to the

22   debtor would need to be disclosed subject -- you know,

23   for the Court's final approval of any order approving the

24   sale.

25        THE COURT:  I mean, it's only a concern if some of

1    the common owners end up in a brand new corporation

2    formed in order to buy the assets.

3         MS. PEARSON:  I understand that, Your Honor.  And

4    that's certainly a legitimate concern.

5         And then, finally, I mean, and if it is such a

6    fantastic asset, guaranteed -- you know, that people are

7    so confident is going to make so much money, then there

8    should be lots of bidders --

9         THE COURT:  Yeah.  I think it's the opposite.

10        MS. PEARSON:  -- and the objecting parties should

11    bid.

12        THE COURT:  I think from my perspective it's the

13    opposite.  Mr. Vessenes is saying that it's not.  That

14    these are assets that are devaluing rapidly.

15        MS. PEARSON:  That's certainly --

16        THE COURT:  And Ms. Glynn Levin described them

17    basically as scrap by February.

18        MS. PEARSON:  Well --

19        THE COURT:  So I think they're not -- I guess I

20    thought the debtor's argument was they're not going to be

21    worth anything unless we unload them quickly.

22        MS. PEARSON:  That's what I think the debtor's

23    argument is also.  But I'm saying the objecting parties I

24    think are challenging that representation, and if --

25        THE COURT:  Well, I'm not so sure.  I think

1    Ms. Simonyan basically said we can make more money by

2    operating with this equipment for a couple of months and

3    then just trashing it.  I mean, I guess that's what we're

4    trying to get at.  What are --

5         MS. PEARSON:  Well, but it --

6         THE COURT:  -- these things really worth?

7         MS. PEARSON:  But it appears -- well, it appears

8    that it's extremely difficult to establish a value at any

9    particular in time.

10        THE COURT:  Right.

11        MR. VESSENES:  I have estimates, actually.  I just

12   haven't wanted to put them on the record in case we would

13   prejudice bidders from going over that.

14        THE COURT:  Okay.  And you don't -- you can't

15   talk.

16        MS. PEARSON:  No.  No.  That makes sense.

17        And it also appears that, I mean, the value --

18   it's a highly volatile market, not just for the mining

19   equipment, but also for the bitcoin, and I think -- I

20   believe -- I can't speak for the debtor, but I believe

21   the debtor's intention is to continue operating until the

22   sale takes place.  So if the Court did approve the sale,

23   until the equipment, the mining equipment changes hands,

24   it would continue to mine.  It wouldn't just, like, today

25   be shut down.  Subject, of course, to the availability of

1    the employees.

2            So those are all the comments that I have,

3    Your Honor.

4            THE COURT:  All right.

5            Ms. Glynn Levin, now do you want to respond

6    briefly?

7            MS. GLYNN LEVIN:  I'll try to make it brief,

8    Your Honor.  I know Your Honor has heard a lot already

9    today.

10           I think the point has been made that just because

11   you have a complicated and perhaps complex industry where

12   there are a lot of questions about how things work and

13   there are a lot of questions about what the technology

14   is, that doesn't defeat our right to be able to be in

15   bankruptcy.  That doesn't defeat a debtor's right to be

16   able to reorganize and sell.  It's not required that we

17   have a simple, well understood, well established, common,

18   conventional industry in order to be in bankruptcy court.

19           This is new, and the fact that it is new does --

20   is perplexing to a lot of people, and we have done our

21   very best in trying to simplify it and making it as clear

22   as possible to everyone so that it is patently obvious

23   what is going on, how the accounting works, what the

24   assets are.  We know who's involved.  And it does take --

25   I mean, it has taken some time to get our collective

1   hands around this so that we can sort of convert the

2   information and the data into a form that is sort of

3   readily usable for all of the constituent parts of the

4   bankruptcy system.  You know, I definitely get that.

5       So when Mr. Stehlik comes up and says, you know,

6   "What is this stuff?  Gee, I don't get it."  Well, you

7   know, he's a newcomer to the case.  That's how I felt

8   when I first started off.  I mean, I couldn't spell

9   "bitcoin."  So it does take some time to start to get

10  there and understanding.  That is not a reason, that's

11  not a ground to defeat our motion.  And maybe the

12  contrary is true.  Maybe the fact that we have something

13  that is so unique, we are bringing this, doing our best

14  to explain in sort of layman terms as well as possible

15  what we are doing, is the -- really the essence of this

16  motion.

17      I kind of have to object with the long discussion

18  about discovery.  While I know the Court has been

19  concerned about disclosure and making sure that all of

20  the discovery is turned over, I mean, this is not a

21  discovery motion, and I wasn't -- didn't stand here

22  prepared to be addressing this.

23      Let's turn quickly to the operating agreement.  I

24  think Ms. Pearson correctly identified the -- you know,

25  the pros and cons of that agreement, that it's not a

1   carte blanche to do whatever is -- whatever CoinLab

2   wants.

3        Your Honor specifically addressed the question of

4   should we under a 2004 proceeding be required to turn

5   over all of the underlying invoices, and I said that

6   would be burdensome, but we could do it.  And Your Honor

7   said, no, that would by overly burdensome, so we did not

8   do it.  It was not part of the court order, and I object

9   to the insinuation now that we withheld something that we

10  were supposed to turn over.  It was expressly asked for

11  and not turned over because it was not part of the court

12  order.

13       In terms of the timing of the 2004, that was

14  strictly up to Bitvestment.  The Court agreed to allow us

15  basically one week, a very short week to turn over a

16  volume, and I think the Court described it as overly

17  broad when we were in here a day or two before New Years,

18  and a volume was turned over on the 6th of January.

19       Now, there's been some sort of insinuation that

20  information was buried, and I resent that, because

21  Bitvestment has been asking time and time again, "Turn

22  over all the addresses.  Turn over all the addresses."

23  And we have been saying, and I said in court, "Really?

24  You really want these?  There are a hundred thousand

25  addresses out there that are essentially set aside as

1  sort of like empty vessels, and they are not being used."

2  And they said, "Yes.  Turn over all the addresses."  So

3  we did.

4        Now, the form of the addresses, the watermark, as

5  it got copied, does appear much darker than when it left

6  my office.  I will say that, and I -- and the day the

7  initial production was supposed to be turned over, that

8  27 pages, Lane Powell did not tell me their office was

9  closed, so literally there was a court order requiring us

10  to turn over documents to an office that was closed on

11  New Years, and only through the efforts of a messenger

12  who managed to find his way up through the security

13  system and beg to deliver these things was it actually --

14  were we able to finally meet the terms of the court

15  order.  And so with 24 hours, it would have -- I think it

16  would have been nice had we been told that Lane Powell

17  was going to be closed on the time that -- at the time

18  that we were required to turn them over.

19        I'll also point out that at the deposition of

20  Mr. Vessenes, which lasted a good eight hours so every

21  opportunity was there to ask any question of him, one

22  exhibit was turned over, and it's Exhibit 9.  It is a

23  16-page document, and I'm happy to turn it over just like

24  Counsel has done, although they didn't put -- they didn't

25  Bates stamp it, so it just appears as a printout.  And

1   what it is is a printout of exactly as Your Honor was

2   saying.  It's all the addresses and all the activity on

3   CoinLab's active using accounts.

4            MR. VESSENES:  Alydian.

5            MS. GLYNN LEVIN:  Excuse me.  Debtor's.  The

6   debtor's accounts.  All of the activity.  So when they

7   came up after hours of saying, "Why didn't you turn these

8   things over," and then walked up and said, "Well, here's

9   Exhibit 9.  Are these all your accounts?"  They had them

10  all along.

11           THE COURT:  So you're saying this Exhibit 9 was

12  produced by them?

13           MS. GLYNN LEVIN:  This Exhibit 9 was produced by

14  them, Your Honor.  They had had them --

15           THE COURT:  Oh, okay.  I guess I should --

16           MS. GLYNN LEVIN:  They had them --

17           THE COURT:  You can take this one back and give it

18  to --

19           MS. GLYNN LEVIN:  -- all along, and the way to

20  match up that they are owned by the debtor is that the

21  first five or so -- five or six characters or so which

22  appeared on the spreadsheets that we produced match

23  exactly the account or the address numbers on there.  So

24  they had them all along.  The whole thing was a great big

25  subterfuge to really force the debtor to go through an

1    incredible amount of work, expend enormous resources, and

2    make a very large fuss, really, out of nothing.  They

3    have all the information about the accounts.  These

4    accounts are available now that they have the full

5    address, literally the full address with all 27 or 30

6    characters or whatever it is.  I mean, literally now that

7    they know that those belong to the debtor, they can

8    actually go and see in real time the activity on them.

9    So it's a little hard to accept the objection that we

10   didn't turn over, that there's some information that's

11   being hidden.  There were transfers between, among those

12   accounts.  Those were all accounts held by the debtor.

13   They were not being sent out to third parties and

14   certainly not to CoinLab.  Again, it's all very

15   transparent and very able to be determined.

16       I think the one thing that I did hear from Counsel

17   for Bitvestment is that she said it was intuitively true

18   and it is no secret that it's out there and -- that it is

19   increasingly difficult to mine.  That was a big

20   concession, and I'm very pleased with her forthrightness

21   on that part.  A big concession.  It is intuitively true

22   it is becoming increasingly difficult to mine.

23       Now, I do ask this.  Where is the declaration of

24   her client?  Where is the declaration of Mr. Gallancy,

25   who is supposedly a financial -- a certified financial

1   analyst and some other kind of an expert in this

2   industry?  There's no evidence from him.  Zero.  So

3   everything that has been done on this objection is just

4   to say, "You've not done your work, debtor.  You've not

5   done your work."  They have not shown one thing.  They

6   have not produced one expert report.  They have not even

7   produced one sentence of Mr. Gallancy's declaration to

8   say:  You know, I don't think this is a good idea.  It's

9   all argument.

10      In terms of the calculation, the value increased

11   80 times, you know, it's just -- it's statistics, and

12   it's really immaterial as to what exactly the value of a

13   bitcoin is at -- over the history of one year.  To this

14   motion --

15      THE COURT:  Okay.  But just trying to be true to

16   the industry, and demonstrating maybe that I've learned

17   something from when we've started, we know, we all know,

18   that at present the total number of bitcoins that are

19   going to be issued is limited.  So as bitcoins are mined,

20   that means there are fewer left available, so doesn't

21   that mean just as a matter of supply and demand that the

22   value of bitcoins is going to go up, setting aside things

23   like the Chinese and Overstock?  But the fact is, the

24   fewer there are, just in that vacuum, the more valuable

25   they will be?

1          MS. GLYNN LEVIN:  In that vacuum?

2          THE COURT:  Right.

3          MS. GLYNN LEVIN:  Yes.

4          THE COURT:  In that vacuum.

5          MS. GLYNN LEVIN:  But we don't operate in a

6     vacuum.  We are operating in an international sphere with

7     multiple variable factors.  I mean, this is an

8     economist's dream analysis to figure out all the factors,

9     I mean, and they could change daily, what factors

10    influence the price of bitcoin.  I mean, I'll bet you you

11    could put that into a Google search and come up with lots

12    of different hits and lots of different analysis, and

13    market supply and demand is only one.  Ability to use

14    them is another.  What's going on in the field of

15    regulation by governments is another.  I mean, there are

16    multiple factors here, and the debtor cannot control the

17    value of the -- the exchange value of the bitcoin.  And

18    that isn't actually before the Court today.  The debtor

19    can say, "Here's the history from the" -- it was high, it

20    was low, it's gone up again, it's gone up and down and up

21    and down.  We can't control that.  The only thing right

22    now we have a limited bit of control over is getting our

23    rigs out there to mine, and that, as we've shown, has

24    got -- and I -- what was the percentage increase?  Some

25    thousands and thousands of percentage increase of

1    difficulty, going straight up.

2         I guess I also want to turn to now -- because I

3    don't want to beg the Court's patience for too, too long.

4         THE COURT:  Okay.  Well, I'm going to give you

5    four minutes.

6         MS. GLYNN LEVIN:  I have four minutes.

7         In terms of the amount of time, it's not five

8    days.  We're really talking from today 12 days.  And the

9    news has already hit the press.  We already have a PR

10   firm out there.  Why didn't we start --

11        THE COURT:  We do?

12        MS. GLYNN LEVIN:  Well, we've negotiated a

13   contract with one.  One has not been employed by the

14   Court.

15        THE COURT:  So they've started advertising?

16        MS. GLYNN LEVIN:  They have --

17        THE COURT:  Okay.  I stopped you.  I don't want to

18   use your four minutes.

19        MS. GLYNN LEVIN:  They have used -- they have --

20   this is -- this was a -- this is a tricky decision,

21   Your Honor.  Do we leak the information out and get it

22   out there so that the time we actually sell it the news

23   is stale, or do we hold on to it and then make a big

24   splash?  "Debtor is selling these things."  Get out

25   there, get the excitement, figure out right at the right

```
1    time.  How could we go out and start marketing something

2    where we had no idea where the Court was going to be in

3    terms of setting a floor?

4         THE COURT:  Okay.  That's why I asked you because

5    you said we already have a PR firm out there, and that's

6    why I asked you because we don't yet.  Haven't hired

7    them.  They haven't done anything yet.

8         MS. GLYNN LEVIN:  They have been retained and they

9    are ready to go.  I mean --

10        THE COURT:  All right.

11        MS. GLYNN LEVIN:  -- literally ready.  We have

12   telephone calls set up this afternoon, and they are ready

13   to hit the button and set the ground running, and I would

14   like to set their application for appointment on

15   immediately.  I mean literally this afternoon.

16        Can the debtor be trusted to make sound business

17   decisions?  It's a -- this is a very -- this is a

18   judgment call, Your Honor.  This is not an objective

19   standard.  We have done our absolute best to put

20   everything out there.  Where we had forms and reports

21   that didn't suit our industry, we modified them.  We

22   supplemented.  We amended our -- we amended -- we have

23   had no complaints from the U.S. trustee.  Not one.  He is

24   sitting there quietly listening and enjoying the story

25   here.  Not one complaint from the U.S. trustee.  Zero.
```

1    And ultimately --

2              THE COURT:  Okay.  Before you keep beating that

3    dead horse --

4              MS. GLYNN LEVIN:  Yes.

5              THE COURT:  -- let me just remind you, I am the

6    one who makes the decisions --

7              MS. GLYNN LEVIN:  Yes.

8              THE COURT:  -- not Mr. Buford.

9              MS. GLYNN LEVIN:  I understand, but --

10             THE COURT:  So I don't really care whether he

11   stands up or sits down.

12             MS. GLYNN LEVIN:  I understand, Your Honor.

13             THE COURT:  If he stood up, that would be of great

14   concern to me.

15             MS. GLYNN LEVIN:  Okay.

16             THE COURT:  And probably to you too, because that

17   would mean that all of a sudden maybe Mr. Buford does

18   have concerns.  So fortunately for you, you're only

19   dealing with mine, Mr. Stehlik, and Ms. Simonyan.

20             MS. GLYNN LEVIN:  What this does is it

21   characterizes the dynamic of this dispute.  This is

22   really two private parties who have had litigation going

23   on in New York and who are now transferring and trying to

24   convert and sway this court to take their side in

25   litigation that doesn't even in some ways really belong

1    here, except to the extent that we are dealing with an

2    objection to claim.

3         Again, I'm certainly happy and -- you know, when I

4    look at that -- those watermarks too, I mean, I -- they

5    do look dark to me, and I am absolutely happy to

6    reproduce that production without the watermark or with

7    just something at the bottom.  But there was some concern

8    that these would be used and circulated, and we -- and

9    unfortunately, the way it got photocopied, it looks very

10   dark.  But the information below was not obscured, so

11   ultimately I'm not sure what the practical complaint is,

12   but if the Court would like us to reproduce those without

13   the watermark on top, I'm certainly willing to do that,

14   as I offered at the 2004 exam multiple times.

15        Again, a full audit of all of the addresses were

16   provided to the U.S. trustee.

17        Turning to the emails --

18        THE COURT:  Okay.  I want you to wrap up.

19        MS. GLYNN LEVIN:  I will wrap --

20        THE COURT:  I don't want to discuss the discovery

21   dispute.  If they file a motion to compel, I'll respond

22   to it.  I'm not making an order with regard to that

23   today.

24        MS. GLYNN LEVIN:  I don't have too much else,

25   Your Honor.  Your Honor has been very patient with this

1      process, and I appreciate -- my client appreciates the

2      time that the Court has spent in trying to learn where

3      this industry is.  We have confidence that with Tim

4      Murphy in charge of an auction that that will be the best

5      way to ensure the -- sort of the neutrality of the

6      process.  He could certainly file his auctioneer's

7      report.  We will have our expert to go out and get the PR

8      out there and get the sale, to generate the excitement,

9      set that minimum bid of $2,000 per terra-hash and see

10     where this goes.  And we're willing to consider -- or

11     we'll consider what other contingencies there could be in

12     terms of a sale.

13          But the reality is, Your Honor, that we -- that

14     the systems need to get sold.  No Chapter 7 trustee is

15     going to sell them.  Your Honor said that.  And to -- we

16     will continue to operate them up until, you know, the

17     moment that they're turned over to a new purchaser or

18     purchasers and sold.  We ask the Court to grant the

19     motion and allow us to go ahead on that, on a sale.

20          Thank you.

21          THE COURT:  Okay.  I am not going to grant the

22     motion.  I'm not saying never, and I'm going to give you

23     my conditions today for what I need before I'm going to

24     be prepared to do this.

25          I want to start with one of the last points

1    Ms. Glynn Levin just made, and that is the point that

2    this is in reality a two-party dispute, and I agree with

3    that, and I am very close to sua sponte dismissing this

4    case and letting the parties just fight it out in state

5    court or in federal court in New York, where perhaps they

6    ought to be.  And so let me just lay what I think the

7    motivations are of the parties that are troubling to me

8    and their motivations on both sides that I am obviously

9    going to be watching.

10           On the debtor's side, I don't know as much about

11   this industry as I should, but I've learned enough so far

12   to be convinced that these machines, these so-called

13   systems, could be a lot like the Harleys I see from my

14   consumer debtors, and that means they're Mr. Vessenes's

15   and his colleagues' babies and that it will be a cold day

16   before they're willing to give them up.  And I know that

17   the only place the debtor can get out of these contracts,

18   which I have held are not executory, is here.  And I know

19   that I will therefore be very concerned about whether

20   insiders or related parties are the ones bidding at an

21   auction.

22           And Mr. Stehlik and others have kind of --

23   Mr. Stehlik hit it on the head when he said what we are

24   to believe is that all this effort by the debtor and

25   CoinLab has occurred over the last few months, all

1    culminating in equipment that is worth a couple

2    hundred -- $400,000.  And Mr. Vessenes is shaking his

3    head, which is why I'm going to give his my conditions

4    for going forward.

5         MR. VESSENES:  Yeah.

6         THE COURT:  Maybe they are worth $10 million, and

7    if somebody -- if that's true, somebody is going to have

8    to tell me that, but today that's not in the record.

9    What I know, however, is the debtor has great

10   incentive -- I think the debtor's principals will have

11   great incentive to find a way into continuing this

12   business, given the personal and financial investment

13   they have obviously made in it in the last few weeks.

14        On the flip side, I know that Bitvestment has a

15   contract and a legal argument that it can force specific

16   performance on the debtor, and that if it is successful

17   in doing that, then none of the other creditors get paid.

18   That bitcoin continues to go up in value.  I understand

19   the volatility, but the basic premise of bitcoin right

20   now is that people are betting that its value is going to

21   go up.  The more of it that is mined, the less of it is

22   that is there.  And Mr. Gallancy and those on his side

23   are interested in turning their investment into their own

24   bitcoin gold mine, if you will.

25        So I start with the proposition that I think that

1     the parties' motivations are on the table.  We know what

2     they are.

3           My biggest concern is I do not believe this

4     evidentiary record convinces me that the debtor is better

5     off to sell this equipment.  And before I am willing to

6     consider that, I need accurate monthly financial reports.

7     Maybe it's not true that the debtor didn't just make

8     $1.8 million in November and have no costs, but I don't

9·    have December's report.  I don't have any breakdown of

10    what the actual expenses incurred were.  Therefore, I

11    have no idea whether this debtor is profitable or not.

12    All I have in the record shows me that the debtor is

13    wildly profitable, and that if this debtor could make

14    $1.8 million a month and not incur any expenses, it would

15    be one of the most successful debtors I have ever had,

16    and we would just stay at that for a few months and

17    everybody would be more than paid, and the debtor could

18    go off on its merry way and do its thing.  But I think

19    that is not the case.  I think there are expenses here.

20    Before I am willing to go forward, I need to have

21    financial reports that honestly show me what the revenue

22    is and what the expenses are.

23          With regard to CoinLab, I am not satisfied with

24    these huge payments to CoinLab without any court

25    approval.  We have post-petition agreements and payments;

1    prepetition, possibly; very large preference

2    transactions.  And I agree with Ms. Simonyan that we will

3    ultimately have to get to the underlying cost that has

4    been incurred by CoinLab and passed on to the debtor.  If

5    it is, in fact, a direct cost, as argued by Ms. Pearson

6    and as stated in the contract, so it's just a

7    pass-through of costs that we can verify, fine.  But

8    Mr. Stehlik points out that here we have these huge costs

9    being incurred relative to equipment that the debtor is

10    now telling us is going to be worthless if we don't get

11    rid of it immediately, and that is, frankly, hard for me

12    to believe.

13        So I am concerned about post-petition contracts in

14    which CoinLab has entered which involve huge monthly

15    lease obligations.  Those are obligations of CoinLab.

16    The debtor can't control those.  CoinLab doesn't have to

17    get any approval from me as to whether or not those

18    leases can be signed.  However, when CoinLab comes in

19    here to seek reimbursement from the debtor for what is, I

20    believe, $198,350 per month in lease obligations, CoinLab

21    had better have some evidence that these are market

22    leases.  Otherwise, I have concerns that these expenses

23    are being trumped up in order to draw money out of this

24    debtor and away from the creditors here.

25        Mr. Vessenes is reluctant to tell me how much he

1     thinks these systems are worth because, like all

2     Chapter 11 debtors, he is concerned that if he takes any

3     kind of stand in public that will telegraph to others

4     what they can bid.  That is the case in all auctions in

5     Chapter 11.  That's just how we do it.  That's just a

6     fact.  And the way you deal with that is at a minimum

7     you've got to give me an estimate of what the universe

8     might be.  It can be anywhere from a minimum of $400,000

9     to $25 million.  What I need is for someone -- and maybe

10    the expert is Mr. Vessenes.  If it is, time for you to

11    tell me because I'm not going into a sale where the

12    debtor shows $1.8 million in revenue after only one month

13    and I am going to get $400,000 for equipment.  That's

14    just not going to happen.

15         MR. VESSENES:  I'd be happy --

16         THE COURT:  I need more certainty that there will

17    actually be competitive bidding that could generate a

18    significant amount of money.  Otherwise, it may very well

19    be that that same return can be generated by operating

20    this business and trashing the equipment at the end, just

21    giving it up.

22         I know what I will hear in responses:  "But you

23    haven't considered the fact that the employees have

24    threatened to leave."  I frankly don't care.  This is a

25    common theme in Chapter 11.  In almost every corporate

1    Chapter 11 all of a sudden employees want to leave and

2    they want to be paid big dollars at the expense of

3    everybody else in the case so that we can all beg them

4    and get down on our knees and be thankful that they're

5    going to save us.  From what?  That which they wrought

6    upon the creditors.  So we can't let the demands of a few

7    people drive the entire case.  If they want to leave,

8    they should leave.  I suspect that they don't.  And if

9    they do want to leave and there aren't people to come in

10   and operate this business, then we're left where we are

11   today, which is we need to sell the equipment.

12        And I haven't heard anything to convince me that

13   this is a kind of sale like a store where you've got, you

14   know, 150 employees who come in every day and stack

15   shelves and man cash registers and do accounting and do

16   all that's necessary to run a business, that it really

17   does generate more money upon sale if all that is in

18   place.  I'm not seeing that evidence.  If that's the

19   case, then I think the debtor needs to put that into some

20   form of evidence that I can understand:  Hey, the fact

21   that it's in a place with people who can operate it will

22   actually generate more money versus scrap, turn it off,

23   unplug it.

24        I don't know what the terms of these leases are at

25   all with regard to this equipment.  If it's the kind of

1       thing that really is hard to move, then it really

2       surprises me that on December 19, 2013, the debtor and

3       CoinLab installed ten rigs in this Wow lease headquarters.

4              Post-petition transactions cannot continue.   In

5       the first place, the monthly report, that's going to be

6       prepared for December.   And if there are some correction

7       that needs to be made for November, then it better be

8       made.   Incentive compensation does not get paid in a

9       Chapter 11 unless there is a motion for authority to pay

10      on notice to creditors and an order signed by me.

11             Post-petition contracts.   I suppose the debtor

12      could argue this was in the ordinary course of business,

13      but I'm going to say it's not.   A contract signed between

14      the debtor and a related entity which is signed by the

15      person that I am counting on to be in charge of the

16      debtor in possession, Mr. Vessenes, when he signs with

17      both hats on, I have to have all of my systems on high

18      alert.   And with a contract like this, it says a number

19      of things that are interesting in the proprietary

20      materials section.   We actually have, "CoinLab hereby

21      assigns and transfers to Alydian, without separate

22      consideration, all right, title, and interest that

23      CoinLab may have in the proprietary materials."   I don't

24      know what that means or why that's in here, but things

25      like that concern me when the person who is supposedly

1    the business person interacting with Ms. Glynn Levin has

2    signed on behalf of both companies.  This is not valid

3    until there is a motion to approve it, notice to

4    creditors, and an order signed by me.

5         Let me go back to see if there are any other

6    things that I need.

7         I do want you to reproduce, Ms. Glynn Levin.  The

8    only thing I'll say about the production today is that

9    you need to reproduce those documents without the

10   watermark.  And I am assuming when Bitvestment starts

11   making its disclosures it will not put a watermark all

12   over the front of its documents.

13        Let's review the major conditions that I have

14   before I will reconsider this motion to sell:

15        I need accurate and honest income and expense

16   information for November and December.

17        I need a clear description of the property.  I

18   don't want there to be reliance on the fact that

19   everybody knows what it is.  I think it is very unclear

20   from this operations agreement and the way it says that

21   CoinLab essentially owns all this stuff.  So there must

22   be an exhibit that actually describes what the system

23   includes and how many there are.  I understand that we

24   don't want to make representations about what that system

25   can accomplish, but I think there must be a way to

1     describe it so that the estate is making an accurate and

2     honest representation to the public about what's for

3     sale.

4          I need a declaration from Mr. Vessenes which

5     addresses the value of this equipment in more detail for

6     me so that I know more than just what the minimum bid is

7     going to be.

8          Every time we do an auction in bankruptcy court we

9     don't know what we're going to get, but over the years

10    I've learned that I can be surprised.  If you had told me

11    that Tully's would sell for what it did for, I would have

12    said no way.  I had another case where everybody got paid

13    in full, and nobody saw it coming.  And it involved

14    technology.  So all I need to know is that there's

15    something more here than $400,000, and if there isn't, if

16    it is $400,000, then I can compare that to the income and

17    the expenses and the net income and make a decision about

18    whether or not that is actually in the best interest of

19    creditors.  In this record, I can't see that this is in

20    the best interest of the creditors.

21         And I am concerned about the debtor's business

22    judgment, which I think may be clouded by the debtor's

23    own interests, the interests of its affiliates, and the

24    animosity toward what I agree is a bitter enemy.  But

25    that doesn't change the fact, as Ms. Simonyan says, that

```
1      Bitvestment has every right to exercise the legal rights

2      that it has, and it's clear that that will continue in

3      the case, and I am worried about the expenses.

4           With regard to the PR firm, I haven't seen that

5      application, but, again, that's part of the economics of

6      the sale.  In order to determine whether the sale makes

7      any sense, we need to know what the expenses of the sale

8      are going to be.  Presumably, Murphy is going to take a

9      cut.  We need to know what that is.  Presumably, the PR

10     firm is going to have to be paid.  We need to know

11     what -- if Murphy takes 20 percent and the PR firm takes

12     50, you know, and we're down to 200,000, then that makes

13     it a totally different case.

14          So, Ms. Glynn Levin, I'm going to leave it to you.

15     Tee it up however you want, but you're going to need to

16     re-file the motion.  I am not persuaded that there is an

17     emergency here that requires me to unload this equipment

18     without taking the time to actually analyze what's at

19     stake here, and I have concerns about what's been going

20     on in the case.

21          And so, Mr. Buford, I hope that you are perfectly

22     satisfied, and if you are, that's great, and I won't see

23     a motion to dismiss or convert.

24          But if he's not, then I expect somebody to request

25     relief that they think is appropriate if there are
```

1     problems with the management of the company.

2              With that, we will be at recess.  Thank you.

3              MR. STEHLIK:  Thank you.

4              MS. SIMONYAN:  Thank you.

5              THE CLERK:  Please rise.

6              (Hearing concluded.)

7                      C E R T I F I C A T E

8     STATE OF WASHINGTON        )

9                                )

10    COUNTY OF KING             )

11         I, the undersigned, under my commission as a Notary

12    Public in and for the State of Washington, do hereby

13    certify that the foregoing digitally recorded proceedings

14    were transcribed under my direction as a certified

15    transcriptionist; and that the transcript is true and

16    accurate to the best of my knowledge and ability; that I

17    am not a relative or employee of any attorney or counsel

18    employed by the parties hereto, nor financially

19    interested in its outcome.

20

21         Signed and dated this 14th day of January, 2014

22

23

24              by [s] Shanna Barr

25         SHANNA BARR, CETD